

**IT IS ORDERED as set forth below:**

**Date: September 29, 2021**

_____

**Barbara Ellis-Monro**
**U.S. Bankruptcy Court Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

| | |
|---|---|
| IN RE: | |
| BEAULIEU GROUP, LLC AND BEAULIEU TRUCKING, LLC, | CASE NO. 17-41677-BEM |
| Debtor. | |
| PHOENIX CORPORATE RECOVERY SERVICES, LLC f/k/a PMCM 2, LLC, LIQUIDATING TRUSTEE FOR THE ESTATES OF BEAULIEU GROUP, LLC, et al., | CHAPTER 11 |
| Plaintiff, | |
| v. | ADVERSARY PROCEEDING NO. 18-4027-BEM |
| JOSEPH ASTRACHAN et al, | |
| Defendants. | |

## **O R D E R**

This matter is before the Court on Defendants' *Motion to Dismiss* (the "Motion"). [Doc. 142]. The Motion requests dismissal of Plaintiff's *Amended Complaint* (the "AC") [Doc. 122] with prejudice. The AC, filed by Plaintiff, the Liquidating Trustee for Debtors Beaulieu Group, LLC ("Beaulieu") and Beaulieu Trucking, LLC (together, "Debtors"), asserts claims for Breach of Fiduciary Duties and Breach of Duty to Creditors (Counts 1, 10), Waste of Corporate Assets (Count 12), Avoidable Transfers (Counts 2-6), Unjust Enrichment (Counts 7, 9), Breach of Contract (Count 8), Recovery of Unlawful Distributions (Count 11), and Objections to Claims (Counts 13-28). Defendants are managers and officers of Beaulieu and entities affiliated with Beaulieu or its managers and officers.[1]

Defendants filed a joint brief in support of the Motion (the "Master Brief") [Doc. 143], as well as filing individual supplemental briefs. Plaintiff filed responses, and Defendants filed replies. The Motion is now ripe for decision. For the reasons explained herein, the Court will grant the Motion in part and deny the Motion in part.

# I. Preliminary Matters

## A. The AC Was Filed in Compliance With Rule 15

Defendants contend the AC was filed in violation of Federal Rule of Civil Procedure 15, made applicable in this proceeding by Federal Rule of Bankruptcy Procedure 7015,[2] because Plaintiff obtained neither leave of Court nor written consent from Defendants prior to filing the AC. Rule 15(a)(1) permits a party to amend its pleading once as a matter of course if, among other things, "the pleading is one to which a responsive pleading is required … 21 days

---

[1] Under the terms of a settlement agreement and joinder agreement approved by the Court on April 30, 2021 [Case No. 17-41677, Doc. 1989], all claims against Defendants Annette Cyr, Vincent Donargo, Ronald Steven Hillis, G. Michael Hofmann, Richard W. Roedel, Lawrence Rogers, Joyce White, and Rosanne B. St. Clair have been dismissed pursuant to a stipulation of dismissal. [Doc. 258].

[2] Federal Rules of Civil Procedure shall be referred to as "Rule" and Federal Rules of Bankruptcy Procedure shall be referred to as "Bankruptcy Rule."

after service of a motion under 12(b)[.]" Fed. R. Civ. P. 15(a)(1)(B). Otherwise, "a party may amend its pleading only with the opposing party's written consent or the court's leave." *Id.* 15(a)(2). The original complaint was filed on August 29, 2018. [Doc. 1]. Defendants filed a motion to dismiss the original complaint on January 7, 2019 [Doc. 75], such that the deadline for amending by right would have expired on January 28, 2019.

Plaintiff argues that the parties' multiple consent orders extending deadlines in this proceeding, including a consent order extending the "Deadline for Plaintiff to Respond to Any Motions filed in Response to the Complaint" to May 24, 2019 (the "Consent Order") [Doc. 120], extended the time for it to file an amended complaint by right or constituted written consent for Plaintiff to file an amended complaint. The AC was filed within the extended deadline on May 23, 2019. To the extent the Court requires a motion to amend, Plaintiff made such motion in its response to the Master Brief. [Doc. 170 at 17 n.11].

The Court agrees that the AC meets the requirements of Rule 15. The Consent Order did not limit the type of response Plaintiff could file to the prior motion to dismiss, and therefore the extension in the Consent Order applied to filing an amended complaint. But even if the Consent Order were not sufficient to extend the deadline in Rule 15(a)(1)(B), the Court finds it appropriate to allow the AC in light of the fact that the Motion to Dismiss has been fully briefed to the tune of more than 60 total briefs, responses, and replies.

### B. The AC Is Not a Shotgun Pleading

Defendants argue that the AC should be dismissed as an impermissible shotgun pleading. Such pleadings violate the requirement in Rule 8(a)(2) that a complaint include "a short and plain statement of the claim showing the pleader is entitled to relief" and/or the requirement in Rule 10(b) to state claims in numbered paragraphs limited to a single set of circumstances, and

stating each claim founded on a separate transaction in a separate count if doing so would promote clarity. *Weiland v. Palm Beach County Sheriff's Office*, 792 F.3d 1313, 1320 (11th Cir. 2015). "The unifying characteristic of all types of shotgun pleadings is that they fail to one degree or another, and in one way or another, to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Id.* at 1323.

The Eleventh Circuit has identified four categories of shotgun pleadings, as follows: (1) "a complaint containing multiple counts where each count adopts the allegations of all preceding counts, causing each successive count to carry all that came before and the last count to be a combination of the entire complaint"; (2) a complaint that is "replete with conclusory, vague, and immaterial facts not obviously connected to any particular cause of action"; (3) a complaint that fails to separate "into a different count each cause of action or claim for relief"; and (4) a complaint that asserts "multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against." *Id.* at 1321-23.

Defendants contend the AC is a shotgun pleading because (1) it asserts multiple claims against multiple defendants without sufficient specificity; (2) it re-alleges all allegations and all preceding counts into each subsequent count; and (3) it is replete with conclusory and vague allegations. [Doc. 143 at 15-20]. Although the AC is burdened with 649 paragraphs over nearly 150 pages and a multiplicity of conclusory statements, the Court cannot conclude that it is a shotgun pleading. The "Parties" section of the AC describes each defendant, including information such as position, dates of service, and relationship to Beaulieu or other defendants. [AC ¶ 6-46]. The "Factual Background" section of the AC identifies specific actions, inaction, and other conduct that form the basis of the various counts of the AC. [AC ¶ 68-365, 370-391]. Each count

4

identifies a specific cause of action and the defendants against which it is asserted. Although each count incorporates all preceding paragraphs, including those of the preceding counts, this is not fatal to the AC as many of the same relevant facts are common to multiple counts. Based on the foregoing, the Court cannot conclude that the AC fails to give Defendants adequate notice of the claims against them or the grounds upon which the claims rest. To the extent Defendants seek either dismissal or a direction for Plaintiff to restate the AC based on violations of Rule 8 and Rule 10, that request will be denied.

### C. The CAMI Trust Will Be Dismissed From the Proceeding

Plaintiff names The CAMI Trust as one of the defendants to this action as well as five individuals in their capacity as trustees of The CAMI Trust. Certain of the defendants argue that the Trust is not an entity with the capacity to sue or be sued, and therefore any claims against the Trust must be dismissed. [Doc. 163 n.1]. Plaintiff offered no response to this argument. [Doc. 185].

Rule 17, made applicable by Bankruptcy Rule 7017, requires an action to "be prosecuted in the name of the real party in interest" and provides that the trustee of an express trust may sue in its own name. Fed. R. Civ. P. 17(a)(1)(E). The Rule further provides that capacity to sue or be sued is determined "by the law of the state where the court is located" for parties other than an individual not acting in a representative capacity or a corporation. *Id.* 17(b)(3).

The Revised Georgia Trust Code of 2010, O.C.G.A. § 53-12-1 et seq., defines a trustee as "the person or persons holding legal title to the property in trust." O.C.G.A. § 53-12-2(16); *see also* O.C.G.A. § 53-12-200 ("A trustee shall have legal capacity under Georgia law to acquire, hold, and transfer title to property.") With some exceptions not relevant here, "'where the legal title is in a trustee, such trustee is the proper person to maintain or defend actions involving the *trust estate*.'" *Rollins v. Rollins*, 338 Ga. App. 308, 318, 790 S.E.2d 157, 165 (2016) (emphasis

added). *See also* O.C.G.A. § 53-12-6 (2010) (setting forth the jurisdiction for suits "by or against a trustee" vs. actions "concerning the construction, administration, or internal affairs of a trust").[3] Here, the claims involve the trust estate rather than the administration of the trust. Therefore, based on the foregoing, the Court concludes the trustees rather than The CAMI Trust are the appropriate defendants for claims against the Trust. Because the trustees have already been made defendants in their representative capacity, the Court will dismiss The CAMI Trust from this proceeding.

### D. The Court Lacks Personal Jurisdiction Over Beaulieu International

The AC asserts claims against Defendant Beaulieu International Group NV ("Beaulieu International")[4] for fraudulent transfers (Counts 2 and 3), liability for avoided transfers (Count 6), and unjust enrichment (Count 9). Beaulieu International seeks to dismiss the claims against it for lack of personal jurisdiction pursuant to Rule 12(b)(2), made applicable by Bankruptcy Rule 7012(b). When the summons and complaint are served in accordance with Bankruptcy Rule 7004 or the applicable provisions of Rule 4, then the Court may exercise personal jurisdiction over the defendant if doing so "is consistent with the Constitution and laws of the United States[.]" Fed. R. Bankr. P. 7004(f). Due process is satisfied if the defendant has sufficient minimum contacts with the forum so as not to "offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. State of Wash., Office of Unemployment Comp. & Placement*, 326 U.S. 310, 316, 66 S. Ct. 154, 158 (1945) (citation omitted). In this proceeding the relevant forum for minimum contacts is the United States. *In re Celotex Corp.*, 124 F.3d 619, 630 (4th Cir. 1997).

---

[3] O.C.G.A. § 52-12-6(b) was amended, effective January 1, 2021, to change the relevant language to actions "concerning the construction or administration of a trust …."

[4] The Court notes that the AC identified the defendant as "Beaulieu International Group" without the "NV" designation. Nevertheless, based on the allegations in the AC and the briefs of the parties, the Court is persuaded that the defendant is Beaulieu International Group NV, and that Plaintiff does not dispute same. [*See* AC ¶ 4, Doc.171].

The Eleventh Circuit has set forth the standard for analyzing a motion to dismiss for lack of personal jurisdiction as follows:

> The plaintiff has the burden of establishing a *prima facie* case of personal jurisdiction over a nonresident defendant. … A *prima facie* case is established if the plaintiff presents enough evidence to withstand a motion for directed verdict. … Where … the defendant submits affidavits to the contrary, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction unless those affidavits contain only conclusory assertions that the defendant is not subject to jurisdiction. … Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff.

*Meier ex rel. Meier v. Sun Int'l Hotels, Ltd*., 288 F.3d 1264, 1268–69 (11th Cir. 2002) (quotation marks and citations omitted).

The AC alleges Beaulieu International is based in Belgium, is owned by relatives of Defendant Mieke Hanssens, and upon information and belief transacts business in Georgia and operates a plant in Cartersville, Georgia. [AC ¶ 44]. The AC alleges that Beaulieu Fibres International NV, also based in Belgium, transacts business in Georgia and is a division of Beaulieu International. [AC ¶ 45, 306]. The AC alleges upon information and belief that Beaulieu was required to do business with Beaulieu Fibres and/or Beaulieu International. [AC ¶ 307]. The AC alleges that in July 2018 (post-petition), Beaulieu Canada was sold by Mieke Hannsens to Beaulieu International. [AC ¶ 293, 480]. The AC alleges that Beaulieu International benefitted from fraudulent transfers to Beaulieu Canada, unpaid Beaulieu Canada accounts receivables, and/or was the immediate or mediate transferee of fraudulent transfers to Beaulieu Canada, and that Beaulieu International benefitted from fraudulent transfers to Beaulieu Fibres, and/or was the immediate or mediate transferee of fraudulent transfers to Beaulieu Fibres. [AC ¶ 294, 314, 414, 418, 430, 460]. The AC alleges that Beaulieu International was unjustly enriched by acquiring

7

Beaulieu Canada because, based on information and belief, it (1) retained the benefit of goods received by Beaulieu Canada that are the subject of unpaid accounts receivable; (2) retained the benefit of Beaulieu Canada's failure to reimburse Beaulieu for certain obligations to U.S. Customs as required by contract; (3) and retained the benefit of certain fraudulent transfers received by Beaulieu Canada. [AC ¶ 484-85].

Personal jurisdiction may be either specific or general. With regard to specific, or case-linked, personal jurisdiction, "the suit must arise out of or relate to the defendant's contacts with the forum." *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty*., __ U.S. __, 137 S. Ct. 1773, 1780 (2017) (cleaned up). Specific jurisdiction requires contacts by the corporation that are "continuous and systematic, but also give rise to the liabilities sued on[.]" *Int'l Shoe Co.*, 326 U.S. at 317, 66 S. Ct. at 159. "The contacts must be the defendant's own choice and not 'random, isolated, or fortuitous,'" i.e., purposeful availment. *Ford Motor Co. v. Montana Eighth Judicial Dist. Ct*., __ U.S. __, 141 S. Ct. 1017, 1024 (2021) (quoting *Keeton v. Hustler Magazine, Inc*., 465 U.S. 770, 774, 104 S. Ct. 1473, 1478 (1984)). Specific jurisdiction does not require a causal connection between the claim and the defendant's conduct in the jurisdiction, but there must be some relationship between the two. *Id.* at 1026. None of the allegations in the AC support specific personal jurisdiction, as the claims against Beaulieu International are based on it benefitting from transfers initially made to other defendants and not based on any alleged operations, continuous and systematic or otherwise, in the United States.

General, or all-purpose, jurisdiction does not arise from the conduct complained of, but "may concern events and conduct anywhere in the world." *Ford*, 141 S. Ct. at 1024. Given that breadth, it does not require the same type of contacts as specific jurisdiction. *Id.* Rather it requires "continuous corporate operations within a state … so substantial and of such a nature as to justify

suit against it on causes of action arising from dealings entirely distinct from those activities." *Int'l Shoe Co.,* 326 U.S. at 318, 66 S. Ct. at 159. Therefore, the question is "not whether a foreign corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,' it is whether that corporation's 'affiliations with the State are so continuous and systematic as to render [it] essentially at home in the forum State.'" *Daimler AG v. Bauman*, 571 U.S. 117, 139, 134 S. Ct. 746, 761 (2014) (quoting *Goodyear Dunlop Tires Ops, S.A. v. Brown*, 564 U.S. 915, 919, 131 S. Ct. 2836, 2851 (2011)). The Supreme Court has explained that "a corporation's operations in a forum other than its formal place of incorporation or principal place of business" will be "so substantial and of such a nature as to render the corporation at home in that State" only in "exceptional" cases. *Daimler*, 571 U.S. at 139 n.19, 134 S. Ct. at 761 n.19; *Ford*, 141 S. Ct. at 1024. Accordingly, "[a] foreign corporation cannot be subject to general jurisdiction in a forum unless the corporation's activities in the forum closely approximate the activities that ordinarily characterize a corporation's place of incorporation or principal place of business." *Carmouche v. Tamborlee Mgmt., Inc*., 789 F.3d 1201, 1205 (11th Cir.2015); *Schulman v. Inst. for Shipboard Educ*., 624 F. App'x 1002, 1005 (11th Cir. 2015).

Beaulieu International provided the affidavit of Erwin De Deyn, its Chief Legal Officer, in which he avers that Beaulieu International (1) is a holding company incorporated in Belgium; (2) has never been registered to do business in any U.S. state; (3) has never maintained an office in the U.S. or had a U.S.-based telephone number; (4) has never operated a plant in any U.S. city, including Cartersville, Georgia; (5) has never owned or leased property in the U.S.; (6) has never maintained a bank account in the U.S.; (7) has never paid taxes or been obligated to pay taxes in the U.S.; and (8) has never had a registered agent in the U.S. [Doc. 148, Ex. A]. Based on the foregoing, Beaulieu International contends that this Court lacks personal jurisdiction over it.

Beaulieu International further argues that business transactions of its subsidiaries cannot be imputed to Beaulieu International for purposes of establishing jurisdiction.

In response, Plaintiff argues, without specificity, that Beaulieu International played an integral and pivotal role in the wrongful conduct alleged in the AC. Plaintiff also filed marketing materials through which it contends Beaulieu International publicly stated that it operated a plant in Cartersville. [Doc. 171 Ex. 1-3]. Exhibit 1 is a news release from the website of Beaulieu International dated April 7, 2018 and stating that the acquisition of Beaulieu Canada "adds a second manufacturing plant to Beaulieu Flooring Solutions' operations in the North American Market, next to its new … plant in Cartersville, Georgia." Exhibit 2 is a blurb from www.floordaily.net of a July 15, 2014 interview with Geert Roelens, who is identified in the interview as the CEO of Beaulieu International, regarding an announcement that the company "is building a manufacturing plant and a U.S. headquarters on one campus in Cartersville, Georgia," with a link to audio of the interview. In the interview, Mr. Roelens describes Beaulieu International's plans to build a Beaulieu International campus in Cartersville to locally manufacture product for the U.S. market, including a headquarters for U.S. operations. In the interview, he also says they have acquired 120 acres of land with the possibility of acquiring more. Additionally, he says the company already has a warehouse in Dalton, Georgia, where it stocks product that it produced in Belgium. Exhibit 3 is a July 14, 2014 press release from the Georgia Department of Economic Development announcing that Beaulieu International "will establish its U.S. headquarters and create 350 jobs in Cartersville over the next five years." Plaintiff also attacks the De Deyn affidavit as being self-serving and failing to make certain statements. But if the operation of a plant in Georgia is not sufficient to exercise jurisdiction, Plaintiff contends the Court has jurisdiction over Beaulieu International because it owns Beaulieu Canada and because

10

Beaulieu Fibres is a division of Beaulieu International. Finally, in a footnote in its response brief, Plaintiff requests jurisdictional discovery if the Court finds insufficient allegations for personal jurisdiction in the AC. [Doc. 171 n.3].

In its reply, Beaulieu International argues that the 2014 marketing materials talk about prospective investments in Cartersville and do not provide evidence about what actually happened. Furthermore, all the materials refer to "Beaulieu International Group" rather than "Beaulieu International Group, NV." The former is a conglomerate of companies, while the latter is the legal entity that is the Defendant here.[5] The conglomerate includes Beauflor USA, LLC, the Georgia company that owns the Cartersville plant.

With regard to the sufficiency of the De Deyn affidavit, "conclusory assertions of ultimate fact are insufficient to shift to [plaintiff] the burden of producing evidence supporting jurisdiction." *Posner v. Essex Ins. Co., Ltd.,* 178 F.3d 1209, 1215 (11th Cir. 1999). Therefore, the Court will "consider only those portions of the [De Deyn] Affidavit that set forth specific factual declarations within the affiant's personal knowledge." *Id.* If the statements fail to contradict the allegations in the AC, then the Court will accept the allegations in the AC as true. *Id.* The De Deyn affidavit is composed entirely of factual rather than conclusory statements. And each statement goes to the allegations that Beaulieu International owns and operates a plant in Cartersville. The affidavit denies Beaulieu International ever owned or leased property in the United States, ever operated a plant in the United States, and ever engaged in specific commercial activities such as holding a U.S. bank account or paying taxes in the United States. The affidavit is therefore sufficient to contradict the AC and shift the burden to Plaintiff on the issue of personal jurisdiction.

---

[5] See supra n.4.

The marketing materials provided by Plaintiff do not overcome the De Deyn affidavit. Plaintiff's exhibits lack probative value because the two 2014 documents refer to prospective events, and all the documents fail to specify the full legal name of the entity whose activities are described in the materials. Even if the Court were to conclude that when taken in the light most favorable to Plaintiff, the evidence shows that Beaulieu International does own and operate a plant in Cartersville—which the Court does not do—that is not sufficient to establish general personal jurisdiction because it is not the type of activity that "closely approximate[s] the activities that ordinarily characterize a corporation's place of incorporation or principal place of business." *Carmouche*, 789 F.3d at 1205.

Next, the Court considers whether it may exercise personal jurisdiction based on the contacts of Beaulieu Canada, which is alleged to be owned by Beaulieu International,[6] and Beaulieu Fibres, which is alleged to be a division of Beaulieu International.[7] Plaintiff cites *Coca-Cola Co. v Procter & Gamble Co*., 595 F. Supp. 304 (N.D. Ga. 1983), in support of its argument that the Court may exercise personal jurisdiction over Beaulieu International based on the contacts of its subsidiaries. In *Coca Cola*, the court held "that neither the Due Process Clause nor traditional notions of fair play and substantial justice preclude the exercise of personal jurisdiction over a parent corporation if the parent's control over the subsidiaries' activities is so complete that the subsidiary is, in fact, merely a division or department of the parent." 595 F. Supp. at 308. The court set forth a number of ways in which the defendant exercised control over its subsidiaries, including

---

[6] Beaulieu International asserts that it purchased all the issued and outstanding shares of Beaulieu Canada, such that it is a shareholder of Beaulieu Canada, and it has filed under seal a redacted copy of the Share Transfer Agreement, dated June 28, 2018. [Doc. 148 at 8; Doc. 241].

[7] Beaulieu International contends that Beaulieu Fibres is not a division but is a separate legal entity, but did not provide any supporting evidence of this statement. [Doc. 148 n.3].

sharing directors and officers, providing centralized functions for the subsidiaries, and preparing consolidated tax returns. *Id.* at 307.

More recently, in *Daimler*, the Supreme Court ruled that "California courts could not exercise general personal jurisdiction over a German company with a wholly owned subsidiary that did business in California, even though the subsidiary served as the parent's exclusive importer and distributor in the United States and was the largest supplier of luxury vehicles to the California market, and even if the subsidiary's contacts with California were imputable to the parent." *Schulman v. Inst. for Shipboard Educ.*, 624 F. App'x 1002, 1005 (11th Cir. 2015) (citing *Daimler*, 571 U.S. at 124, 134 S. Ct. at 752). The Court held that even with the subsidiary's contacts attributed to it, the defendant was not at home in California. 571 U.S. at 136, 134 S. Ct. at 760. In so ruling, the Court noted that neither the defendant nor the subsidiary was incorporated in California nor had its principal place of business there. *Id.* at 139, 134 S. Ct. at 761. "If [the defendant's] California activities sufficed to allow adjudication of this Argentina-rooted case in California, the same global reach would presumably be available in every other State in which [the subsidiary's] sales are sizable. Such exorbitant exercises of all-purpose jurisdiction would scarcely permit out-of-state defendants 'to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.'" *Daimler*, 571 U.S. at 139, 134 S. Ct. at 761-62 (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 105 S. Ct. 2174, 2182 (1985)).

The AC alleges Beaulieu Canada is a Canadian company owned and controlled by Mieke Hanssens with its principal place of business in Quebec, with the same CEO as Beaulieu until 2016, that transacted business in Georgia, had a registered agent in Georgia, operated a plant in Georgia, and transacted business with Beaulieu in a manner that harmed Beaulieu. [AC ¶ 26,

39, 124, 271-276, 284-291]. The AC also alleges that Beaulieu Canada and Beaulieu entered into a Master Sales Agreement on March 1, 2001 and that they entered into a Letter Agreement dated May 22, 2017 related to Beaulieu's disclosures to U.S. Customs regarding carpet products imported into the United States. [AC ¶ 282, 288, 469, 473]. Beaulieu sold yarn, carpet backing, residential carpet and commercial carpet to Beaulieu Canada. [AC ¶ 272]. And Beaulieu Canada sold commercial and residential carpet to Beaulieu. [AC ¶ 273]. During the four years prior to the petition date, the accounts receivable due from Beaulieu Canada to Beaulieu were repeatedly reduced by purported Beaulieu Canada accounts payable offsets, which are set forth in Exhibit W. [AC ¶ 284]. The AC alleges Beaulieu Canada is an initial transferee of fraudulent and/or preferential transfers, of which Beaulieu International is an immediate or mediate transferee. [AC ¶ 418, 430, 460]. Beaulieu Canada filed claims in the bankruptcy case, including a reclamation claim, a 503(b)(9) request, two proofs of claim, and an administrative expense claim. [AC ¶ 390]. The alleged harmful transactions were purported to have taken place during the four years prepetition, and Beaulieu International did not acquire Beaulieu Canada until after the petition date. Similarly, the shared CEO was terminated in 2016, prior to Beaulieu International's acquisition of Beaulieu Canada.

The AC alleges Beaulieu Fibres is a Belgian company and a division of Beaulieu International, both of which are owned by relatives of Mieke Hanssens, with its principal place of business in Belgium and a sales office in White, Georgia, which transacts business in Georgia, and that also transacted business with Beaulieu[8] in a manner that harmed Beaulieu. [AC ¶ 45, 306-307, 311-312]. A list of payments from Beaulieu to Beaulieu Fibres is set forth in Exhibit Y. [AC ¶ 307, 311]. The AC alleges that Beaulieu Fibres is an initial transferee of fraudulent and/or

---

[8] The AC does not specify what product or service Beaulieu Fibres provided to Beaulieu.

preferential transfers, for which Beaulieu International is an immediate or mediate transferee. [AC ¶ 418, 430, 460].

Even if the activities of Beaulieu Canada and Beaulieu Fibres were imputed to Beaulieu International, the Court cannot conclude that Plaintiff has shown that they establish general or specific personal jurisdiction over Beaulieu International, given that the AC does not allege facts showing Beaulieu International exercised the type of control seen in *Coca Cola*, nor does it allege facts showing that either Beaulieu Canada or Beaulieu Fibres engaged in activities rendering them at home in the United States.

Finally, the Court turns to Plaintiff's request for jurisdictional discovery. Whether to allow discovery in aid of jurisdiction is within the discretion of the court. *In re Takata Airbag Products Liability Litigation*, 396 F. Supp.3d 1101, 1156 (2019). "[J]urisdictional discovery is favored where there is a genuine dispute concerning jurisdictional facts necessary to decide the question of personal jurisdiction; it is not an unconditional right that permits a plaintiff to seek facts that would ultimately not support a showing [of] personal jurisdiction." *Bernardele v. Bonorino*, 608 F. Supp. 2d 1313, 1321 (S.D. Fla. 2009); *see also Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 730 (11th Cir. 1982). Furthermore, failing to "take … reasonable steps to seek discovery, or a deferral of a ruling pending discovery" while a motion to dismiss is pending, burying a request for jurisdictional discovery in a brief, and failing to specify the information the plaintiff seeks or "how that information would bolster [the plaintiff's] allegations" justify denial of a request for jurisdictional discovery. *United Technologies Corp. v. Mazar*, 556 F.3d 1260, 1281 (11th Cir. 2009); *Wolf v. Celebrity Cruises, Inc.*, 683 F. App'x 786, 792 (11th Cir. 2017). Here, Plaintiff buried its request for discovery in a footnote in its brief rather than filing a formal motion for discovery, Beaulieu International asserts in its reply brief that Plaintiff made no further efforts

to pursue either formal or informal discovery in the more than 13 months that the Motion to Dismiss has been pending [Doc. 216 at 12],[9] and Plaintiff has not specified what information it will seek or how that information will demonstrate personal jurisdiction. Furthermore, given the above analysis, it is not clear what facts Plaintiff could adduce that would demonstrate personal jurisdiction over Beaulieu International. Accordingly, the Court will deny the request for discovery.

Based on the foregoing, the Court concludes that it lacks personal jurisdiction over Beaulieu International. As a result, all claims against Beaulieu International will be dismissed.

**E. Entry of Final Orders**

Pursuant to 28 U.S.C. § 1334(b) "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." This provision creates jurisdiction in three categories of proceedings: those that "arise under title 11," those that "arise in cases under title 11," and those "related to cases under title 11." The jurisdiction of the bankruptcy court is derived from and dependent upon these three bases. *Celotex Corp. v. Edwards*, 514 U.S. 300, 307, 115 S. Ct. 1493, 1498 (1995).

Matters that "arise under" title 11 are matters that invoke a substantive right created by the Bankruptcy Code. *Toledo v. Sanchez (In re Toledo)*, 170 F.3d 1340, 1345 (11th Cir. 1999). Matters that "arise in a case under" title 11 generally are administrative type matters or "matters that could arise only in bankruptcy." *Id.* (citing *Wood v. Wood (In re Wood)*, 825 F.2d 90, 97 (5th Cir.1987)). Matters that are "related to" are matters in which "the outcome of the proceeding could conceivably have an effect on the estate[.]" *Id.* (quoting *Miller v. Kemira, Inc. (In re Lemco Gypsum, Inc.)*, 910 F.2d 784, 788 (11th Cir.1990)).

---

[9] Plaintiff did not allege that it has pursued formal or informal discovery and the docket does not disclose any such efforts.

The Court's jurisdiction is further divided into core jurisdiction, in which the Court has statutory authority to enter final orders and judgments, and non-core jurisdiction, in which the Court requires consent of the parties to enter final orders and judgments. *Wellness Intern. Network, Ltd. v. Sharif*, 575 U.S. 665, ___, 135 S. Ct. 1932, 1940 (2015); 28 U.S.C. § 157(b)(1). Related-to matters generally fall into non-core jurisdiction. This proceeding includes a number of non-core matters, including the claims for breach of duties and waste, unjust enrichment, breach of contract, and unlawful distributions, all of which arise under non-bankruptcy law and can arise outside of bankruptcy. Therefore, without consent of the parties to enter final orders, the Court must submit proposed findings of fact and conclusions of law to the district court. *Id.*

A number of Defendants have indicated that they do not consent to entry of final orders by the Bankruptcy Court at this time. [Docs. 144 at 12, 145 at 10, 147 at 8, 148 at 12, 150 at 11, 151 at 5, 153 at 11, 154 at 5, 155 at 4, 157 at 2, 158 at 2, 160 at 10, 163 at 19, 162 at 14]. However, an order on a motion to dismiss is not final and appealable unless it adjudicates all the claims against all the parties or unless the Court certifies the order as final under Rule 54(b). *Lloyd Noland Found., Inc. v. Tenet Health Care Corp.*, 483 F.3d 773, 777 (11th Cir. 2007). As set forth below, this Order does not adjudicate all the claims against all Defendants, and the Court does not find it appropriate at this time to sua sponte certify the order under Rule 54(b).[10] Therefore, the Order is not a final order and need not be submitted to the district court as proposed findings and conclusions.

## II. Legal Standard Under Rule 12(b)(6)

Defendants seek dismissal of the AC pursuant to Rule 12(b)(6), made applicable by Bankruptcy Rule 7012(b), for failure to state a claim upon which relief can be granted. To

---

[10] No party has requested such certification.

survive such a motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' … A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (citations omitted). Although the complaint "does not need detailed factual allegations" to survive a motion to dismiss, it "requires more than labels and conclusions[;] a formulaic recitation of the elements of a cause of action will not do[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S. Ct. 1955, 1964-65 (2007). "Factual allegations must be enough to raise a right to relief above the speculative level[.]" *Id.*, 127 S. Ct. at 1965. But, "conclusory allegations ... or legal conclusions masquerading as facts will not prevent dismissal." *Bamert v. Pulte Home Corp*., 445 F. App'x 256, 265 (11th Cir. 2011) (citation omitted).

The parties dispute the extent to which the Court can take as true allegations made on information and belief. Defendants contend that at least 150 allegations are made on information and belief, and that the Court need not take such allegations as true. [Doc. 143 at 26 and n.20]. Plaintiff argues the Court may take such allegations as true if, as in its AC, they are supported by other factual allegations. [Doc. 170 n.8]. Defendants cite *Smith v. City of Sumiton*, 578 F. App'x 933 (11th Cir. 2014), for the proposition that that judges "do not have to take as true allegations based merely 'upon information and belief.'" *Id.* at 935 n.4 (citing *Mann v. Palmer*, 713 F.3d 1306, 1315 (11th Cir. 2013)). But that does not mean the Court can or should disregard all such allegations. Rather it can disregard those that are conclusory and unsupported by facts to make the allegation plausible. *See Mann v. Palmer*, 713 F.3d at 1315 (citing *Twombly*, 550 U.S. at 544, 127 S. Ct. at 1962-63); *see also Associated Ind. Ins. Co., Inc. v. Advanced Mgmt. Servs., Inc.*, No. 12-80393, 2013 WL 1149668, at *6 (S.D. Fla. March 19, 2013) ("The *Twombly*

18

plausibility standard … does not prevent a plaintiff from pleading facts alleged upon information and belief where the belief is based on factual information that makes the inference of culpability plausible.") (cleaned up). Therefore, to the extent allegations made on information and belief are supported by other factual matter, the Court will assume their truth for purposes of this Motion. The Court will not accept as true any allegations that are conclusory or speculative or that attempt to characterize facts.

Defendants attached a copy of Beaulieu's Second Amended and Restated Operating Agreement to the Master Brief (the "Operating Agreement" or "Op. Agmt") [Doc. 143, Ex. A]. Plaintiff argues the Court may not consider the Operating Agreement because it is not mentioned in the Complaint. [Doc. 170 n.19]. If, on a motion to dismiss under Rule 12(b)(6), the Court considers matters outside the pleadings, the motion must be treated as a motion for summary judgment and the "parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); Fed. R. Bankr. P. 7012(b). However, the Court "may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed. In this context, 'undisputed' means that the authenticity of the document is not challenged." *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005). In *Horsley v. Feldt*, the court described this as the "incorporation by reference" doctrine. 304 F.3d 1125, 1134 (11th Cir. 2002). A document does not have to be attached to a complaint to be incorporated by reference "if the document's contents are alleged in a complaint and no party questions those contents[.]" *Day*, 400 F.3d at 1276; *see Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 322, 127 S. Ct. 2499, 2509 (2007) (noting that "when ruling on Rule 12(b)(6) motions to dismiss" courts ordinarily

examine "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice").

Here, the AC does not expressly mention the Operating Agreement, but Defendants contend the AC references the Operating Agreement: "For example, Paragraph 94 [of the AC] is modeled after Section 5.9 of the Operating Agreement, both of which pertain to the need for Board of Managers' consent for 'major' decisions, including 'significant' changes in the nature of the Debtor's business." [Doc. 200 n.12]. In addition to this example, the AC includes other indirect references to and what appears to be unattributed paraphrasing or quotation of language in the Operating Agreement, such as: (1) Beaulieu's business and affairs were managed by a board of directors titled its Board of Managers. [AC ¶ 4; Op. Agmt § 5.1 & Amendment No. 6, March 28, 2016]; (2) description of the duties of individuals serving as CEO and President, including responsibility for administration of Beaulieu and its business as well as its day-to-day affairs, including the development and supervision of its policies, the selection and supervision of officers and the active management of its financial affairs, and "express authority"[11] to execute agreements and instruments on behalf of Beaulieu. [AC ¶ 7, 8; Op. Agmt § 5.19(b)(i). (ii), & Amendment No. 1, June 14, 2007]; and (3) beginning in 2016, The CAMI Trust has exclusive authority to appoint managers to the Board [AC ¶ 79; Op. Agmt § 5.1, Amendment No. 6, March 28, 2016].

Based on the foregoing, the Court concludes that the Operating Agreement is referenced in the AC, is central to Plaintiff's claims, and is undisputed as to authenticity such that the Court may consider it on the Motion to Dismiss. *See Financial Sec. Assur., Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1284-85 (11th Cir. 2007) (when the complaint referred to the existence of an insurance policy and relied on the effect of the policy, but did not quote the policy or discuss its

---

[11] The source of this "express authority" is the Operating Agreement.

specific provisions, and when the plaintiff would have to offer the policy to prove its case, the court could consider the policy on a motion to dismiss even though it was outside the pleadings).

## III. General Allegations

### A. Background

Debtors filed for bankruptcy on July 16, 2017 (the "Petition Date"). [AC ¶ 56]. Prior to its bankruptcy, Beaulieu was one of the largest vertically integrated carpet manufacturers in North America and was engaged in the distribution of carpet and hard surface flooring products in both residential and commercial markets in the United States and many foreign countries. [AC ¶ 2]. The AC identifies the following Defendants as Beaulieu's former directors, managers, officers, and equity owners: Joseph Astrachan, Ralph Boe, Carl M. Bouckaert, Nicolas E. Bouckaert (individually and as trustee of The CAMI Trust), Stanislas A. Bouckaert (individually and as trustee of The CAMI Trust), Stephanie C. Bouckaert (individually and as trustee of The CAMI Trust), Constance Cantrell, Mieke D. Hanssens, Nathalie B. Pollard[12] (individually and as trustee of The CAMI Trust), Leo Van Steenberge (the "Managers"), Del Land, David A. Marr (individually and as trustee of The CAMI Trust), J. Michael Pollard, and Karel Vercruyssen (the "Officers" and with the Managers, the "D&O Defendants"). The AC identifies the following entities and individuals as affiliated with Beaulieu and/or as having conducted business with Beaulieu: South Richmond Chemicals, LLC, Pinnacle Polymers, LLC, Marglen Industries, Inc., Centaur Technologies, LLC, CEEA, LLC, OneSource Sample, LLC, Leinster Global, Inc., Avalon Industrial Products, LLC, Sabuka, LLC; Renuco Recycling Company, LLC, Beaulieu Canada Company, Inc., Centaur Properties, LLC, Centaur Marketing Group, LLC, Centaur Equestrian,

---

[12] The *Joint Consolidated Motion to Dismiss Amended Complaint* identifies Nathalie Pollard as "Nathalie E. Bouckaert f/k/a Nathalie B. Pollard." [Doc. 142 n.1]. For purposes of this Order, the Court will refer to her as Nathalie Pollard.

LLC (the "Bouckaert Affiliates" or "Affiliates"), Centaur Consolidated Companies, LLC, Beaulieu Fibres International NV, and John Bryant.

Defendants Carl Bouckaert and Mieke Hanssens formed Beaulieu in 1978. Defendants Nicolas, Stanislas, and Stephanie Bouckaert, and Nathalie Pollard are the adult children of Carl Bouckaert and Mieke Hannsens (the "Bouckaert Children" and with Carl Bouckaert and Mieke Hannsens the "Bouckaert Family" or the "Family"). Defendant J. Michael Pollard was Nathalie's husband. The CAMI Trust is the majority owner and member of Beaulieu. The Bouckaert Children are the trustees and the beneficiaries of The CAMI Trust. David Marr is also a trustee of The CAMI Trust. The remaining D&O Defendants are alleged to have served on Beaulieu's Board of Managers and/or as officers of Beaulieu.

**B. Management of Beaulieu**

Beaulieu's affairs were managed by a board of directors titled as its Board of Managers (the "Board of Managers" or the "Board"). [AC ¶ 4]. Beaulieu's Board of Managers had full and complete authority and discretion over Beaulieu's business decisions, including the appointment of officers of Beaulieu. [AC ¶ 82]. The officers of Beaulieu served at the pleasure of the Board, which had the power to set the duties and authorities of the officers. [AC ¶ 83]. The Board also had the power to remove officers of Beaulieu, except for Carl Bouckaert and Mieke Hanssens, who the Board could not remove without their prior written consent. [AC ¶ 84]. The Chairman of the Board had further authority to appoint additional officers and to remove such Chairman-appointed officers. [AC ¶ 85]. The Board was required to obtain the consent of the members of Beaulieu (Carl Bouckaert, Mieke Hannsens, and The CAMI Trust) related to certain "major" decisions of the company, including significant changes in the nature of Beaulieu's business. [AC ¶ 94].

During the relevant time period, the Operating Agreement provided that the Board would include one or more "independent" managers. [Op. Agmt Amend. 4, Feb. 23, 2012 § 5.2 (one independent manager); Amend. 5, Aug. 25, 2014 § 5.2 (one independent manager); Amend. 6, March 28, 2016 § 5.3 (three independent managers)]. An independent manager is defined as

> a Manager who is not affiliated with the Company or any of its subsidiaries and who does not receive any consulting fee, advisory fee or other compensation from the Company, other than in his or her capacity as a member of the Board of Managers or any committee thereof. For purposes of this definition, "affiliated" means no prior or current family, financial or personal relationship with the Company, its subsidiaries, Carl M. Bouckaert, Mieke De Clerck Hanssens, or any member of the Board of Managers of the Company.

[Op. Agmt, Amend. 1, June 14, 2007, § 1.1]. The 2016 amendment to the Operating Agreement provided the additional caveat that the independent managers "are not related by blood or marriage" to the Bouckaert Family Defendants. [Op. Agmt, Amend. 6, March 28, 2016 § 5.3]. The AC does not allege which, if any, of the D&O Defendants were independent managers.

By reason of their positions as officers, directors, managers, and/or fiduciaries of Beaulieu and because of their ability to control the business and corporate affairs of Beaulieu, the D&O Defendants owed Beaulieu fiduciary obligations and were required to act in the best interests of Beaulieu and not in furtherance of their personal interest or benefit, and were required to act with the care that an ordinarily prudent person in a like position would exercise under similar circumstances. [AC ¶ 50]. Each D&O Defendant owed Beaulieu the fiduciary duty to exercise good faith and diligence in the management and administration of Beaulieu's affairs and in the use and preservation of its property and assets. [AC ¶ 51, 54]. To discharge their duties, the D&O Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of Beaulieu and its assets. [AC ¶ 53].

The D&O Defendants, because of their positions of control and authority as directors and/or officers of Beaulieu, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of in the AC. [AC ¶ 52]. The conduct of the D&O Defendants involves violations of their obligations as directors and officers of Beaulieu and a reckless disregard for their duties to Beaulieu and/or its creditors that the D&O Defendants were aware or should have been aware posed a risk of serious injury to Beaulieu. [AC ¶ 54].

Each of the D&O Defendants engaged in a variety of self-dealing and above-market transactions to benefit themselves, the Bouckaert Family, and the Bouckaert Affiliates. [AC ¶ 397]. They knew or should have known of the impact of the transactions. [AC ¶ 398]. To the extent they did not directly cause the transactions, the D&O Defendants turned a blind eye to them. [AC ¶ 399]. Each of the D&O Defendants failed to put in place, implement, and/or enforce meaningful controls and procedures to monitor and control transactions with Bouckaert Affiliates or to conduct appropriate due diligence. [AC ¶ 400-401].

### C. Failure to Respond to Shift in Consumer Preferences

As one of the largest carpet manufacturers in North America, Beaulieu developed what appeared to be a vertically integrated (from resin-to-carpet) manufacturing and distribution operation that ran from raw materials to carpet manufacturing through sales and distribution. [AC ¶ 65]. Approximately 87% of Beaulieu's sales were carpet-related. [AC ¶ 67]. In the years prior to the Petition Date, consumer preference shifted away from carpet products toward hardwood flooring and similar products, but the D&O Defendants failed to respond to the changing market. [AC ¶ 68, 315-316]. Such failure resulted in declining revenue from over $1 billion in 2007 to approximately $525 million in 2016. [AC ¶ 69]. Upon information and belief, the Bouckaert Family kept Beaulieu focused on carpet sales because a number of the Bouckaert Affiliates'

survival depended on Beaulieu's carpet sales. [AC ¶ 317]. Each of the D&O Defendants failed to respond to shifting consumer preferences toward hardwood and other flooring and caused Beaulieu to continue to focus on the carpet industry to benefit the Bouckaert Affiliates. [AC ¶ 403].

### D. Affiliate Transactions

Certain officers of Beaulieu appointed by the Board of Managers had the ability to bind Beaulieu and enter into agreements and other instruments. [AC ¶ 88]. Certain of the D&O Defendants required Beaulieu to enter into agreements and transact business with the Bouckaert Affiliates, which were owned or controlled by the Bouckaert Family and/or Michael Pollard. [AC ¶ 90, 119]. Several of the Bouckeart Affiliates had only one customer—Beaulieu—and were formed for the sole purpose of engaging in transactions with Beaulieu such that their survival and profitability depended on Beaulieu continuing to do business with them. [AC ¶ 91].

The Affiliates served as middlemen that were used to mark up transaction costs for products, chemicals, or services needed by Beaulieu, which resulted in Beaulieu overpaying the Bouckaert Family and/or Affiliates. [AC ¶ 96]. During the four years preceding the Petition Date, the Bouckaert Affiliates received more than $352 million in transfers and offsets from Beaulieu. [AC ¶ 116]. The D&O Defendants approved Beaulieu's relationships with the Affiliates and knew or should have known the one-sided nature of the relationships and/or failed to adequately inform themselves of the nature and impact of the relationships. [AC ¶ 137, 150, 165, 181, 193, 209, 223, 236, 248, 265, 278, 300, 309].

The D&O Defendants allowed the direct transfers of Beaulieu's funds to the Bouckaert Affiliates, often to purchase products regardless of whether those products were of the best quality or purchased for the best price. [AC ¶ 98, 401-402]. Some of the transactions took place without any written agreements with Beaulieu. [AC ¶ 117]. These transactions personally

benefited the Bouckaert Family and Affiliates, caused financial damage to Beaulieu, and contributed to Beaulieu's insolvency. [AC ¶ 99-100, 118]. The D&O Defendants knew or should have known of the Affiliate transactions due to their positions, and they knew their positions at Beaulieu and their compensation depended on continuing to allow the Affiliate transactions. [AC ¶ 101, 121]. By allowing these transactions to occur and to continue, all the D&O Defendants contributed to Beaulieu's insolvency and caused hundreds of millions of dollars in damages to Beaulieu and its creditors. [AC ¶ 122]. A list of transfers from Beaulieu to the Bouckaert Affiliates is attached to the AC in Exhibits M to Y.

### E. Line of Authority Policy

Beaulieu had a "line of authority" policy that governed the type of transactions that required approval by the Board. [AC ¶ 105]. Upon information and belief, historically, Affiliate and related-party transactions technically required Board of Managers' approval under this policy, but because of the Bouckaert Family's control over the Board and officers, the approval added virtually no oversight to transactions with the Affiliates. [AC ¶ 106]. In May 2015, the Board of Managers unanimously approved a revision to the line of authority policy that allowed Beaulieu's CEO to approve transactions with Affiliates of up to $100,000. [AC ¶ 107-108, 111]. Board members failed to inform themselves of how the revision would impact Beaulieu and/or knew the true purpose of the revision. [AC ¶ 110]. The unanimous approval of the revision reflects the D&O Defendants' failures to monitor and control insider transactions and their knowledge and awareness of the ongoing Affiliate transactions and the large amounts of money at issue. [AC ¶ 113-114].

### F. Attempts to Refinance Out Bank of America

As of the Petition Date, Debtors owed approximately $51.7 million to lenders, including Bank of America, secured by a first-priority lien in liquid assets, including accounts and inventory, and a second priority lien in real estate, machinery, and equipment. [AC ¶ 70-71, 319]. As of the Petition Date, Beaulieu also owed approximately $15.8 million to Cygnets, LLC, which is owned and managed by Mieke Hanssens and which asserted a first priority lien on the Debtors' real estate and equipment and a second priority lien on the Debtors' accounts receivable and inventory. [AC ¶ 320]. As of the Petition Date, Beaulieu also owed approximately $6 million to CT Lender, LLC, which is owned by The CAMI Trust for the benefit of the Bouckaert Children. [AC ¶ 321]. The Bank of America loan matured shortly before the Petition Date on June 30, 2017 and prior to that, the Debtors executed eight forbearance agreements with Bank of America. [AC ¶ 322].

For months before the Petition Date and during the continued forbearances of the Bank of America secured loan, the Bouckaert Family, and in particular Mieke Hanssens, attempted to work out an insider deal to finance out Bank of America. [AC ¶ 323]. Upon information and belief, the Bouckaert Family sought an insider deal so that they could maintain control over Beaulieu and force Beaulieu to continue to conduct business with the Bouckaert Affiliates. [AC ¶ 324]. Had the Bouckaert Family not repeatedly attempted to work out an insider deal to benefit themselves, Beaulieu would likely have been able to successfully refinance with Bank of America before the loan matured, reorganize and/or would have been worth a lot more in a sale transaction. [AC ¶ 325]. These actions resulted in less being available to unsecured creditors in the bankruptcy proceedings. [AC ¶ 326]. Each of the D&O Defendants allowed the Bouckaert Family's repeated

27

attempts to construct an insider deal to finance out Bank of America to the detriment of Beaulieu's

business. [AC ¶ 404].

### G. Payment of Compensation and Distributions

During the four years before the Petition Date, certain of the D&O Defendants

caused Beaulieu to pay them above-market salaries, fees, bonuses and other amounts, for which

Beaulieu did not receive reasonably equivalent value. [AC ¶ 332, 335-362 & Ex. Z]. The payments

are set forth in Exhibit Z to the AC.

## IV. Counts 1, 10, and 12: Breach of Duties

### A. Overview

In Count 1 of the AC, Plaintiff seeks to hold the D&O Defendants liable for breach

of fiduciary duties to Beaulieu.[13] In Count 10 of the AC, Plaintiff seeks to hold the D&O

Defendants liable for breach of duty to creditors. In Count 12 of the AC, Plaintiff seeks to hold the

D&O Defendants liable for waste of corporate assets. Beaulieu was organized under the laws of

Georgia. [Op. Agmt § 2.1]. In Georgia, to state a claim for breach of fiduciary duty, Plaintiff must

allege facts showing: "(1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage

proximately caused by the breach." *Sewell v. Cancel*, 331 Ga. App. 687, 689, 771 S.E.2d 388, 391

(2015) (citation omitted). To establish breach of duty to creditors, Plaintiff must show the same

elements but also must allege insolvency of the corporation. *Georgia Commercial Stores, Inc. v.

Forsman*, 342 Ga. App. 542, 547, 803 S.E.2d 805, 810-11 (2017). Waste of corporate assets is a

---

[13] The AC does not specify what the relevant time period is for purposes of the claims for breach of fiduciary duty.
But it appears that a four-year statute of limitations applies. *See Huddle v. Heindel*, 347 Ga. App. 819, 823, 821 S.E.2d
61, 66 (2018) ("Georgia has no specific statute of limitation for breach of fiduciary duty claims. Instead, [courts]
examine the injury alleged and the conduct giving rise to the claim to determine the appropriate statute of limitation.
… [T]he statute of limitation for a cause of action for breach of fiduciary duty is triggered by a wrongful act
accompanied by any appreciable damage.") (internal quotation marks and citations omitted); *see also Rollins v. LOR,
Inc.*, 345 Ga. App. 832, 815 S.E.2d 169 (2018) (applying a four-year statute of limitations to a breach of fiduciary
duty claim when economic losses were alleged); O.C.G.A. § 9-3-31 ("Actions for injuries to personalty shall be
brought within four years after the right of action accrues."); *Antley v. Small*, 859 S.E.2d 881, 889 (Ga. Ct. App. 2021).

type of breach of fiduciary duty. *Knieper v. Forest Grp. USA, Inc.*, No. 4:15-CV-00222-HLM,
2016 WL 9449794, at *5 (N.D. Ga. Sept. 12, 2016), order clarified, No. 4:15-CV-00222-HLM,
2017 WL 3449601 (N.D. Ga. Jan. 23, 2017).

### B. Legal Argument and Analysis

Defendants argue that the AC fails to state a claim for breach of fiduciary duty
because it seeks to hold each D&O Defendant—regardless of position, scope of authority, and
dates of service—liable for (1) each transaction with the Bouckaert Affiliates that was allegedly
approved by the Board from July 2013 to July 2017; (2) Beaulieu's alleged failure to move from
carpet to hardwood flooring; (3) the allegedly improper attempts to finance out Bank of America;
and (4) the allegedly unlawful distributions made by Beaulieu in 2013 and 2014. More specifically,
Defendants argue that (1) the AC relies on conclusory and speculative allegations that are lacking
in factual support;[14] (2) officers and managers only owe fiduciary duties with respect to actions
taken when they were serving as officers and managers; (3) officers and managers can only be
liable for transactions that they played a role in approving, and with regard to officers, if they had
the ability to prevent the challenged transactions and conduct; (4) Georgia's safe harbor statute,
O.C.G.A. § 14-11-307, applies to managers when the challenged transactions were approved by
"qualified" managers and applies to transactions approved by the CEO under the line of authority
policy when the CEO had no conflicting interest in the transaction; and (5) the exculpation clause
in the Operating Agreement limits managers' liability except in cases of intentional misconduct, a
knowing violation of law, or a transaction resulting in a personal benefit that is prohibited by the
Operating Agreement.

---

[14] As stated in Part II, the Court will not take such allegations as true, even if the Order cites to such allegations for context.

**1. Fiduciary Duties Owed by Officers, Managers, and Trustees of The CAMI Trust**

The first element of a breach of fiduciary duty claim is showing the existence of a duty. The duties of members and managers of an LLC are set forth in the Georgia Limited Liability Company Act, O.C.G.A. § 14-11-100 et seq., as follows:

> In managing the business or affairs of a limited liability company:
>
> (1) A member or manager shall act in a manner he or she believes in good faith to be in the best interests of the limited liability company and with the care an ordinarily prudent person in a like position would exercise under similar circumstances. … Except as otherwise provided in the articles of organization or a written operating agreement, a person who is a member of a limited liability company in which management is vested in one or more managers, and who is not a manager, shall have no duties to the limited liability company or to the other members solely by reason of acting in his or her capacity as a member[.]

O.C.G.A. § 14-11-305(1). The Operating Agreement provides for Beaulieu to be managed by a Board of Managers. [Op. Agmt § 5.1]. Therefore, under Georgia law, the managers of Beaulieu "owe a fiduciary duty to the company and its members." Kaplan's Nadler Ga. Corp., LP, and LLC, § 18:17 (2019) (citing *Internal Medicine Alliance, LLC v. Budell*, 290 Ga. App. 231, 659 S.E.2d 668 (2008)). Accordingly, the AC sufficiently alleges the existence of fiduciary duties by those alleged to have served on the Board for at least the period of their service: Carl M. Bouckaert (voting member 2006-2016, non-voting member 2016-2017), Nicolas E. Bouckaert (2009-2017), Stanilas A. Bouckaert (2009-2017), Stephanie C. Bouckaert (2013-2017), Mieke Hanssens (voting member 2006-2016, non-voting member 2016-2017), Nathalie B. Pollard (2013-2017), Joseph Astrachan (2014-2016), Ralph Boe (2006-2014), Constance Cantrell (2014-2016), and Leo Van Steenberge (2013-2017).

While the fiduciary duties of managers of an LLC are set forth in the Georgia Limited Liability Company Act, the same is not true for the officers of an LLC.[15] As one court stated:

> the Court knows of no authority for the proposition that status as an officer of an LLC automatically establishes individual liability. … Indeed, far from establishing any such liability, O.C.G.A. § 14-11-304 instead provides general default provisions for determining the power of LLC members, and possibly outside managers, to make management decisions on behalf of the LLC. *See* O.C.G.A. § 14-11-304.

*Carey v. Hannah, Kendrix, Zachary & Assocs., LLC*, No. 1:11-CV-01782-SCJ-AJB, 2012 WL 13133676, at *8 (N.D. Ga. Dec. 21, 2012), report and recommendation adopted, No. 1:11-CV-1782-SCJ, 2013 WL 12382308 (N.D. Ga. Jan. 11, 2013) (considering whether an individual could be liable under the FDCPA for the acts of an LLC).

In *Brock Built, LLC v. Blake*, 300 Ga. App. 816, 686 S.E.2d 425 (2009), *overruled on other grounds by FDIC v. Loudermilk*, 295 Ga. 579, 761 S.E.2d 332 (2014), the Georgia Court of Appeals considered whether the president of an LLC had breached his fiduciary duty to the LLC. *Id.* at 821, 686 S.E.2d at 430. The court stated that "Georgia law requires that corporate officers and directors discharge their duties in good faith and with the care of an ordinarily prudent person in a like position." *Id.* In making that statement, the court cited O.C.G.A. § 14-2-830(a) and -842(a), both of which are found in the Georgia Business Corporation Code; the court did not include any citation to the Georgia Limited Liability Company Act. Furthermore, the Limited Liability Company Act provides defenses to liability for managers of an LLC but not for officers of an LLC, which would be incongruous if managers and officers both owed fiduciary duties to

---

[15] By contrast, the Georgia Business Corporation Code expressly requires an officer to "perform his or her duties in good faith and with the degree of care which an ordinarily prudent person in a like position would use under similar circumstances." O.C.G.A. § 14-2-842(a).

the LLC. O.C.G.A. § 14-11-305, -307. Therefore, the Court concludes officers of an LLC do not owe fiduciary duties to the LLC. This conclusion is supported by allegations in the AC that the Board of Managers had control over Beaulieu, including the power to appoint officers and to set the duties and authority of officers. [AC ¶ 82-85]. Accordingly, the AC fails to state a claim for breach of fiduciary duty against the Officers: Del Land, David A. Marr, J. Michael Pollard, and Karel Vercruyssen.

The CAMI Trust is not alleged to be either an officer or a manager of Beaulieu. Rather, the AC alleges the Trust is the majority owner and member of Beaulieu. [AC ¶ 28]. The Bouckaert Children and Defendant David A. Marr are defendants in their capacity as trustees (the "Trustees"). [AC ¶ 19, 28]. Starting in 2016, the Trust had the exclusive right to appoint Board members. [AC ¶ 79].

Under Georgia law, "[e]xcept as otherwise provided in the articles of organization or a written operating agreement, a person who is a *member* of a limited liability company in which management is vested in one or more managers, and who is not a manager, *shall have no duties* to the limited liability company or to the other members *solely by reason of acting in his or her capacity as a member*." O.C.G.A. § 14-11-305(1) (emphasis added). Under this statute, the Trust's membership interest in Beaulieu is not, by itself, sufficient to establish the existence of fiduciary obligations owed by the Trust or the Trustees. *ULQ, LLC v. Meder*, 293 Ga. App. 176, 184-85, 666 S.E.2d 713, 720-21 (2008) ("non-managing members owe no fiduciary duties to the LLC or the other members[;] [a]lthough the parties may impose such duties in the operating agreement or articles of organization[.]"). Plaintiff has alleged that the Trust had the exclusive ability to appoint Managers starting in 2016. This allegation is also insufficient to establish the existence of a fiduciary duty.

In *Denim North America Holdings, LLC v. Swift Textiles, LLC*, 532 F. App'x 853 (11th Cir. 2013), a dispute arose between the two members of a Georgia LLC. Under the operating agreement all management authority was vested in a board of eight managers. Each member of the LLC could appoint four of the managers. *Id.* at 855. At issue was whether one member owed fiduciary duties to the other member. *Id.* at 861. The court found that, if the operating agreement provides for management of the LLC by managers, then a member does not have fiduciary duties to the LLC. The court rejected the argument that the ability to appoint managers gave a member "de facto" control over the LLC and thus gives rise to fiduciary duties. *Id.* at 862. The court stated:

> Unless otherwise provided by an operating agreement, a "manager" of a Georgia limited liability company "[s]hall be designated, appointed, elected, removed, or replaced by the approval of more than one half by number of the members." [O.C.G.A.] § 14–11–304(b)(1). In other words, Georgia law presumes that managers will be appointed by the members of a limited liability company. Georgia law also states that "a person who is a member of a limited liability company in which management is vested in one or more managers, and who is not a manager, shall have no duties to the limited liability company or to the other members *solely by reason of acting in his or her capacity as a member.*" *Id.* § 14–11–305(1) (emphasis added). Because Georgia law presumes that members will appoint the managers of a limited liability company, the act of a member appointing a manager cannot give rise to a fiduciary duty.

*Id.* (emphasis in original). Therefore, the Trustees do not have fiduciary duties to Beaulieu based on the Trust's authority to appoint Managers. The AC does not allege any other basis for fiduciary obligations owed by the Trustees. As such, Plaintiff has failed to state a claim for breach of fiduciary duty by the Bouckaert Children or Mr. Marr in their capacity as Trustees of The CAMI Trust, and Count 1 of the AC will be dismissed as to the Trustees in their representative capacity.

**2. Breach of Fiduciary Duties**

The more difficult question is whether the AC sufficiently alleges that the Managers breached their fiduciary duties to Beaulieu. As noted by Defendants, many of the allegations

33

relating to breach are conclusory in nature. For example, allegations that consumer preferences shifted from carpet to hardwood are conclusory and without support. In addition, the AC contains allegations of conduct that is not facially wrongful but is followed by conclusions that the conduct was undertaken for personal benefit or other wrongful reason without factual support for those conclusions—such as seeking to refinance the Bank of America loan or changing the "line of authority" policy.[16] That is not to say that the factual matter, when taken as a whole, fails to lead to the reasonable inference that the Managers breached their fiduciary duties, as explained more fully below.

Defendants argue that Managers are not liable for conduct that occurred outside their dates of service or if they had no role in approving a challenged transaction. *Schrader v. Yi (In re Yi)*, No. 09-83827, AP No. 09-6742, 2011 WL 1364229 at \*7 (Bankr. N.D. Ga. April 4, 2011) (Hagenau, J.) (involving defalcation or fraud while acting in a fiduciary capacity under 11 U.S.C. § 523(a)(4), which has been interpreted to require the fiduciary duty to arise prior to the bad act); *In re Sagent Tech., Inc.*, 278 F. Supp.2d 1079, 1093-94 (N.D. Calif. 2003) (complaint for breach of fiduciary duties against current and former officers and directors of a corporation failed to state a claim, in part, because the complaint did not "indicate which individual defendant or defendants were responsible for which alleged wrongful act" or how certain defendants could be responsible for wrongful acts that took place prior to or after their service); *In re Bridgeport Holdings, Inc.*, 388 B.R. 548, 566 (Bankr. D. Del. 2008) (director was not liable for breach of duty of loyalty when he was appointed after the board had approved an allegedly wrongful contract to

---

[16] As pointed out by Mieke Hanssens in her reply brief, the exhibits to the AC "show that of the more than $352 million in transactions listed, approximately $15 million were under the $100,000 limit, or less than 5%" despite the allegation the AC that the policy gave the Family leeway to engage in "unlimited" transactions with the Affiliates up to $100,000. [Doc. 220 at 10; AC ¶ 109]. And the AC did not identify any specific transactions that were approved under the policy as opposed to being approved in some other manner. [Doc. 220 at 10].

sell assets, but then allowed the company to fulfill its contractual obligations) (applying Delaware law).

Plaintiff argues that *Bridgeport* is not applicable because the breaches of fiduciary duty were plead as separate actions, while the breach in this proceeding is plead as a continuing and ongoing course of conduct. Furthermore, *Bridgeport* has been distinguished as dismissing claims "against non-directors where both the challenged action was approved by the board *and* there were no specific allegations of misconduct against the non-directors." *Burtch v. Owlstone, Inc. (In re Advance Nanotech, Inc.)*, No. 11-10776, AP No. 13-51215, 2014 WL 1320145, at *6 (Bankr. D. Del. April 2, 2014) (emphasis in original). Plaintiff contends it has alleged facts that directly link the Managers to breaches of fiduciary duty.

Plaintiff also cites *Scott v. Vantage Corporation*, No. 17-448, 2017 WL 3485818 (D. Del. Aug. 15, 2017), for the proposition that a claim for breach of fiduciary duty may be adequately plead even if the wrongful conduct occurred before the fiduciary relationship existed. In *Scott*, the plaintiffs—shareholders of the corporation—alleged they purchased their shares based on misrepresentations and omissions of the directors. *Id.* at *2. Applying Delaware law, the court stated that the plaintiffs had stated a claim: "Although certain of the alleged misrepresentations and omissions occurred before plaintiffs bought Vantage Corporation shares, this conduct and the conduct which transpired after the purchase, when accepted as true, show defendants breached their fiduciary duties." *Id.* at *5.

Having reviewed the case law, which comes from outside of Georgia and finding no Georgia cases on point, the Court concludes that managers cannot be liable for breaches of fiduciary duty that occurred *entirely* outside their dates of service.

### a. Bouckaert Family

First, with respect to the Bouckaert Family Defendants—Carl Bouckaert, Meike Hanssens, and the Bouckaert Children in their individual capacities—the AC alleges that they each served as managers for some portion of the relevant period, while also retaining ownership or control of one or more Affiliates with which Beaulieu conducted business.

With respect to Carl Bouckaert, the AC alleges: (1) he was an owner and member of Beaulieu and served as a voting member of the Board during at least 2006 through 2016, and as a non-voting member from 2016 through 2017, (2) he served as President and Chief Executive Officer, although the dates of this service are not alleged, and as CEO, he was authorized to execute agreements and instruments on behalf of Beaulieu, (3) he had the ability to appoint one or two additional managers to the Board, and the Board was unable to remove him as an officer without his prior written consent [AC ¶ 8], (4) he owns or controls South Richmond Chemicals, LLC [AC ¶ 29] and CEEA, LLC [AC ¶ 33]; (5) he signed agreements between Beaulieu and some of the Bouckaert Affiliates, in some cases signing the agreement for both parties, and in some cases long before the relevant time period. [AC ¶ 153, 167, 196], and (6) he was paid $1,794,546.60 plus an additional $972,354 in improper dividends and/or unlawful distributions. [AC ¶ 337].

With respect to Nicolas E. Bouckaert, the AC alleges (1) he served as a member of Beaulieu's Board of Managers during at least 2009 through 2017, (2) he had the power to appoint and remove officers of Beaulieu [AC ¶ 9], (3) he owns or controls Avalon Industrial Products, LLC, and signed agreements with Beaulieu on behalf of Avalon [AC ¶ 36, 238], and (4) he was paid $344,024.01 [AC ¶ 338].

With respect to Stanilas A. Bouckaert, the AC alleges (1) he served as a member of Beaulieu's Board of Managers during at least 2009 through 2017 [AC ¶ 10], (2) he owns or controls

Sabuka, LLC and signed agreements with Beaulieu on Sabuka's behalf [AC ¶ 37, 249], and (3) he was paid $461,100.73 [AC ¶ 339].

With respect to Stephanie C. Bouckaert, the AC alleges (1) she served as a member of Beaulieu's Board of Managers during at least 2013 through 2017 [AC ¶ 11], and (2) she was paid $15,258.20 [AC ¶ 340].

With respect to Mieke Hanssens, the AC alleges (1) she is an owner and member of Beaulieu and served as a voting member of the Board during at least 2006 through 2016, and as a non-voting member from 2016 through 2017, (2) she had the ability to appoint one or two additional managers to the Board, and the Board was unable to remove her from any officer position at Beaulieu without her prior written consent. [AC ¶ 15], (3) she owns or controls South Richmond Chemicals, LLC [AC ¶ 29], Marglen Industries, Inc. [AC ¶ 31], CEEA, LLC [AC ¶ 33], and Beaulieu Canada Company, Inc. [AC ¶ 39], (4) she signed agreements between Beaulieu and CEEA [AC ¶ 198], (5) she attempted to work out an insider deal to refinance out the Bank of America loans [AC ¶ 323], and she was paid $28,324.72 plus an additional $972,354 in improper dividends and/or unlawful distributions [AC ¶ 344].

With respect to Nathalie B. Pollard, the AC alleges (1) she served as a member of the Board during at least 2013 through 2017 [AC ¶ 21], (2) she owns or controls Centaur Technologies, LLC [AC ¶ 32]; OneSource Sample, LLC [AC ¶ 34]; Centaur Properties, LLC [AC ¶ 40]; Centaur Consolidated Companies, LLC [AC ¶ 40, 43]; Centaur Marketing Group, LLC [AC ¶ 41]; and Centaur Equestrian, LLC [AC ¶ 42], and (3) she was paid $13,642.76 [AC ¶ 356].

With respect to the Bouckaert Children collectively, the AC alleges (1) they are all beneficiaries of The CAMI Trust [AC ¶ 9-11, 21], (2) from 2014 through 2016, they had voting rights via a shared voting position on the Board of Managers, (3) beginning in 2016 through the

37

Petition Date, through The CAMI Trust, they had the exclusive ability to appoint all managers to the Board of Managers. [AC ¶ 9-11, 21, 78-79], and (4) they own or control Leinster Global, Inc. [AC ¶ 35] and Renuco Recycling Company, LLC [AC ¶ 38].

With respect to the Bouckeart Family collectively, the AC alleges: Throughout the relevant time period, they maintained voting control over the Board of Managers by their ability to appoint a majority of the managers. [AC ¶ 76]. From 2006 through 2016, Carl Bouckaert and Mieke Hannsens controlled the Board as they each had the ability to appoint one or two additional managers and the Board had only one "independent manager," who was, in turn, selected by Carl Bouckaert and Mieke Hannsens's appointed managers. [AC ¶ 77]. Upon information and belief, they appointed managers who were "friendly" to them and would approve transactions in their favor. [AC ¶ 80]. They regularly had non-managers who were their personal advisors or employees attend Board meetings. [AC ¶ 81]. With voting control over the Board, they were able to control and direct the appointment of Beaulieu's officers. [AC ¶ 86]. Upon information and belief, they handpicked managers and officers of Beaulieu that they could control and influence in their favor. [AC ¶ 87]. The Bouckaert Family and Michael Pollard required that Beaulieu conduct business with and enter into agreements and transactions with Bouckaert Affiliates, even when not in Beaulieu's best interest. [AC ¶ 89-90]. All the Bouckaert Family Defendants were present at the Board meeting when the revised line of authority policy was approved. [AC ¶ 111-112].

With regard to Carl Bouckaert and Mieke Hannsens, the AC alleges that they controlled the Board of Managers from 2006 to 2016, which in turn controlled the employment of officers; that they owned South Richmond Chemicals, from which Beaulieu purchased materials, and CEEA, which leased properties to Beaulieu; and that they received and caused Beaulieu to issue improper or unlawful distributions [AC ¶ 77, 82-86, 130, 132, 187-88, 337, 344, 363].

The foregoing allegations establish the Bouckaert Family Defendants stood on both sides of various transactions between Beaulieu and the Bouckaert Affiliates. As such, they stood to personally benefit from the Affiliate transactions. When combined with the otherwise bare allegations of engineering sweetheart deals without regard to the effect on Beaulieu, it is plausible that these Defendants breached their fiduciary duties to Beaulieu.

### b. Other Managers

Turning to the other Managers, in addition to the general allegations regarding management of Beaulieu, the AC alleges:

Joseph Astrachan (1) was a voting member of the Board from 2014 to 2016 [AC ¶ 6], (2) was among the managers who approved the revision to the line of authority policy [AC ¶ 107, 112], (3) was among the managers who approved a transaction between Beaulieu and Sabuka [AC ¶ 254], and (4) received $77,000 [AC ¶ 335]. There is no factual matter to allow the Court to infer that being paid for services[17] or changing the line of authority policy breaches any fiduciary duty.

Ralph Boe (1) was a voting member of the Board from 2006 to 2014 and had authority to execute agreements on behalf of Beaulieu [AC ¶ 7], (2) signed an agreement between Beaulieu and CEEA [AC ¶ 198], (3) signed an agreement on Beaulieu's behalf with Avalon Industrial in 2006[18] [AC ¶ 237-238], (4) was among the managers who approved transactions between Beaulieu and Sabuka [AC ¶ 254], and (5) was paid $2,192,929.27 [AC ¶ 336].

---

[17] In its response brief, Plaintiff objected to Defendants referring to allegedly fraudulent transfers as being in the nature of compensation and expense reimbursement, arguing that such a characterization is not appropriate at the motion to dismiss stage. [Doc. 170 at 30, n.17]. However, the AC itself characterized certain payments to the D&O Defendants as "salaries," "fees," and "bonuses" [AC ¶ 137, 150, 165, 181, 193, 209, 223, 236, 248, 265, 278, 300, 309, 332, 467].

[18] Mr. Boe argues that this action is far outside of any applicable statute of limitations. [Doc. 157-1 at 4].

Constance Cantrell (1) was a voting member of the Board from 2014 to 2016 [AC ¶ 12], (2) was among the managers who approved the revision of the line of authority policy [AC ¶ 107], (3) was among the managers who approved transactions between Beaulieu and Sabuka [AC ¶ 254], and (4) was paid $76,991.03 [AC ¶ 341].

Leo Van Steenberge (1) served on the Board from 2013 to 2017 and had the power to appoint and remove officers [AC ¶ 25], (2) was among the managers present for the revision of the line of authority policy [AC ¶ 112], (3) was among the managers who approved transactions between Beaulieu at Sabuka [AC ¶ 254], and (4) was paid $104,950.57 [AC ¶ 360].

The fact that the Managers provided services to Beaulieu and received payments from Beaulieu does not establish that the payments were exorbitant or above-market or otherwise a breach of fiduciary duties. Furthermore, the AC does not allege these managers had any role in evaluating or approving any payments they received for their services.

As to agreements with Affiliates that were signed by specified managers, the content and, in some cases, the dates of the agreements were not alleged. Nor were any facts alleged as to why signing such agreements was a breach of fiduciary duty, other than that an Affiliate was on the other side of the transaction. Other allegations in the AC suggest that the materials and services purchased from Affiliates were actually used in Beaulieu's operations. However, the AC alleges that some of the Affiliates had Beaulieu as their only customer, which lends support to the allegation that the Affiliates may have been paid at above-market rates. Nevertheless, there is no allegation these Defendants received any personal benefit from any of the alleged wrongful conduct other than being paid for their services.

With respect to the line of authority policy, as noted above, the allegations that approving the revision was a breach of fiduciary duty because it gave way to the possibility of

unlimited transactions up to $100,000 with Bouckaert Affiliates is conclusory in nature and not supported by factual matter alleged. [See supra n.16 and accompanying text].

The foregoing allegations do not by themselves support a plausible claim for breach of fiduciary duty by the non-Family Managers. However, the AC alleges that David Marr and Michael Pollard presented to the Board on issues related to transactions and agreements with the Bouckaert Affiliates and that both are conflicted insiders. [AC ¶ 19, 20, 154, 168, 197]. Under Georgia law, the managers of a LLC are "entitled to rely on information, opinions, reports, or statements … if prepared or presented by … members, managers, or employees of the limited liability company whom the member or manager reasonably believes to be reliable and competent in the matter presented" but may not rely on such information if the manager "has knowledge concerning the matter in question that makes reliance … unwarranted[.]" O.C.G.A. § 14-11-305(2)(A), (3). As a result, these additional allegations are sufficient to plausibly show that the non-Family Managers breached their fiduciary duties to Beaulieu.

### 3. Damages

Plaintiff has alleged that Beaulieu suffered declining profits and losses during the relevant time period, including a decline in profits from over $1 billion in 2007 to $525 million in 2016. [AC ¶ 69]. Although this does not indicate how much of the decline occurred during the four years prior to the Petition Date, the AC also alleges net losses of $14,838,000 in fiscal year 2014, net losses of $3,424,000 in fiscal year 2015, net losses of $55,236,000 in fiscal year 2016, and net losses of $16,630,000 in fiscal year 2017 through the Petition Date. [AC ¶ 371-374]. In conjunction with the general allegations regarding Affiliate transactions and other payments made by Beaulieu during the relevant period, the AC sets forth sufficient facts regarding damages as a result of alleged breaches of fiduciary duty.

### 4. Defenses

Having determined that the AC states a claim for breach of fiduciary duty against the Managers, the Court will consider certain defenses raised by them, namely the safe harbor provisions of the Limited Liability Company Act and the exculpation provision in the Operating Agreement.

Defendants argue that under Georgia's safe harbor statute, they are not liable for any alleged breaches of fiduciary duty. O.C.G.A. § 14-11-307. Section 14-11-307 governs conflicting interest transactions. A "conflicting interest" is defined in part as "the interest a … manager of the limited liability company has respecting a transaction effected or proposed to be effected by the limited liability company … with respect to which the … manager has the power to act or vote" if the manager or an entity the manager controls will receive financial benefit from the transaction of such significance that, if called upon to vote on the transaction, the manager's judgment would be influenced. O.C.G.A. § 14-11-101(3). Section 14-11-307(a) provides that the operating agreement may exclude or alter applicability of the section to an LLC. Subsection (b) provides that if a transaction is not a conflicting interest transaction, it does not give rise to liability of a manager. Subsections (c)(1) and (d) provide that a transaction in which a manager has a conflicting interest does not give rise to liability of such manager if it is approved by a majority of qualified managers after disclosure of the conflict. A "qualified manager" is defined as one

> who does not have either a conflicting interest respecting the transaction or a familial, financial, professional, or employment relationship with a second … manager who does have a conflicting interest respecting the transaction, which relationship would, in the circumstances, reasonably be expected to exert an influence on the first … manager's judgment when voting on the transaction.

*Id.* 14-11-307(g). Finally, "[a] majority of all the qualified managers constitutes a quorum for purposes of action that complies with this Code section." *Id.* § 14-11-307(f). And, "managers'

42

action that otherwise complies with this Code section is not affected by the presence or vote of a … manager who is not a qualified … manager." *Id.*

Defendants argue that under these rules, a transaction approved by even one manager, when such manager constitutes a majority of qualified managers, does not give rise to liability of a manager. Defendants further contend that the AC alleges that each or all of the D&O Defendants had knowledge and awareness of the transactions, and as such, the qualified managers were fully informed. The AC does not contain any allegations showing that the qualified managers were conflicted or subject to undue influence because the Bouckaert Family's involvement in appointment of managers is insufficient to question the managers' independence. As acknowledged by Defendants, there is no reported case law from the Georgia courts on this issue.

Plaintiff argues that the safe harbor provisions are an affirmative defense that cannot normally be considered on a motion to dismiss. *Perlman v. Wells Fargo Bank, N.A.*, 559 F. App'x 988, 994 (11th Cir. 2014). However, an affirmative defense can be considered on a motion to dismiss if it appears on the face of the complaint. *Hunt v. Aimco Props., LP*, 814 F.3d 1213, 1225 n.8 (11th Cir. 2016) (citations omitted). Plaintiff argues the defense is unavailable because there were no qualified managers due to the D&O Defendants' engagement in self-dealing, rubberstamping transactions to benefit the Bouckaert Family and Affiliates, and failing to adequately inform themselves about the transactions they were supporting. The Court cannot conclude that this defense is established on the face of the AC because there are simply not enough specific facts about the approval of each challenged transaction for the Court to determine whether they were all approved by a qualified manager.

The second defense asserted by Defendants is applicability of the exculpation clause in the Operating Agreement.

43

The Georgia Limited Liability Company Act provides:

(4) To the extent that, pursuant to paragraph (1) of this Code section or otherwise at law or in equity, a member or manager has duties (including fiduciary duties) and liabilities relating thereto to a limited liability company or to another member or manager:

(A) *The member's or manager's duties and liabilities may be expanded, restricted, or eliminated by provisions in the articles of organization or a written operating agreement*; provided, however, that no such provision shall eliminate or limit the liability of a member or manager:

(i) For intentional misconduct or a knowing violation of law; or

(ii) For any transaction for which the person received a personal benefit in violation or breach of any provision of a written operating agreement; and

(B) The member or manager shall have no liability to the limited liability company or to any other member or manager for his or her good faith reliance on the provisions of a written operating agreement, including, without limitation, provisions thereof that relate to the scope of duties (including fiduciary duties) of members and managers.

O.C.G.A. § 14-11-305(4) (emphasis added).

The Operating Agreement provides in part:

Liability for Certain Acts. … No Manager shall be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member unless such loss or damage shall have been caused by intentional misconduct or a knowing violation of law or a transaction for which such Manager received a personal benefit in violation or breach of the provisions of this Operating Agreement.

[Op. Agmt § 5.10].

Defendants argue that the AC fails to allege a breach of fiduciary duty by the managers that involves intentional misconduct, a knowing violation of law, or a transaction resulting in a personal benefit that is prohibited by the Operating Agreement. Plaintiff argues that if the Court considers the defense at this time, the exculpatory clause is not sufficiently "explicit, prominent, clear and unambiguous" and as such, it is not effective. *Allstate Ins. Co. v. ADT, LLC*,

No. 1:15-cv-517, 2015 WL 5737371, at *3 (N.D. Ga. Sept. 30, 2015) (quoting *JVC Am., Inc. v. Guardsmark, LLC*, No. 1:05-cv-681, 2006 WL 2443735, at *4 (N.D. Ga. Aug. 22, 2006)). In *Allstate*, the exculpatory clause at issue was in a contract between a consumer and a company that provided protective equipment for the consumer's residence. *Id.* at *1. The contract included a section titled "Limitation of Liability" but the relevant language was "far removed from that heading and … written in the same single-spaced, small typeface as the majority of the contract." *Id.* at *5. Therefore, the exculpatory clause did not provide a basis to dismiss the claims against the defendant. *Id.* at *6. *See also Amerisave Mortg. Corp. v. Recovco Mortg. Mgmt, LLC*, No. 1:17-cv-164, 2017 WL 7519074, at *4 (N.D. Ga. Apr. 7, 2017); *Parkside Center, Ltd. v. Chicagoland Vending, Inc.*, 250 Ga. App. 607, 611-12, 552 S.E.2d 557, 562 (2001).

None of the cases cited by Plaintiff involve an exculpation clause in the operating agreement of an LLC that is authorized by statute. In addition, the AC does not allege facts regarding the specific type of conduct required by the exculpation clause. However, the Court is not persuaded that the exculpation clause requires dismissal of the claims against the Managers at this point in the litigation given the allegations that they were on both sides of various transactions which can lead to a reasonable inference of improper self-dealing. Based on the foregoing, Count 1 of the AC will be dismissed as to Officers and Trustees and will not be dismissed as to Managers.

### 5. Breach of Duty to Creditors

The analysis of breach of duty to creditors is similar to that of breach of fiduciary duty, except that the LLC must be insolvent for the duty to arise. "[L]ike corporate directors of an insolvent corporation, the managing members of an insolvent limited liability company owe a fiduciary duty to the company's creditors to conserve and manage the remaining assets of the company in trust for the benefit of those creditors." *Georgia Commercial Stores, Inc. v. Forsman*,

342 Ga. App. 542, 547, 803 S.E.2d 805, 810-11 (2017). Therefore, the Court must determine whether the AC sufficiently pleads insolvency. The issue of insolvency is also relevant to other counts of the AC, including Counts 2, 3, and 4.

Defendants argue that the AC fails to sufficiently allege insolvency because it consists of a recitation of the statutory definition of insolvency untethered to any particular date or transfer. And the factual allegations regarding Beaulieu's financial condition do not show insolvency. Plaintiff argues that it also alleged that Beaulieu was insolvent at the time of each transaction in that its total liabilities exceeded the fair value of its assets or that Beaulieu was rendered insolvent as a result of the transactions [AC ¶ 367]; the exorbitant rates and above-market amounts paid to the Bouckaert Affiliates contributed to Beaulieu's insolvency [AC ¶ 118]; and by allowing the transfers to occur, the D&O Defendants contributed to Beaulieu's insolvency [AC ¶ 122].

Plaintiff cites *Scarver v. Patel (In re Haven Trust Bancorp, Inc.)*, 461 B.R. 910 (Bankr. N.D. Ga. 2011) (Diehl, J.), *Gordon v. Harrison (In re Alpha Protective Services, Inc.)*, 531 B.R. 889 (Bankr. M.D. Ga. 2015), and *Howell v. Fulford (In re Southern Home and Ranch Supply, Inc.)*, No. 11-12755, AP No. 13-1042, 2013 WL 7393247 (Bankr. N.D. Ga. Dec 20, 2013) (Drake, J.), to argue that the mere allegation that a debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer is sufficient to plausibly state a claim that requires a showing of insolvency.

In *Haven Trust*, not only did the complaint allege the statutory language for insolvency, it also included factual allegations that supported the allegation of insolvency. 461 B.R. at 913. The debtor was a holding company for a bank that closed prior to the bankruptcy filing, and the trustee was seeking to recover constructive fraudulent transfers, among other things,

from the officers. *Id.* at 911. The complaint alleged that the relevant transfers occurred seven to twelve months before the bank closed in December 2008. *Id.* at 913. And the complaint alleged that when the debtor filed for bankruptcy in February 2009, its schedules showed liabilities of $9 million and $0 assets. *Id.* "These factual allegations together state a plausible claim for constructive fraudulent transfer." *Id.*

In *Alpha Protective Services*, involving insider preference payments, the complaint alleged that the payments "were 'made at a time when the Debtor was insolvent.'" 531 B.R. at 902. The court stated that "[a]lthough the language of the Complaint mirrors § 547, the question of whether Alpha was insolvent at the time of the payments remains a factual issue to be decided at trial or some other juncture. … Therefore, the allegation that Alpha was insolvent at the time of the transfers is a factual assertion rather than a 'bare recital.'" *Id.* (citing *Haven Trust*, 461 B.R. at 913). Nevertheless, the court found that the "context of this action bolsters the plausibility that Alpha was insolvent at the time of the payments" because the timing of the payments, the amount of the payments, and the fact that they were made to insiders led to a reasonable inference of insolvency. *Id.*

In *Southern Home*, the defendant argued that the complaint did not sufficiently plead constructive fraudulent transfer, which requires insolvency, because it merely recited the elements of the claim. 2013 WL 7393247 at *5. The court disagreed because the complaint provided the defendant with "fair notice of the claims raised against them and the grounds upon which these claims rest." *Id.* at *6 (citing *In re Tousa, Inc.*, 442 B.R. 852 (Bankr. S.D. Fla. 2010)). In *Tousa*, the court was considering the proper standard for pleading a preference claim, which also requires insolvency, without reference to whether the claim was a 90-day preference claim (insolvency is presumed) or an insider preference claim (insolvency is not presumed). 442 B.R. at

853. In any event, the court rejected a standard that would require identification of the nature and amount of each antecedent debt and identification of each transfer by date, transferor, transferee, and amount. *Id.* at 854. Instead, the court concluded that

> so long as the complaint makes clear who transferred what to whom and when, a preference defendant will have enough information to mount whatever defenses may be available. To require more is to mandate pedantry and to return federal courts to the days of gotcha pleadings before the adoption of the Federal Rules of Civil Procedure.

*Id.* at 856.

To plausibly state a claim for insolvency, the complaint should include supporting factual allegations to enable the Court to conclude that the applicable standard of insolvency is plausible. The question then is whether the allegations in the AC regarding Beaulieu's financial condition in the years preceding the bankruptcy filing plausibly allege insolvency.[19] In *In re Trinsum Grp., Inc.*, 460 B.R. 379 (Bankr. S.D.N.Y. 2011), net income and net cash flow figures plus allegations of declining revenues and increasing debts were insufficient to state the element of insolvency in a fraudulent transfer claim brought under § 544(b) because they did "not rule out the possibility that the Debtors may have had a reserve such that that they were not insolvent or rendered insolvent." *Id.* at 392-93.

The court in *In re Midway Games, Inc.*, 428 B.R. 303 (Bankr. D. Del. 2010), found allegations of insolvency sufficient when they included: the debtor had substantial losses in the relevant time period; failure of the debtor to pay its debts as they came due; the debtor had large

---

[19] The Bankruptcy Code defines insolvency of a corporation as its liabilities exceeding the fair value of its property, also known as balance-sheet insolvency. 11 U.S.C. § 101(32)(A). Georgia avoidable transfer law defines insolvency under either the balance-sheet test or by a showing that the debtor is unable to pay its debts as they come due, also known as equitable or cash-flow insolvency. O.C.G.A. § 18-2-72. In *Georgia Commercial Stores*, the court did not specify which test applied to a claim for breach of duty to creditors but found that both tests were met in that case. 342 Ga. App. at 548, 803 S.E.2d at 811.

trade debts; the debtor owed $150 million on notes, half of which was due in the relevant time period; the debtor's liabilities exceeded its assets in the relevant time period; the debtor's management informed the board that the debtor was running out of cash and breaching a liquidity covenant with its secured lender; and because of the liquidity issue the debtor's auditor was preparing a going concern valuation for its audit opinion. *Id.* at 321; *see also In re Troll Commc'ns., Inc.*, 385 B.R. 110, 124 (Bankr. D. Del. 2008) (holding that allegations of insolvency were sufficient when the complaint cited financial statements to identify the debtor's liabilities and net worth).

The transfers at issue occurred over the four-year period between July 2013 and July 2017. The AC alleges that Beaulieu suffered a decline in profits from over $1 billion in 2007 to $525 million in 2016, [AC ¶ 69], net losses of $14,838,000 in fiscal year 2014, net losses of $3,424,000 in fiscal year 2015, net losses of $55,236,000 in fiscal year 2016, net losses of $16,630,000 in fiscal year 2017 through the Petition Date [AC ¶ 371-374], and a negative EBITDA[20] in 2016 and 2017 through the Petition Date [AC ¶ 375]. Additionally, the AC alleges that the Bank of America loan matured on June 30, 2017, and prior to that, the Debtors had executed eight forbearance agreements on the loan. [AC ¶ 322]. These allegations depict a declining financial condition, which alone might be insufficient to allege insolvency. However, like *Midway Games* and *Haven Trust*, the AC includes some allegations that bear more directly on the issue of insolvency, specifically the allegations regarding the Bank of America loan—that it matured in the month before the bankruptcy was filed and that it had been the subject of multiple forbearance agreements.[21] Although the allegations in the AC regarding insolvency are limited,

---

[20] Earnings before interest, taxes, depreciation, and amortization.
[21] The Court takes judicial notice of the schedules filed in Beaulieu's bankruptcy case, which show that liabilities exceeded assets on the Petition Date. [Case No. 17-41677, Doc. 211 at 2]. Although this fact is not determinative, it adds plausibility to the allegation of insolvency.

they are sufficient to establish the plausibility of insolvency under either the balance-sheet test or the cash-flow test for some period prior to the Petition Date.

Having sufficiently alleged insolvency, the analysis is otherwise the same as the foregoing analysis for breach of fiduciary duties, such that the AC sufficiently alleges breach of duty to creditors by the Managers of Beaulieu.

The Defendants argue that breach of duty to creditors is a derivative breach of fiduciary duty claim that cannot be brought in the same action as a breach of fiduciary duty claim that is based on the same allegations. *See Mukamal v. Bakes*, 378 F. App'x 890 (11th Cir. 2010). In *Mukamal*, which was decided under Delaware law, the person appointed under the debtor's chapter 11 plan as trustee of trusts created to pursue claims on behalf of the debtors and the creditors (the "trustee") initially filed a direct claim for breach of fiduciary duty to creditors. *Id.* at 892. That claim was dismissed because Delaware does not recognize a direct claim for breach of duty to creditors. *Id.* at 897. The trustee then filed an amended complaint that asserted both a direct claim by the debtors for breach of fiduciary duty to the debtors and a derivative claim by the creditors for breach of duty to the debtors. *Id.* at 895. The derivative claim was dismissed as duplicative of the direct claim. *Id.* at 897.

With respect to dismissal of the initial direct claim for breach of duty to creditors, the circuit court affirmed because under Delaware law "directors and officers do not owe a fiduciary duty to creditors, even after insolvency[.]" *Id.* at 898. With respect to dismissal of the later derivative claim of the creditors for breach of duty to the debtors, the circuit court also affirmed.

> If the Debtors succeed on the direct claims against the Individual Defendants then the creditors' derivative claims must fail because the Individual Defendants cannot be liable twice for the same claim. If, however, the Debtors' direct claims fail to state a claim, then the

50

creditors' derivative claims must also fail because the claims are based on the same factual allegations.

*Id.* at 899.

This proceeding is not like *Mukamal* because Georgia law recognizes a claim for breach of fiduciary duty to creditors against managers of an LLC when the LLC is insolvent. *Georgia Commercial*, 342 Ga. App. at 547, 803 S.E.2d at 811 ("We therefore conclude that if a managing member of an insolvent limited liability company breaches his fiduciary duty to the company's creditors by making an improper preferential transfer of company assets to himself, a creditor may bring an action against the member to set aside the transfer and recover the funds impermissibly paid to that member."). However, the claims are duplicative in the sense that the injury under both is the same, i.e., injuring the debtor's ability to make money. Whether the plaintiff is entitled to a recovery based on breach of duty to the debtor or breach of duty to creditors appears to be a timing issue according to when the debtor became insolvent. For purposes of a motion to dismiss, both claims have been sufficiently alleged against the Managers. But there can only be one recovery. Once evidence of the specific timing of insolvency is proffered, it is possible one or the other claims may no longer be viable, or it may be that partial damages are owed under each claim. Accordingly, Count 10 of the AC will be dismissed as to the Officers and Trustees and not dismissed as to the Managers.

### 6. Waste of Corporate Assets

The manager of an LLC has a duty under O.C.G.A. § 14-11-305(a) not to waste corporate assets. *BSL Holdings, LLC v. Trinity Lifestyles Mgmt, LLC*, No. 2016-cv-278256, 2017 WL 2494405, at *4 (Super. Ct. Fulton Cty. Ga. Jan. 20, 2017); *accord Knieper v. Forest Grp. USA, Inc.*, No. 4:15-CV-00222-HLM, 2016 WL 9449794, at *5 (N.D. Ga. Sept. 12, 2016) (citing *Pelletier v. Shultz*, 157 Ga. App. 64, 66, 276 S.E.2d 118, 120 (1981)).

> "[A] waste entails an exchange of corporate assets for consideration
> so disproportionately small as to lie beyond the range at which any
> reasonable person might be willing to trade." … [T]he threshold is
> high. "If ... there is any substantial consideration received by the
> corporation, and if there is a good faith judgment that in the
> circumstances the transaction is worthwhile, there should be no
> finding of waste, even if the fact finder would conclude ex post that
> the transaction was unreasonably risky."

*F.D.I.C. ex rel. Cmty. Bank & Tr. Cornelia, Ga. v. Miller*, No. 2:12-CV-42-WCO, 2012 WL

9494095, at *7 (N.D. Ga. Dec. 26, 2012) (quoting *Lewis v. Vogelstein*, 699 A.2d 327, 336 (Del.

Ch. 1997)); s*ee also L. L. Minor Co. v. Perkins*, 246 Ga. 6, 12, 268 S.E.2d 637, 643 (1980) ("[T]he

appropriate criterion for determining whether the payment of a given salary to a corporate

employee is a waste of corporate assets is whether the employee has performed services to the

corporation commensurate with the salary paid.").

The AC alleges that the contested transfers wasted cash and valuable assets of

Beaulieu to the detriment of Beaulieu and its creditors for the benefit of the Defendants and the

Bouckaert Family. [AC ¶ 515]. The Managers were aware of, should have been aware of and/or

allowed and caused Beaulieu to make the contested transfers despite that the transfers were not in

exchange for fair consideration or reasonably equivalent value, but they were rather in exchange

for consideration so disproportionately small as to lie beyond the range at which any reasonable

person might be willing to trade. [AC ¶ 516-17]. The transfers served no corporate purpose, and

no ordinary reasonably prudent person would have permitted the transfers of such high amounts

of capital from Beaulieu. [AC ¶ 518]. The Managers engaged in self-dealing and/or allowed the

self-dealing and one-sided transactions that resulted in waste and failed to properly consider the

best interests of Beaulieu. [AC ¶ 519-20].

Defendants argue that a claim for corporate waste does not exist as an independent

cause of action against managers of an LLC in Georgia, that the allegations are vague and

conclusory, and that it is based on the same alleged wrongdoing as Count 1 for breach of fiduciary duty and is therefore duplicative and must be dismissed. Plaintiff argues that specific facts regarding the transfers are set forth in Counts 2 and 3[22] and incorporated into Count 12 and that the claim is not duplicative because it is permitted to move forward with alternative theories of recovery.

The Court cannot conclude that waste of corporate assets is duplicative of breach of fiduciary duty under Georgia law. In *North Walhalla Properties, LLC v. Kennestone Gates Condominium Association, Inc.*, 358 Ga. App. 272, 855 S.E.2d 35 (2021), which involved a dispute between a condominium association and a unit owner over assessments, the court said, "claims related to election procedures, breach of fiduciary duties, negligent misuse of corporate funds, usurpation of corporate opportunities, personal use of assets without sufficient compensation, mismanagement, and corporate-waste are not separate and distinct causes of action[.]" *Id.* at __, 855 S.E.2d at38 (citations omitted). However, the court's statement was made in the context of whether a shareholder who lacks standing to bring a derivative suit has standing to sue individually when it has not suffered an injury that is separate and distinct from the injury to all shareholders. *Id.* at __, 855 S.E.2d at 38. In other words, the issue was standing, not whether breach of fiduciary duty and waste are mutually exclusive. By contrast, in *Knieper* the plaintiff brought separate claims for breach of fiduciary duty and corporate waste against the same defendants. 2016 WL 9449794, at *2. The court acknowledged waste as a separate cause of action by finding that the plaintiff had stated a claim for both breach of fiduciary duty and for waste against defendant Wright and allowing both claims to go forward against that defendant. *Id.* at *4-5. Therefore, the Court will

---

[22] *See infra* Part V.B.

not dismiss Count 12 as duplicative with the caveat that there can only be one recovery to the extent Counts 1, 10, and 12 are all based on the same injury.

For the reasons stated above in the discussion of breach of fiduciary duty, the Court finds that Plaintiff has sufficiently stated a claim for waste against the Managers but has not stated a claim for waste against the Officers or Trustees.

## V. Counts 2 and 3: Avoidance and Recovery of Fraudulent Transfers

### A. Legal Standard

The AC asserts claims for the avoidance and recovery of fraudulent transfers against all the Defendants (the "Fraudulent Transfer Defendants") under 11 U.S.C. §§ 544(b), 548(a), 550, and 551, and O.C.G.A. §§ 18-2-74, 18-2-75, and 18-2-77. In Count 2, Plaintiff alleges the transfers were made with actual intent to defraud, and in Count 3, Plaintiff alleges the transfers were constructively fraudulent.

Transfers made with actual intent to hinder, delay, or defraud creditors are avoidable pursuant to 11 U.S.C. § 548 or pursuant to 11 U.S.C. § 544 and O.C.G.A. § 18-2-74(a).

Bankruptcy Code § 548 states in relevant part:

> The trustee may avoid any transfer ... of an interest of the debtor in property, or any obligation ... incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
>
> (A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted[.]

11 U.S.C. § 548(a)(1)(A).

Bankruptcy Code § 544 states in relevant part:

> [T]the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that

is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

11 U.S.C. § 544(b)(1).

The applicable law referenced in § 544(b)(1) is the Georgia Uniform Voidable Transactions Act ("UVTA"), O.C.G.A. § 18-2-70 et seq.[23] The law provides in relevant part as follows:

> A transfer made or obligation incurred by a debtor is voidable as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor[.]

O.C.G.A. § 18-2-74(a)(1).

Constructively fraudulent transfers are avoidable pursuant to 11 U.S.C. § 548(a)(1)(B) or § 544 and O.C.G.A. §§ 18-2-74(a)(2) and -75(a).

Bankruptcy Code § 548(a)(1)(B) provides in relevant part:

> The trustee may avoid any transfer … of an interest of the debtor in property, or any obligation … incurred by the debtor, that was made or incurred on or within 2 years before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
> …
> (B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
> (ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation[.]

11 U.S.C. § 548(a)(1)(B).

---

[23] The law was amended effective July 1, 2015. The timing of the transactions at issue spans the pre-amendment and post-amendment period of the law. There is no substantive difference between the versions, as it primarily changed the phrase "fraudulent transfers" to "voidable transfers," and the citations here are to the most recent version of the law.

The UVTA provides a transfer is voidable as to a pre-transfer or post-transfer creditor if the debtor made the transfer:

> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> (A) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> (B) Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

O.C.G.A. § 18-2-74(a)(2).

With respect to pre-transfer creditors only, the UVTA also provides that a transfer is voidable "if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." *Id.* § 18-2-75(a).

While § 548 has a two-year lookback period, the UVTA has a lookback period of four years. O.C.G.A. § 18-2-79(1). In either case, the trustee must file suit within two years after the entry of the order for relief. 11 U.S.C. § 546(a)(1).

The analysis of alleged fraudulent transfers under state law and bankruptcy law is substantially the same. *Pettie v. Bonertz (In re LendXFinancial, LLC)*, No. 10-76803, AP 11-05330, 2012 WL 1597394, *7, 12 (Bankr. N.D. Ga. March 19, 2012) (Diehl, J.). When a transfer is avoided under § 544 or 548 it is preserved for the benefit of the estate, 11 U.S.C. § 551, and the trustee may recover the property transferred or its value from the initial transferee or subsequent transferees, with some limitations. *Id.* § 550(a).

56

### B. Allegations

The transfers alleged to be fraudulent include (1) dividends and/or distributions to The CAMI Trust, Carl Bouckaert, and Mieke Hanssens made from August 15, 2013 to November 20, 2013, and totaling $3,040,667.08, as set forth in ¶ 363 of the AC; (2) the transfer of the Land Insurance Policy to Del Land with a cash surrender value of at least $448,518.59 on January 24, 2017, as set forth in AC ¶ 348-352;[24] (3) transfers to South Richmond Chemicals, Pinnacle Polymers, Marglen Industries, Centaur Technologies, CEEA, OneSource Sample, Leinster Global, Avalon Industrial Products, Sabuka, Renuco Recycling, Beaulieu Canada, Centaur Properties, Centaur Marketing, Centaur Equestrian, and Beaulieu Fibres from July 18, 2013 to July 14, 2017, totaling $366,232,957.42, as set forth in AC Exhibits M-Y; [AC ¶ 415, 428], and transfers to the D&O Defendants as set forth in AC Exhibit Z.

Beaulieu made each of the fraudulent transfers to or for the benefit of the Fraudulent Transfer Defendants. [AC ¶ 414, 427]. The fraudulent transfers were made with actual intent to hinder, delay, or defraud creditors of Beaulieu. [AC ¶ 416]. At the time of each transfer, each Fraudulent Transfer Defendant except Beaulieu Fibres that initially received any of the transfers was an insider under the Bankruptcy Code. [AC ¶ 417, 429]. Certain of the Defendants were immediate or mediate transferees as set forth in AC ¶ 418 and 430. At all times in the four years preceding the Petition Date, one or more creditors have held claims against the Debtors that were and are allowable under § 502 or were and are not allowable only under § 502(e). [AC ¶ 419-420, 431-432]. Each transfer was of an interest in property of Beaulieu. [AC ¶ 421, 433]. Each of the Fraudulent Transfer Defendants received valuable consideration and failed to provide reasonably equivalent value in exchange. [AC ¶ 422, 434]. Beaulieu was insolvent at the time of the transfers

---

[24] Mr. Land contends Plaintiff omitted reference to his 2015 employment agreement showing that the Land Insurance Policy was part of his compensation. [Doc. 214 at 11 n.4].

and/or was rendered insolvent as a result of the transfers in that Beaulieu's total liabilities exceed

the fair value of its assets; or Beaulieu (i) was engaged in business or a transaction for which any

property remaining with Beaulieu was for an unreasonably small capital at the time of or as a result

of the transfers or (ii) intended to incur, or believed that it would incur, debts beyond its ability to

pay as such debts matured. [AC ¶ 423, 435]. Beaulieu suffered a decline in revenue from over $1

billion in 2007 to $525 million in 2016, [AC ¶ 69], net losses of $14,838,000 in fiscal year 2014,

net losses of $3,424,000 in fiscal year 2015, net losses of $55,236,000 in fiscal year 2016, net

losses of $16,630,000 in fiscal year 2017 through the Petition Date [AC ¶ 371-374], and a negative

EBITDA in 2016 and 2017 through the Petition Date [AC ¶ 375].

### C. Legal Argument and Analysis

#### 1. Actual Fraud

In the Master Brief, Defendants argue that the heightened pleading standard of Rule

9 applies and is not satisfied, that the allegations are conclusory and merely a formulaic recitation

of the elements of the claim, and that the AC fails to sufficiently plead badges of fraud. Plaintiff

does not dispute that Rule 9(b) applies to the claims for actual fraudulent transfers. *Kerr v. Venetian

Casino Resort (In re Medici)*, 524 B.R. 902, 905 (Bankr. N.D. Ga. 2014) (Ellis-Monro, J.) ("To

successfully plead a fraudulent transfer under section 548(a)(1)(A), the plaintiff must meet the

heightened standards of Rule 9(b)…."). Thus, Plaintiff "must state with particularity the

circumstances constituting the fraud or mistake. Malice, intent, knowledge, and other conditions

of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b); Fed. R. Bankr. P. 7009.

The elements of a claim for actual fraudulent transfer are: (1) a transfer; (2) of an

interest of property of the debtor; (3) made with actual intent to hinder, delay, or defraud a creditor.

Here, Plaintiff has set forth details of the transfers it seeks to avoid, including recipient, date, and

amount, and in some cases the method of the transfer (check or ACH/Wire). Thus, the circumstances constituting fraud are plead with the specificity required of Rule 9(b).

Plaintiff has also alleged that the transfers were of an interest of a property of Beaulieu, and Defendants do not challenge this allegation. Furthermore, the AC repeatedly alleges that Beaulieu either made the transfers or the D&O Defendants caused Beaulieu to make the transfers. [AC ¶ 142, 157, 170, 183, 199, 211, 225, 239, 251, 267, 284, 302, 311, 327, 335-347, 352-354, 356-363.] These allegations establish the plausibility that the transfers were of an interest of Beaulieu in property.

The question then is whether the AC has sufficiently plead intent, which is generally established through badges of fraud. *Dionne v. Keating (In re XYZ Options, Inc.)*, 154 F.3d 1262, 1271 (11th Cir. 1998). Defendants argue that Plaintiff alleged three badges of fraud: (1) the transfers were to insiders; (2) Beaulieu did not receive reasonably equivalent value for the transfers; and (3) Beaulieu was insolvent at the time of the transfers or became insolvent because of the transfers. Defendants further argue the second and third badges of fraud were alleged in a conclusory manner and are therefore insufficient to state a claim. Additionally, certain of the Defendants contend they are not insiders.

With respect to lack of reasonably equivalent value, courts apply a three-part test: "1) whether the debtor received value; 2) whether the value received was in exchange for the property transferred; and 3) whether the value was reasonably equivalent to the value of the property transferred." *Southern Home and Ranch Supply*, 515 B.R. at 707. Defendants cite *Guiliano v. Ferdinand (In re Liquid Holdings Group, Inc.)*, No. 16-10202, AP No. 17-50662, 2018 WL 2759301, at *18 (Bankr. D. Del. June 6, 2018), for the proposition that "'[t]o plead lack of reasonably equivalent value exchanged sufficiently … the [t]rustee must present some information

of the value of what [the debtor] received in exchange for the [t]ransfers.'" *See also In re AgFeed USA, LLC*, 558 B.R. 116, 130 (Bankr. D. Del. 2016) ("Allegations showing that payments are 'excessive or extraordinary …, i.e., outside the normal rate,' may be sufficient to overcome a motion to dismiss. However, conclusory allegations are insufficient."). Plaintiff pleads that every transfer at issue was not for reasonably equivalent value because each was "exorbitant" or "above-market." Plaintiff argues that because reasonably equivalent value is a fact-specific question, it should not be a basis to dismiss a complaint. *See Kipperman v. Onex Corp*., No. 1:05-CV-1242-JOF, 2006 WL 8421931, at *10 (N.D. Ga. Sept. 15, 2006), on reconsideration, No. CIV.A. 1:05-CV-1242, 2007 WL 2872463 (N.D. Ga. Sept. 26, 2007) (stating that "[w]hether or not Plaintiff received reasonably equivalent value is a fact-specific issue" but also noting on reconsideration that the complaint alleged the debtor received no consideration for the transfers at issue); *Welch v. Synovus Bank*, 517 B.R. 269, 283 (M.D. Fla. 2014) (finding that an allegation of less than reasonably equivalent value was sufficient to survive dismissal "[i]n the context of the Trustee's comprehensive Amended Complaint[.]").

The Eleventh Circuit considered the sufficiency of allegations of reasonably equivalent value on a motion to dismiss a fraudulent transfer claim in *In re Fundamental Long Term Care, Inc*., 873 F.3d 1325 (11th Cir. 2017). In that case the debtor entity assigned certain claims to defendants for $700,000, of which defendant Schron paid $200,000. *Id.* at 1343. The complaint alleged that the claims were actually worth in excess of $2 billion. *Id.* at 1344. The court said that to state a claim, the plaintiff "[was] required to allege facts demonstrating that the claims Schron received were not reasonably equivalent in value to the price he paid." *Id.* To determine whether a complaint has alleged reasonably equivalent value, courts do not look for "dollar-for-dollar equivalence" but rather "make informed judgments as to asset valuation in light of the

totality of the circumstances." *Id.* In order to be plausible, the complaint must offer "more than a bald assertion" that the goods or services received by the debtor exceeded the value received by the defendants. *See id.*

Here, with respect to Affiliate transactions, the AC offers more than the sort of bald assertions rejected as insufficient by the Eleventh Circuit. Allegations that Beaulieu paid Affiliates at "exorbitant" and "above-market" rates are supported by the allegation that Beaulieu was the only customer of some Affiliates. As such, it is plausible that Beaulieu received less than reasonably equivalent value for the Affiliate transactions.[25]

With respect to insolvency, Defendants argue the allegations in the AC are conclusory, consist largely of recitations of the statutory definitions of insolvency, and are not specific to the time of the transfers. The Court discussed the allegations of insolvency in Part IV.B.5. above, and found them sufficient for a claim of breach of duty to creditors. The Court likewise finds them sufficient to allege insolvency as a badge of fraud.

The AC has also alleged that the initial recipients of the payments at issue were made to insiders of Beaulieu. [AC ¶ 417]. The AC alleges that, at the time of the transfers, Defendants other than Beaulieu Fibres were officers and directors of Beaulieu, were companies owned or controlled by insiders of Beaulieu, or were affiliates of Beaulieu. [AC ¶ 6-43, 46]. *See* 11 U.S.C. § 101(31). Beaulieu Canada, Pinnacle Polymers, and One Source have argued they are not insiders because the AC does not allege facts showing they meet the statutory definition of an affiliate, and they are not non-statutory insiders. Ms. Cantrell and Mr. Land also argue that the AC

---

[25] The Court notes that the AC alleges that Renuco Recycling was paid for providing waste brokerage services to Beaulieu. [AC ¶ 257, 261]. But, upon information and belief, Renuco Recycling did not actually provide those services. Instead, they were conducted by Beaulieu's manufacturing plants directly. [AC ¶ 259-60].

does not sufficiently allege their insider status.[26] Additionally, Mr. Bryant contends the AC does not allege facts to support the conclusion that he is an insider.

The Bankruptcy Code defines an insider of a corporation to include a director, officer, person in control, partnership in which the debtor is a general partner, general partner of the debtor, or a relative of a general partner, director, officer, or person in control of the debtor. 11 U.S.C. § 101(31)(B). Managers of a limited liability company are analogous to directors of a corporation, especially when the operating agreement vests management of the company in a board of managers. *In re Longview Aluminum*, LLC, 657 F.3d 507, 510 (7th Cir. 2011). Nevertheless, it is the individual's relationship with the debtor and not his or her title that establishes insider status. *Id.* With respect to the D&O Defendants, including Ms. Cantrell and Mr. Land, because they are all alleged to be officers or managers of Beaulieu, they are sufficiently alleged to be insiders for purposes of a motion to dismiss. Additionally, affiliates of the debtor are insiders. *Id.* § 101(31)(E). An affiliate is defined as:

> (A) entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor …;
>
> (B) corporation 20 percent or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by the debtor, or by an entity that directly or indirectly owns, controls, or holds with power to vote, 20 percent or more of the outstanding voting securities of the debtor …;
>
> (C) person whose business is operated under a lease or operating agreement by a debtor, or person substantially all of whose property is operated under an operating agreement with the debtor; or
>
> (D) entity that operates the business or substantially all of the property of the debtor under a lease or operating agreement.

---

[26] The reply brief of Constance Cantrell and Del Land alleges that Plaintiff has pled its complaint in a profit-driven manner that frustrates adjudication by omitting material information, such as the Operating Agreement and Mr. Land's employment agreement. [Doc. 214 n.4]. At this stage of the pleadings, the Court cannot evaluate this allegation.

*Id.* § 101(2). Finally, a defendant may be a non-statutory insider based on "(1) the closeness of the relationship between the transferee and the debtor; and (2) whether the transactions between the transferee and the debtor were conducted at arm's length." *In re Fla. Fund of Coral Gables, Ltd.*, 144 F. App'x 72, 75 (11th Cir. 2005); *see also U.S. Bank Nat. Ass'n ex rel. CW Capital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, __ U.S. __, 138 S. Ct. 960, 963 (2018) (noting that courts' recognition of non-statutory insiders "often turns on whether the person's transactions with the debtor (or another of its insiders) were at arm's length.").

The AC alleges that Beaulieu Canada was owned or controlled by Mieke Hanssens during the four years prepetition, and that Ms. Hannsens was an owner and manager of Beaulieu and a voting board member through 2016. [AC ¶ 15, 39]. The AC alleges that Karel Vercruyssen simultaneously served as the president and CEO of both Beaulieu and Beaulieu Canada. [AC ¶ 26, 124]. The AC alleges that Mieke Hannsens required Beaulieu to sell and purchase product to and from Beaulieu at prices that benefitted Beaulieu Canada. [AC ¶ 276]. Based on these allegations, it is plausible that Beaulieu Canada is a non-statutory insider of Beaulieu.

The AC alleges that Pinnacle Polymers is owned or controlled by the CAMI Trust, which is the majority owner of Beaulieu. [AC ¶ 28, 30, 146]. The AC alleges that The CAMI Trust, Carl Bouckaert, and the Bouckaert Children required Beaulieu to purchase polypropylene resin from Pinnacle Polymers at above-market prices. [AC ¶ 148]. The AC alleges that insider Defendants were on both sides of the transaction when Beaulieu entered into the First Amendment to the Supply Agreement dated August 7, 2004 with a predecessor to Pinnacle Polymers, and that the same individual signed the agreement as vice president for both parties. [AC ¶ 148, 151-152]. Additionally, Carl Bouckaert signed the Second Amendment to the Pinnacle Supply Agreement

on behalf of both parties. [AC ¶ 153]. Based on these allegations, it is plausible that Pinnacle Polymers is a non-statutory insider of Beaulieu.

The AC alleges that Michael and Nathalie Pollard own at least 25% of OneSource Sample. [AC ¶ 34, 204]. The AC alleges that OneSource Sample sold flooring samples to Beaulieu, and that Beaulieu was required to buy such samples from OneSource. [AC ¶ 205, 206]. The AC alleges that insider Defendants were on both sides of the transactions between OneSource and Beaulieu. [AC ¶ 210]. Based on these allegations, it is plausible that OneSource Sample is a non-statutory insider of Beaulieu.

Similar allegations were made with respect to the other Defendants alleged to be insiders, in that they were controlled by insiders of Beaulieu and that insiders were on both sides of their transactions with Beaulieu. Therefore, the Court concludes that where the AC alleges the insider status of Defendants, it does so sufficiently to state a claim, except for John Bryant.

John Bryant is not alleged to be an officer, manager, or owner of Beaulieu. Instead, he is alleged to be the 50% owner of Centaur Technologies, the other half of which is owned by Nathalie and Michael Pollard. [AC ¶ 46, 174-175]. The AC alleges that Centaur Tech purchased manufacturing chemicals from Mr. Bryant's company, Phoenix Chemicals, and that the owners of Centaur Tech (including Mr. Bryant) then required Beaulieu to purchase the chemicals from Centaur Tech at a mark up. [AC ¶ 175-178]. These facts fail to demonstrate that Mr. Bryant meets the statutory definition of an insider. The AC sufficiently alleges that Centaur Tech and the Pollards are all insiders of Beaulieu. The question then, is whether the AC sufficiently alleges that Mr. Bryant is also an insider by virtue of being a half owner of Centaur Tech. Plaintiff offered no argument in support of its allegation of insider status in its response to Mr. Bryant's brief. [Doc. 173], and the Court cannot conclude that the AC is sufficient in this regard. Mr. Bryant is not

alleged to be an officer or manager of Beaulieu and is not alleged to be on both sides of any transactions with Beaulieu. The fact that he is a partial owner of an entity that has been sufficiently alleged to be an insider is not enough for the Court to reasonably conclude that Mr. Bryant is an insider, especially when Centaur Tech's insider status is based on the Pollards' relationship with Beaulieu and not on any relationship or conduct of Mr. Bryant.

Based on the foregoing, Plaintiff "has alleged at least two badges of fraud" in the AC—transfer to insiders and insolvency—which is "sufficient to support an inference of fraudulent intent …." *Medici*, 524 B.R. at 906-907. Additionally, Plaintiff has sufficiently alleged lack of reasonably equivalent value as to the Affiliates. Therefore, Plaintiff has stated a claim for fraudulent transfer based on actual fraud, as to most Defendants.

With respect to Beaulieu Fibres[27] which is not alleged to be an insider, and John Bryant who has not been sufficiently alleged to be an insider, and neither of which is an Affiliate, Plaintiff has only sufficiently pled one badge of fraud. Plaintiff cites to *In re Siskey Hauling Co., Inc.*, No. 10-77265, AP No. 10-6493, 2011 WL 1519969, at *3 (Bankr. N.D. Ga. Jan. 6, 2011) (Diehl, J.), for the proposition that "[p]leading one or more of the badges of fraud sufficiently pleads the required element of intent." But in *Siskey Hauling*, the court stated that the complaint sufficiently set forth four badges of fraud. *Id.* In *Kipperman v. Onex Corp.*, No. 1:05-cv-1242, 2007 WL 2872463, at *9 (N.D. Ga. Sept 26, 2007), which was cited by *Siskey Hauling*, the court said that "[a]s long as the parties plead one or more of the badges of fraud …, they have pled the intent element with the requisite degree of particularity." But, as in *Siskey Hauling*, the plaintiff in *Kipperman* pled "several badges of fraud[.]" *Id*. Thus, while there may be circumstances in which

---

[27] Beaulieu Fibres is not alleged to be owned or controlled by members of the Bouckaert Family. Rather it is alleged to be owned by relatives of Mieke Hannsens. Additionally, the AC does not allege that Beaulieu is the only customer of Beaulieu Fibres.

pleading a single badge of fraud is sufficient to allege intent, the Court does not find it to be the case here. The only badge of fraud alleged for the claim against Beaulieu Fibres and John Bryant is insolvency. Were those allegations more robust, they might suffice on their own. But as the Court noted previously, the allegations of insolvency are limited. Therefore, Plaintiff has failed to state a claim for actual fraudulent transfers against Beaulieu Fibres or John Bryant.

Additionally, two categories of transfers that Plaintiff seeks to avoid are offsets that Beaulieu Canada used to reduce its accounts receivable owed to Beaulieu and over- and under-charges in transactions between Beaulieu and Beaulieu Canada. [AC ¶ 274-275; 284]. Beaulieu Canada argues that while the AC includes a list of the offsets in Exhibit W, it does not identify the over- and under-charge damages. Beaulieu Canada further argues that offsets are not avoidable transfers, as they are governed by 11 U.S.C. § 553.[28] Plaintiff argues that the AC alleges the offsets were taken improperly and therefore are not valid setoffs under § 553. Plaintiff further argues that identifying the over- and under-charges at this point is premature because the amount is to be determined at trial.

Offsets are governed by § 553 and "no other provisions of the Code, including sections 547 or 548, can be used to avoid or otherwise destroy the right of setoff." *In re MCB Fin. Grp., Inc*., 461 B.R. 914, 920 (Bankr. N.D. Ga. 2011) (Drake, J.). Plaintiff cites to *In re American Remanufacturers, Inc*., No. 05-20022 PJW, 2008 WL 2909871, at *2 (Bankr. D. Del. July 25, 2008), for the proposition that only "valid" setoffs are unavoidable. *See also In re Comer*, 386 B.R. 607, 609 (Bankr. W.D. Va. 2008) (a valid setoff cannot be avoided as a preference). The Court agrees. Here, the allegations are that Beaulieu Canada sold goods to Beaulieu at inflated

---

[28] "Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commence of the case …." 11 U.S.C. § 553(a).

prices, that Beaulieu sold goods to Beaulieu Canada at inadequate prices, and that the accounts receivable due to Beaulieu from Beaulieu Canada were reduced by the accounts payable from Beaulieu. [AC ¶ 272-274, 284]. This relationship was governed by a Master Sales Agreement. [AC ¶ 282]. Under Georgia contract law, a defendant has a right to set off a "debt owed him by the plaintiff against the claim of the plaintiff." *Automated Print, Inc. v. Edgar*, 288 Ga. App. 326, 330, 654 S.E.2d 413, 416 (2007); O.C.G.A. § 13-7-1 to -5, Plaintiff has alleged that the setoffs involved "purported" accounts payable that were artificially inflated due to over- and under-charging. These allegations of the method of the transfers make it plausible that the offsets are not valid. With respect to the over- and under-charges, the AC merely alleges that such charging took place which does not meet the specificity requirements of Rule 9. Consequently, the AC states a claim for actual fraudulent transfers against Beaulieu Canada for the offsets but not for the over- and under-charges.

### 2. Constructive Fraud

Unlike an actual fraudulent transfer claim, a claim for constructive fraudulent transfer is not subject to Rule 9(b) and need only meet the pleading standard of Rule 8(a). *Medici*, 524 B.R. at 905. The elements of a claim for constructive fraudulent transfer are: (1) a transfer; (2) of an interest of property of the debtor; and (3)(a) the debtor was insolvent at the time of the transfer or became insolvent as a result; or (b) the debtor received less than reasonably equivalent value for the transfer. As explained above, the AC sufficiently alleges the transfers were of property of Beaulieu and that Beaulieu was insolvent at the time of the transfers. Therefore, the Motion to Dismiss will be denied on this count.

### 3. Preservation and Recovery of Transfers

Under 11 U.S.C. § 551, "[a]ny transfer avoided under section 544 [or]… 548 … is preserved for the benefit of the estate but only with respect to property of the estate." Under § 550(a), when a transfer is avoided under § 544 or 548, the trustee may recover the property or its value from the initial transferee or certain subsequent transferees. Because the AC sufficiently alleges claims for fraudulent transfers, it also alleges a claim for preservation and recovery of the transfers. Whether the allegations for recovery of the transfers under § 550(a) are sufficient as to specific Defendants will be considered in the discussion of Count 6 of the AC.

## VI. Counts 4 and 5: Avoidance and Recovery of Preferential Transfers

Counts 4 and 5 of the AC seek to avoid various transfers as preferences. A preference consists of a

> transfer of an interest of the debtor in property—
> (1) to or for the benefit of a creditor;
> (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> (3) made while the debtor was insolvent;
> (4) made—
>     (A) on or within 90 days before the date of the filing of the petition; or
>     (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> (5) that enables such creditor to receive more than such creditor would receive if—
>     (A) the case were a case under chapter 7 of this title;
>     (B) the transfer had not been made; and
>     (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

11 U.S.C. § 547(b).

Count 4, one-year preferential transfers, is asserted against Avalon, CEEA, Centaur Tech, Leinster, Marglen, OneSource, Pinnacle Polymers, Renuco Recycling, Sabuka, South

Richmond Chemicals, the Bouckaert Family, the CAMI Trustees, Ralph Boe, Del Land, David Marr, Michael Pollard, and John Bryant. The AC alleges that Beaulieu made transfers totaling at least $40,263,329.14 during the one-year preference period as set forth in Exhibits M to Z. [AC ¶ 441]. Also within the one-year period, Beaulieu transferred the Land Insurance Policy to Del Land. [AC ¶ 442]. The AC further alleges the elements of a preferential transfer for the one-year transfers, including that the transferees were insiders. [AC ¶ 443-447].

Count 5, 90-day preferential transfers, is asserted against Avalon, CEEA, Centaur Tech, Leinster, Marglen, OneSource, Pinnacle Polymers, Sabuka, Ralph Boe, Del Land, David Marr, Michael Pollard, the Bouckaert Family, John Bryant, and the CAMI Trustees (with the Count 4 Defendants, the "Preference Defendants"). The AC alleges that Beaulieu made transfers totaling $6,493,563.15 during the 90-day preference period as set forth in Exhibits M to Z. [AC ¶ 452]. The AC further alleges the elements of a preference for the 90-day transfers. [AC ¶ 453-456].

The Court has already concluded that the AC sufficiently alleges that the transfers at issue were of property of the Debtors, that Beaulieu was insolvent during the relevant period,[29] and that the Preference Defendants other John Bryant who are initial transferees are insiders. Additionally, Plaintiff has set forth the dates of the disputed transfers such that the timing is sufficiently alleged. Therefore, the open questions are whether the transfers were made for the benefit of a creditor, were made on account of antecedent debt, and allowed the creditor to receive more than it would in a hypothetical Chapter 7 case. Additionally, Ralph Boe has argued he was not an insider for purposes of the preference claim.

---

[29] Additionally, a debtor is presumed insolvent during the 90 days preceding the bankruptcy filing for purposes of a preference claim. 11 U.S.C. § 547(f).

Mr. Boe contends that he was not an insider at the time of the one-year transfers because his employment with Beaulieu terminated on February 28, 2014. [Doc. 207 at 10]. Section 547 provides that the one-year lookback period applies "if such creditor *at the time of such transfer* was an insider[.]" 11 U.S.C. § 547(b)(4)(B) (emphasis added). Although some courts have held that the statute is satisfied if the creditor was an insider at the time the transfer was arranged, that is an older view not followed by courts in recent years. *See In re NetBank, Inc.*, 424 B.R. 568, 572 (Bankr. M.D. Fla. 2010) (rejecting the "arranged" approach and noting that it has not been followed in post-1992 cases); *In re Incentium, LLC*, No. 11-10706, AP No. 11-149, 2012 WL 1660657, at *9 (Bankr. E.D. Tenn. May 10, 2012) (same). The Court agrees that there is no basis to depart from the plain language of the statute, which requires that insider status exist at the time of the transfer. Therefore, to state an insider preference claim against Mr. Boe, the AC must allege facts to show Mr. Boe was an insider during the one year prior to the July 16, 2017 Petition Date, and specifically on the dates of the one-year transfers to Mr. Boe set forth in Exhibit Z. The AC alleges that Mr. Boe served on the Board of Managers during at least 2006 through 2014. [AC ¶ 7]. There are no allegations that he retained any control over Beaulieu after his employment ended or any other allegations to indicate that Mr. Boe was an insider during the one-year preference period.[30] Therefore, the AC fails to state a claim for one-year preferences against Mr. Boe.

Turning to the other open questions, in the Master Brief, the Preference Defendants argue that the AC fails to allege the existence of any antecedent debt and cites a number of cases for the proposition that to survive a motion to dismiss the AC must allege the nature and amount of the antecedent debts. *See In re Valley Media, Inc.*, 288 B.R. 189, 192 (Bankr. D. Del. 2003); *In*

---

[30] Exhibit A to the AC indicates that Mr. Boe was not an insider during the one-year preference period. Exhibit A is a copy of Mr. Boe's proof of claim, which includes a copy of the Release and Separation Agreement between Mr. Boe and Beaulieu. The Separation Agreement provides that Mr. Boe's employment with Beaulieu "terminates effective February 28, 2014" and was signed by Mr. Boe and a representative of Beaulieu. [AC, Ex. A at 26, 31].

*re PostRock Energy Corp.*, No. 16-11230, AP 18-01024, 2018 WL 4261521, at *4 (Bankr. W.D. Okla. Sept. 6, 2018); *In re Caremerica, Inc.*, 409 B.R. 737, 751 (Bankr. E.D.N.C. 2009); *In re Crucible Materials Corp.*, No. 09-11582, AP 10-55178, 2011 WL 2669113, at *4 (Bankr. D. Del. July 6, 2011); *Beaman v. Barth (In re Amerlink, Ltd.)*, No. 09-01055, AP 10-00164, 2011 WL 864953, at *3 (Bankr. E.D.N.C. Mar. 11, 2011); *Pardro v. Gozaba (In re APF Co.)*, 308 B.R. 183, 188 (Bankr. D. Del. 2004). Plaintiff argues it met this requirement via Exhibits M to Z, which identifies the amounts and dates of the challenged transfers. *See Taylor, Bean & Whitaker Mortg. Corp.*, 470 B.R. 219, 221-222 (Bankr. M.D. Fla. 2012).[31] Plaintiff contends it alleged further facts about the nature of the antecedent debt by setting forth the relationship between Beaulieu and the Defendants. Plaintiff contends the foregoing allegations "make it plausible that a debtor/creditor relationship existed from which an antecedent debt arose[.]" *In re CRC Parent Corp.*, No. 10-11567, AP 12-50702, 2013 WL 781603, at *3 (Bankr. D. Del. Mar. 1, 2013).

"A debt is 'antecedent' to the transfer sought to be avoided under § 547(b) if it is *pre-existing* or is incurred before the transfer." *Midwest Holding #7, LLC v. Anderson (In re Tanner Family, LLC)*, 556 F.3d 1194, 1196 (11th Cir. 2009) (emphasis in original). A debt is incurred "when the creditor has a claim against the debtor*, even if the claim is unliquidated, unmatured, unfixed, or contingent*." *Id.* (emphasis in original); *see also In re Am. Berber, Inc.*, No. 19-41154, AP 19-4230, 2020 WL 7074146, at *3 (Bankr. N.D. Ga. Dec. 2, 2020) (Ellis-Monro, J.). In *Valley Media*, to survive a motion to dismiss, the court required a preference complaint to include "(a) an identification of the nature and amount of each antecedent debt and (b) an identification of each alleged preference transfer by (i) date, (ii) name of debtor/transferor, (iii) name of transferee and (iv) the amount of the transfer." 288 B.R. at 192. However, it rejected as

---

[31] In *Taylor, Bean*, the list of transfers went further than Plaintiff's exhibits in that it "identifie[d] the transactions that relate to the purported antecedent debt(s) by invoice number[.]" 470 B.R. at 222.

contrary to Rule 8 the defendant's proposed test that would require "(1) how Defendant is considered a creditor; (2) how an interest in the property was transferred to the Defendant; (3) that Plaintiff owed Defendant an antecedent debt; and (4) how the transfers enable Defendant to receive more than it would have in a Chapter 7 liquidation." *Id.* at 193. *Compare In re Oconee Regional Health Sys., Inc.*, 621 B.R. 64, 75 (Bankr. M.D. Ga. 2020) ("the Court considers a heightened pleading standard as advocated in *Valley Media* as inconsistent with the Rule 8 pleading standard. The Trustee is under no obligation to plead the antecedent debt element of § 547(b)(2) to the specificity as demanded by the Defendant"). In *Crucible Materials*, the court noted that a complaint failed to state a claim for preference in part because it "completely fails to describe any type of relationship between the Defendant and any of the Debtors. Without such information … the Trustee has failed to describe sufficiently the nature of the antecedent debt." 2011 WL 2669113 at *4.

Here, the AC contains allegations that each of the Preference Defendants, except Renuco Recycling, David Marr, John Bryant, and the CAMI Trustees, provided goods or services to Beaulieu, the nature of those goods and services, and the date and amount of the payments. [AC ¶ 231-232, Ex. T, ¶ 188, Ex. Q, ¶ 176-177, Ex. P, ¶ 217-218, Ex. S, ¶ 163, Ex. O, ¶ 205, Ex. R, ¶ 148, Ex. N, ¶ 244, Ex. U, ¶ 132-133, Ex. M, ¶ 7-11, 15, 20, 24, Ex Z]. The Court finds these allegations sufficient to make it plausible that the payments were made on account of an antecedent debt and for the benefit of a creditor.

With respect to Renuco Recyling, the AC alleges that it was paid for waste brokerage services, that Renuco Recycling did not actually provide those services, and that Renuco Recycling received payments during the one-year period prior to the Petition Date but not during the 90 days prior to the Petition Date. [AC ¶ 257-262, Ex. V]. Because the AC alleges that Renuco

Recycling did not provide services for which it was paid, the Court cannot conclude that the AC plausibly alleges that Renuco Recycling received the transfers at issue on account of an antecedent debt. Therefore, Renuco Recycling will be dismissed from Count 4 of the AC.

With respect to David Marr, in his individual capacity, the AC alleges that he was a special advisor to the Board of Managers and a vice president of Beaulieu. [AC ¶ 19]. However, the AC also alleges that Mr. Marr was, in reality, an employee of the Bouckaert Family but received payroll from Beaulieu. [Id.]. That allegation was made on information and belief and is contradicted by allegations that Mr. Marr signed contracts on behalf of Beaulieu. [AC ¶ 195, 283]. Accordingly, the Court concludes that the AC plausibly alleges that Mr. Marr received the transfers at issue on account of antecedent debt owed by Beaulieu. Therefore, Mr. Marr, in his individual capacity, will not be dismissed from Counts 4 and 5 of the AC.

With respect to John Bryant, the AC alleges that he is a 50% owner of Centaur Technologies. [AC ¶ 46]. The AC further alleges that he was an immediate or mediate transferee of payments to Centaur Tech. [AC ¶ 441]. Therefore, the AC does not allege that Mr. Bryant received payments on account of antecedent debts owed to him by Beaulieu, although he may be liable for preferential payments to Centaur Tech in Count 6. Additionally, in Part V.C.1., the Court determined that the AC does not sufficiently allege Mr. Bryant is an insider. Therefore, Mr. Bryant will be dismissed from Counts 4 and 5 of the AC.

As with Mr. Bryant, the AC fails to allege that the CAMI Trustees received payments from Beaulieu on account of any antecedent debt owed to them. Neither the AC nor Exhibit Z distinguishes payments received by the Trustees in their individual capacities from those received in their representative capacities. [AC ¶ 441, Ex. Z]. Accordingly, the AC fails to state a

claim for preference against the Trustees in their representative capacities, and they will be dismissed from Counts 4 and 5.

Defendants do not expressly contest the hypothetical Chapter 7 prong of a preference. Although the AC does not contain a liquidation analysis, the Court concludes that the facts regarding Beaulieu's financial condition in the years preceding the bankruptcy filing, which plausibly establish insolvency, also make it plausible that Defendants received more by way of the alleged preferential transfers than they would have received in a Chapter 7 case.

For the reasons stated above, with respect to Counts 4 and 5, the Motion to Dismiss will be granted, as applicable,[32] as to Ralph Boe, Renuco Recycling, John Bryant, and the CAMI Trustees in their representative capacities, and will be denied, as applicable, as to all other Preference Defendants.

## VII. Count 6: Liability for Avoidable Transfers

The AC seeks to recover avoidable transfers against all Defendants under 11 U.S.C. § 550(a) and O.C.G.A. § 18-2-77. To the extent a transfer is avoided under § 544, 547, or 548, among others, the trustee may recover the property or its value from: "(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or (2) any immediate or mediate transferee of such initial transferee." 11 U.S.C. § 550(a). If the transfer is avoided under Georgia's Uniform Voidable Transactions Act, a creditor may obtain "[a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim[.]" O.C.G.A. § 18-2-77(a)(1).

With respect to the transfers identified in Exhibits M to Z, the date, amount, and transferee are identified. Therefore, to the extent Plaintiff has stated a claim for avoidance of those

---

[32] Count 4 was asserted against all the Preference Defendants. Count 5 was asserted against all the Preference Defendants except Renuco Recycling and South Richmond Chemicals.

transfers, Plaintiff has also stated a claim that the individual identified as receiving the transfers is liable under § 550 as an initial transferee.

The AC also alleges that certain of the Defendants were immediate or mediate transferees of the alleged avoidable transfers as follows:[33]

| Initial Transferee | Immediate or Mediate Transferee |
|---|---|
| Avalon | Nicolas Bouckaert |
| Beaulieu Canada | Mieke Hanssens |
| CEEA | Mieke Hanssens, Carl Bouckaert, David Marr |
| Centaur Tech | Michael and Nathalie Pollard, John Bryant |
| Centaur Affiliates | Centaur Consolidated, Michael and Nathalie Pollard |
| Leinster | The Bouckaert Children |
| Marglen | Mieke Hanssens and Carl Bouckaert |
| OneSource | Michael and Nathalie Pollard |
| Pinnacle Polymers | Carl Bouckaert, the Bouckaert Children |
| Renuco Recycling | The Bouckaert Children |
| Sabuka | Stanislas Bouckaert, David Marr |
| South Richmond Chemicals | Mieke Hanssens, Carl Bouckaert, David Marr |
| The CAMI Trust | The Bouckaert Children |

[AC ¶ 418, 430, 441, 452, 460]. Defendants argue that where the AC seeks to recover from Defendants as subsequent rather than initial transferees, there are insufficient facts alleged regarding such subsequent transfers—the AC contains no facts tracing the transfers to any immediate or mediate transferees and lists multiple subsequent transferees without alleging what each subsequent transferee received. *See In re Allou Distribs., Inc.*, 379 B.R. 5, 31-32 (Bankr. E.D.N.Y. 2007). Plaintiff argues that once it has sufficiently alleged avoidance of a transfer, it need only allege the defendant was the recipient of the funds as an initial or subsequent transferee. *See In re Harman*, 512 B.R. 321, 348 (Bankr. N.D. Ga. 2014) (Murphy, J.).

In *Allou Distributors*, the court concluded that to state a claim against an immediate or mediate transferee under § 550, "a plaintiff must allege sufficient facts to show, if proved, that

---

[33] The Court omits Beaulieu International and The CAMI Trust as subsequent transferees because claims against those entities have been dismissed on other grounds.

the funds at issue originated with the debtor." 379 B.R. at 30. But a dollar-for-dollar accounting is not required. *Id.* In that case, the complaint identified "the date and amounts of the transfers from" the initial transferees to several of the alleged immediate transferees, and the defendants' motion to dismiss was denied. *Id.*

In *Harman*, the court stated that to recover under § 550, the complaint "need only allege that a Defendant was the initial, immediate, or mediate transferee of the … Funds, or the entity for whose benefit the transfer was made." 512 B.R. at 348. However, in *Harman*, the trustee did not make a bare allegation that the defendant was a subsequent transferee. Instead, the trustee made allegations that traced the path of the funds: the debtor was entitled to certain funds due to his interest in a corporation, the funds were being held by the debtor's attorney, the attorney was served with a garnishment to collect any of debtor's property that was in the attorney's possession, the attorney transferred the funds to a friend to shield them from garnishment, and the friend later transferred part of the funds back to the attorney. *Id.* at 328. The court found the trustee stated a claim against the friend as initial transferee of the funds and against the lawyer as an immediate or mediate transferee. *Id.* at 348.

Were the list of initial transferees with their corresponding subsequent transferees the only allegations that the Defendants were mediate or intermediate transferees, the allegations likely would be insufficient. However, the AC also alleges that certain of the alleged subsequent transferees owned or controlled the respective initial transferees, which demonstrates plausibility. [AC ¶ 130, 161-162, 174-175, 187, 204, 215, 229, 243, 256, 271, 295]. Therefore, the AC states a claim for mediate or intermediate transferee liability against the following Defendants: Nicolas Bouckart for transfers to Avalon; Mieke Hanssens for transfers to Beaulieu Canada; Mieke Hanssens and Carl Bouckaert for transfers to CEEA, Marglen, and South Richmond Chemicals;

Michael Pollard, Nathalie Pollard, and John Bryant for transfers to Centaur Tech; Centaur Consolidated, Michael Pollard, and Nathalie Pollard for transfers to the Centaur Affiliates; the Bouckaert Children for transfers to Leinster and Renuco Recycling; Michael and Nathalie Pollard for transfers to OneSource; the Bouckaert Children for transfers to Pinnacle Polymers; and Stanislas Bouckaert for transfers to Sabuka. With regard to Pinnacle Polymers, the AC alleges it is partially owned by The CAMI Trust and alleges that the Bouckaert Children are the beneficiaries of The CAMI Trust. [AC ¶ 28, 146]. Therefore, it is plausible that the Children were subsequent transferees of property transferred to Pinnacle Polymers. Likewise, because the Children are the alleged beneficiaries of The CAMI Trust, it is plausible they were subsequent transferees of property transferred to the Trust.

For those Defendants that are not alleged to have ownership or control over the initial transferee, the Court cannot reasonably infer that they are subsequent transferees, and the claim that they are liable as mediate or intermediate transferees will be dismissed as follows: David Marr is not alleged to own or control Sabuka, CEEA, or South Richmond Chemicals. But he is alleged to be the registered agent for Sabuka and CEEA and to have served as treasurer of South Richmond Chemicals at an unspecified time. [AC ¶ 131, 187, 243]. Therefore, the AC fails to state a claim that Mr. Marr is liable for avoidable transfers initially made to Sabuka, CEEA, or South Richmond Chemicals. Carl Bouckaert is not alleged to own or control Pinnacle Polymers. Instead, he is alleged to have served as president of Pinnacle Polymers' predecessor, with no indication of when that service took place. [AC ¶ 147]. These allegations are not sufficient to state a claim that Carl Bouckaert is liable for avoidable transfers to Pinnacle Polymers.

## VIII. Counts 7 and 9: Unjust Enrichment

### A. Count 7

In Count 7 of the AC, Plaintiff seeks to recover for unjust enrichment against the D&O Defendants (except the CAMI Trustees), the Bouckaert Affiliates, and Beaulieu Fibres for their alleged receipt of the D&O fraudulent transfers. The AC alleges that the Bouckaert Family, Joseph Astrachan, Ralph Boe, Constance Cantrell, Del Land, David Mar, Michael Pollard, Leo Van Steenberge, and Karel Vercruyssen received the fraudulent transfers as a result of their positions as managers or officers of Beaulieu, and that they were unjustly enriched at the expense of Beaulieu by their wrongful acts and omissions. [AC ¶ 464-465]. The AC further alleges that the Bouckeart Affiliates and Beaulieu Fibres received the transfers from Beaulieu by Beaulieu being required to purchase their products regardless of whether they were the best price. [AC ¶ 466]. Plaintiff seeks to disgorge profits, salaries, bonuses, payments, fees, benefits, and other amounts and transfers received by the Defendants.

Unjust enrichment provides a path for recovery of the value of benefits conferred on the opposing party in the absence of an enforceable express contract. *Watson v. Sierra Contracting Corp.*, 226 Ga. App. 21, 28, 485 S.E.2d 563, 571 (1997). To state a claim for unjust enrichment, Plaintiff must allege facts to show (1) there is no legal contract; (2) Defendants have been conferred a benefit by Plaintiff; and (3) Defendants equitably ought to return or compensate for the benefit. *Wachovia Ins. Servs., Inc. v. Fallon*, 299 Ga. App. 440, 449, 682 S.E.2d 657, 665 (2009). In addition, "the party conferring the ... things of value must act with the expectation that the other will be responsible for the cost." *Hollifield v. Monte Vista Biblical Gardens, Inc*., 251 Ga. App. 124, 131, 553 S.E.2d 662, 670 (2001). "The measure of damages under … unjust enrichment is based upon the benefit conferred upon the defendant and not upon the cost to render

the service or cost of the goods." *Zampatti v. Tradebank Intern. Franchising Corp*., 235 Ga. App. 333, 340, 508 S.E.2d 750, 757 (1998).

Defendants argue that their relationships with Beaulieu were governed by express or implied contracts, and therefore unjust enrichment does not apply. Plaintiff argues that it can assert unjust enrichment as an alternative basis for relief but is limited to only one recovery. Defendants argue that unjust enrichment must be pled as an alternative to breach of contract, which has not been asserted.[34] The Court agrees with Defendants.

Plaintiff is correct that under Georgia law, a party "'cannot recover under both a breach of contract and unjust enrichment theory, [but] a plaintiff may plead these claims in the alternative.'" *In re Equifax, Inc., Customer Data Sec. Breach Litig*., 362 F. Supp. 3d 1295, 1330–31 (N.D. Ga. 2019) (quoting *Clark v. Aaron's, Inc*., 914 F. Supp. 2d 1301, 1309 (N.D. Ga. 2012)); *see also* Fed. R. Civ. P. 8(d)(2) (allowing alternative statements of a claim). However, the unjust enrichment claim is an alternative theory of recovery when a contract claim fails and cannot be plead as a separate tort claim. *Collins v. Athens Orthopedic Clinic*, 356 Ga. App. 776, 779, 849 S.E.2d 213, 216–17 (2020); *Wachovia Ins. Servs., Inc. v. Fallon*, 299 Ga. App. 440, 449, 682 S.E.2d 657, 665 (2009).

Plaintiff argues that it is not asserting unjust enrichment as a tort claim, even though the underlying transfers were alleged to be based on wrongful conduct or other actions resulting in alleged avoidability. However, except for Count 8 against Beaulieu Canada, Plaintiff has not asserted a breach of contract claim to which Count 7 can be an alternative, which makes the unjust enrichment claim appear to be a stand-alone tort claim. Even if the Court agreed with Plaintiff that Count 7 is not presented as a tort claim, Plaintiff cited no authority that unjust enrichment may be

---

[34] In Count 8, Plaintiff did assert breach of contract against Beaulieu Canada, but not against any other of the unjust enrichment Defendants.

pled as an alternative theory of recovery to a failed claim for breach of fiduciary duty or avoidable

transfer. The cases Plaintiff cites involve unjust enrichment as an alternative to a contract claim.

*Campbell v. Ailion*, 338 Ga. App. 382, 386, 790 S.E.2d 68, 73 (2016) (finding the complaint stated

a claim for breach of oral contract or alternatively for unjust enrichment); *Bank of the Ozarks v.

Arco Cmty. Outreach Coal., Inc*., No. CV 212-017, 2013 WL 164421, at *6 (S.D. Ga. Jan. 15,

2013) ("Bank of the Ozarks pled the unjust enrichment theory as an alternative theory of recovery

and should be allowed to proceed with the theory as an alternative to an express contract."); *Clark

v. Aaron's, Inc*., 914 F. Supp. 2d 1301, 1309 (N.D. Ga. 2012) ("While a party, indeed, cannot

recover under both a breach of contract and unjust enrichment theory, a plaintiff may plead these

claims in the alternative."); *Abels v. JPMorgan Chase Bank, N.A*., 678 F. Supp. 2d 1273, 1279

(S.D. Fla. 2009) ("at this point it would be premature to dismiss the unjust enrichment count simply

because an express contract exists" (applying Florida law)). Furthermore, "[w]hile a party may

plead equitable claims in the alternative, the party may only do so if one or more of the parties

contests the existence of an express contract governing the subject of the dispute." *Goldstein v.

Home Depot U.S.A., Inc.*, 609 F. Supp. 2d 1340, 1347 (N.D. Ga. 2009) (dismissing a claim for

unjust enrichment because neither side disputed the existence of a contract and because the plaintiff

had incorporated the allegation of a contract into the unjust enrichment claim); *Bank of the Ozarks

v. Arco Cmty. Outreach Coal., Inc*., No. CV 212-017, 2013 WL 164421, at *6 (S.D. Ga. Jan. 15,

2013).

     The AC alleges the following Defendants had contracts with Beaulieu: Karel

Vercruyssen [AC ¶ 125], South Richmond Chemicals [AC ¶ 138], Pinnacle Polymers[35] [AC ¶ 151-

153], Marglen [AC ¶ 166], CEEA [AC ¶ 198], Avalon [AC ¶ 237], Sabuka [¶ 249], Beaulieu

---

[35] The contracts were alleged to have been entered between Beaulieu and Pinnacle Polymers' predecessor.

Canada [AC ¶ 282, 288], and Renuco Recycling [AC ¶ 387]. Each of those allegations was incorporated into Count 7. [AC ¶ 463]. Because neither party to each contract has disputed those contracts, Plaintiff cannot state a claim for unjust enrichment as to these Defendants.

With respect to the other Count 7 Defendants, Plaintiff alleged that some of the Bouckaert Affiliates received payments without any written contract. [AC ¶ 117]. However, the only Defendant expressly identified in the allegations as not having a contract is Leinster. [AC ¶ 219]. The AC further alleges that Leinster is owned by the Bouckaert Children; that it provided services related to procuring goods manufactured in Asian countries for shipment to the United States; that because of the lack of contract the prices Leinster charged Beaulieu fluctuated; and that Beaulieu paid Leinster more than it would in an arm's length transaction with a third party. [AC ¶ 215, 217-220]. Whether these allegations state a claim for unjust enrichment is similar to the reasonably equivalent value analysis in Part V.C.1 as the Court must determine whether the allegations are sufficient to demonstrate an inequity between the benefit conferred by Beaulieu and the value received by Beaulieu that would require compensation from Leinster. Here, the allegations that insiders of Beaulieu owned Leinster and that Beaulieu did not have a contract with Leinster make it plausible that Leinster overcharged Beaulieu for services. Therefore, the AC states a claim against Leinster for unjust enrichment.

The remaining Count 7 Defendants are neither alleged to have contracts or to not have contracts with Beaulieu.[36] As explained above, unjust enrichment is an alternative remedy to a failed contract claim. In the absence of any allegations regarding such a contract and the absence of a claim for breach of contract, the AC does not state a claim for unjust enrichment as an alternate

---

[36] The Court notes that Exhibit A to the AC is a copy of Ralph Boe's proofs of claim, which includes copies of a Supplemental Executive Retirement Plan established by Beaulieu for Mr. Boe and a Release and Separation Agreement between Mr. Boe and Beaulieu. [Doc. 122, Ex. A]. Additionally, a copy of an employment agreement between Beaulieu and Del Land was attached to a reply brief filed on behalf of Mr. Land. [Doc. 214 Ex. 1].

theory of recovery. Based on the foregoing, Count 7 will be dismissed as to all Count 7 Defendants except Leinster.

### B. Count 9

In Count 9 of the AC, Plaintiff presents a narrower unjust enrichment claim, seeking to recover against Beaulieu Canada, Mieke Hanssens, Marglen, OneSource, Renuco Recycling, and Michael Pollard for amounts they owe to Beaulieu. The AC alleges that Beaulieu Canada owes Beaulieu accounts receivable in the amount of $1,588,767 and Assessment Damages in the amount of $1,252,147.41 and that Beaulieu Canada retained the benefit of fraudulent transfers, offsets, and over- and under-charge damages, all of which unjustly enriched Beaulieu Canada [AC ¶ 290, 481-484]. The AC alleges that Mieke Hanssens benefitted from the foregoing when she sold Beaulieu Canada because their value would have been reflected in the sale price. [AC ¶ 486]. The AC alleges Marglen owes Beaulieu $48,824 in unpaid accounts receivable, OneSource owes Beaulieu $8,179 in unpaid accounts receivable, Renuco Recycling owes Beaulieu $1,775 in unpaid accounts receivable, and Michael Pollard failed to pay Beaulieu for $23,192 in carpet he received for his personal residence, and that each Defendant has been unjustly enriched as a result. [AC ¶ 487-494].

As noted in Count 7, the AC alleges Beaulieu had contracts with Beaulieu Canada, Marglen, and Renuco Recycling. For the reasons the AC did not state a claim to those Defendants under Count 7, it also fails to state a claim to those Defendants under Count 9. With respect to OneSource and Michael Pollard, as in Count 7, there is no allegation of the existence or non-existence of a contract, nor is there any assertion of breach of contract against the Defendants. Therefore, the AC fails to state a claim for unjust enrichment against OneSource and Mr. Pollard.

The claim against Mieke Hanssens is slightly different in that the AC alleges that the unjust enrichment retained by Beaulieu Canada resulted in an inflated sales price when Ms. Hanssens sold Beaulieu Canada, such that she also unjustly benefited. Ms. Hanssens contends that only direct benefits can be the subject of an unjust enrichment claim, and Plaintiff has not alleged that Beaulieu conferred a benefit on her in these transactions. Plaintiff argues that it pled benefits Ms. Hanssens directly received as a result of the sale of Beaulieu Canada, but if it did not, a direct benefit is not necessary to sustain a claim for unjust enrichment. However, the Court need not resolve this dispute because the AC fails to state a claim against Ms. Hanssens regardless of whether her alleged benefit was direct or indirect. Once again, the AC asserts no facts regarding the existence of a contract with Ms. Hanssens and does not assert any contract claim against Ms. Hanssens. Therefore, there can be no alternative claim for a recovery under unjust enrichment. Accordingly, Count 9 will be dismissed as to all Defendants.

## IX. Count 8: Breach of Contract

In Count 8, Plaintiff seeks to recover against Beaulieu Canada for breach of contract. [AC ¶ 469]. To establish a claim for breach of contract, Plaintiff must allege facts showing "the breach, which must be more than de minimis, and the resultant damages to the party having the right to complain about the contract being broken." *TechBios, Inc. v. Champagne*, 301 Ga. App. 592, 595, 688 S.E.2d 378, 381 (2009).

The AC alleges that Beaulieu and Beaulieu Canada entered into the Master Sales Agreement dated March 1, 2001, governing the sale of goods, with 30-day payment terms, that Beaulieu Canada owes Beaulieu $1,588,767 under the Master Sales Agreement, and therefore is in breach. [AC ¶ 469-472]. The AC further alleges that Beaulieu and Beaulieu Canada entered into

the Letter Agreement dated May 22, 2017, that provided for reimbursement of assessed damages,[37] and that Beaulieu Canada failed to pay the Assessment Damages pursuant to the Letter Agreement. [AC ¶ 473-475]. The AC alleges that Beaulieu was damaged in the amount of the accounts receivable and Assessment Damages owed under the agreements. [AC ¶ 476].

Beaulieu Canada argues Count 8 should be dismissed to the extent it is based on the Letter Agreement, because Beaulieu Canada's obligation under the Letter Agreement has not yet arisen. The Letter Agreement requires Beaulieu Canada to "reimburse [Beaulieu] for all amounts due, owing, and paid to" U.S. Customs and Border Protection.[38] [Doc. 149 Ex. B ¶ 1]. Beaulieu Canada argues that this language only applies to amounts already paid by Beaulieu and that the AC does not allege that Beaulieu has made any such payments but has only alleged that fees have been assessed. Plaintiff argues that the payment obligation applies to all amounts due, all amounts owing, and all amounts paid, such that, even if not yet paid, Beaulieu Canada breached the Letter Agreement. Plaintiff argues further that it is inappropriate for the Court to interpret a contract on a motion to dismiss.

Interpretation of a contract is a question of law such that it can be resolved on a motion to dismiss. *See S. Point Retail Partners, LLC v. N. Am. Properties Atlanta, Ltd*., 304 Ga. App. 419, 423, 696 S.E.2d 136, 139-40 (2010) (interpreting language of a contract on a motion to dismiss). Georgia law sets forth a three-step process for interpreting contracts:

> first, the court determines whether the contract language is clear and unambiguous. If the language is clear, the court applies its plain meaning; if it is unclear, the court proceeds to step two. At step two, the court attempts to resolve the ambiguity using Georgia's canons of contract construction. If the ambiguity cannot be resolved using

---

[37] Assessment Damages is defined in the AC as "assessed alleged unpaid lawful duties, taxes and fees in the amount of $1,252,147.41." [AC ¶ 290].

[38] Beaulieu Canada attached a copy of the Letter Agreement to its brief in support of the Motion. [Doc. 149 Ex. B]. The Letter Agreement is referenced in the AC, is central to Plaintiff's claims, and is not disputed as to authenticity. Accordingly, the Court may consider it on the Motion to Dismiss.

the canons, then the court proceeds to step three, where the parties'
intent becomes a question of fact for the jury.

*Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1237 (11th Cir. 2019) (interpreting contract

language and affirming dismissal of contract claims); *Ralls Corp. v. Huerfano River Wind, LLC*,

27 F. Supp. 3d 1303, 1321 (N.D. Ga. 2014) (noting that, "under Georgia law 'contract construction

is a question of law for the court, unless, after applying the rules of contract interpretation, an

uncertainty still remains as to which of two or more possible meanings represents the parties' true

intentions.'"). As step three indicates, questions of law may give way to questions of fact that

cannot be resolved at the pleadings stage. 935 F.3d at 1242 (finding the district court erred in

dismissing breach of contract claim when the contract language was ambiguous and could not be

determined by applying canons of construction).

Cases cited by Plaintiff support the conclusion that the Court cannot interpret a

contract on a motion to dismiss when the language at issue is ambiguous.[39] In *BioHealth Medical*

*Laboratory, Inc. v. Cigna Health and Life Insurance Company*, 706 F. App'x 521 (11th Cir. 2017),

the court held that when there was disagreement about the law applicable to the term "collateral

source" in the assignment documents at issue the district court erred in interpreting the contract on

a motion to dismiss. *Id.* at 524. The court found that there was at least ambiguity as to the law

applicable to the contract term sufficient to require discovery into extrinsic evidence before a

definitive interpretation could be made. *Id.* The court further stated that by applying Florida law

the district court had nullified the collateral source language in the assignments. *Id.* In *Maryland*

*Casualty Company v. Smartcop, Inc.*, No. 4:11–cv–10100, 2012 WL 2675476 (S.D. Fla. July 6,

2012), a declaratory judgment action by the insurer against its insured, the district court found

---

[39] The Court notes that Plaintiff seems to simultaneously argue that there is no ambiguity in the Letter Agreement and
that the Court should not interpret the Letter Agreement on a motion to dismiss due to factual issues. [Doc. 174 at 12-
13]. These two positions are inherently in conflict given Georgia law on the topic.

substantial factual issues precluded its interpretation of the insurance contract at the motion to

dismiss stage. *Id.* at *3. The insurer had filed the action to determine whether it was required to

defend the insured in a pending wrongful death action. *Id.* at *2. The Court noted that pending

litigation in state court would establish the factual record upon which it would then be appropriate

to determine whether policy exclusions precluded coverage. *Id.* at *3 & n.4. In so concluding, the

court noted that contract interpretation was a matter of law but because of the aforementioned

issues, it "declines Defendant's invitation to interpret the contract at the motion to dismiss stage."

*Id.* at *3. In *Sutow v. C.I.R.*, 1992 WL 198498, 64 TCM (CCH) 537 (U.S. Tax Ct. 1992), which

was a review of the tax commissioner's determination of tax deficiencies and did not involve a

motion to dismiss or contract interpretation, the court noted that the term "reimbursement" in a

provision of the Internal Revenue Code is not necessarily limited to a direct payment but can be a

three-party transaction and was thus ambiguous. *Id.* at *7. In *U.S. v. Public Warehousing Co.*

*K.S.C.*, NO. 1:05-CV-2968, 2017 WL 1021745 (N.D. Ga. March 16, 2017), the material issue was

the definition of "manufacturer/supplier." In *Public Warehousing*, the parties disputed whether an

entity was a supplier or a distributor. *Id.* at *8. The court noted the usual definition of supplier and

the definition previously proposed in negotiations by the defendant in concluding that more

discovery was needed to determine the parties' intent. *Id.* Finally, in *Mt. Hawley Insurance Co. v.*

*One River Plaza Co.*, No. 13–CV–62390, 2014 WL 11721638 (S.D. Fla. Sept. 18, 2014), the

parties to an insurance coverage dispute relied on competing dictionary definitions of the word

"contractor" to argue their opposing positions. *Id.* at *2. The court declined to determine the

meaning of the word as it found that, to the extent the word was ambiguous, the parties should

have the opportunity to present evidence of their intention when entering the contract. *Id.*

86

Based on the foregoing, if the Court finds the Letter Agreement to be ambiguous, it must deny the Motion to Dismiss as to Count 8. Initially, the Court notes that the allegations regarding breach of the Master Sales Agreement are not challenged by Beaulieu Canada and that Plaintiff has sufficiently alleged the contract and its breach in the AC such that Count 8 will not be dismissed as it relates to the Master Sales Agreement. With respect to the Letter Agreement, the parties dispute whether the term "reimburse" is ambiguous and whether the series "due, owing, and paid" is conjunctive or disjunctive. Beaulieu Canada argues that "reimburse" is not ambiguous and relies upon several dictionaries and cases to support its argument that the term is not fairly understood in more than one way. *See Foulston Siefkin LLP v. Wells Fargo Bank of Texas N.A.*, 465 F.3d 211, 215 (5th Cir. 2006) (trust language providing for "reimbursement" of the trustee for expenses "incurred" in litigation does not require reimbursement to the trustee of expenses that the trustee would never be required to pay because they were paid by insurance); *United States v. Upton*, 91 F.3d 677, 682 (5th Cir. 1996) (statute providing for reimbursement to contractor of bond premiums upon showing of full payment to the surety did not allow for reimbursement if the surety had not cashed the bond premium checks); *Mathisen by Mathisen v. Sec'y of Dep't of Health & Hum. Servs.*, No. 92-0703V, 1994 WL 808593, at *3 (Fed. Cl. May 2, 1994) (finding that an "unreimbursable" expense is one that carries no legal obligation to repay because it is the opposite of reimburse, which implicitly connotes a legal obligation to repay); *Galderma Lab'ys, L.P. v. Dimensional Healthcare, Inc.*, No. CIV.A.4:06CV822-Y, 2007 WL 1703445, at *5 (N.D. Tex. June 13, 2007) (contract that required plaintiff to "reimburse" defendant for costs and expenses "incurred" did not unambiguously support argument that defendant was entitled to reimbursement for costs that had been invoiced but not yet paid by defendant; the court distinguished between incurring liabilities and incurring costs, stating that costs are not incurred until they are paid).

Plaintiff argues that the term can be subject to more than one interpretation and cites one case in which the term reimburse was considered ambiguous. *See Sutow,* 64 TCM (CCH) 537 (US Tax Ct 1992).

The Court notes the common usage of the word reimburse as referenced by Beaulieu Canada,[40] and the usual usage of the word in a sentence such as "due, owing, and paid." Taking the term reimburse in isolation militates toward accepting Beaulieu Canada's position that the term is unambiguous. However, when considering the series following the word reimburse and the remainder of the paragraph in which the sentence is contained the Court concludes that the meaning of the sentence is ambiguous.

Paragraph 1 of the Letter Agreement states:

> Payment: BCC agrees to reimburse the Company [Beaulieu] for all amounts due, owing, and paid to the U.S. government (or any branch thereof) or the Canadian government, if any arising out of or related to the Disclosure, including, without limitation, any duties, taxes, interest and penalties. BCC shall make such payment to the Company in U.S. Dollars upon demand (and in any event within 5 business days of demand therefor), without offset or deduction for any reason, *and on the payment terms or schedule as the Company is required to make to the U.S. government* (or any branch thereof) or the Canadian government, if applicable.

[Doc. 149 Ex. B, ¶ 1 (emphasis added)]. These provisions call into question Beaulieu Canada's argument that reimbursement requires Beaulieu to have paid the Assessed Damages prior to Beaulieu Canada being required to pay because the provision for reimbursement and Beaulieu's payment obligation are easily read to provide that Beaulieu can make demand upon learning of amounts due and owing and is not required to wait until any such amounts have been paid. This reading of the Letter Agreement is further supported by the terms following provisions for demand which state that the Company "is required to make" which does not indicate a requirement for

---

[40] Beaulieu Canada cites several dictionaries to argue that reimburse means to pay back. [Doc. 149 at14-15].

previous payment by Beaulieu. Thus, the question whether all three terms must have been satisfied prior to Beaulieu Canada's obligation arising is a question of the parties' intent, and the Court will not interpret the terms of the Letter Agreement on the Motion to Dismiss. Rather, the Court finds that the Letter Agreement and its breach is sufficiently alleged to give Beaulieu Canada notice of the claims against it and Count 8 is not subject to dismissal.

## X. Count 11: Recovery of Unlawful Distributions and/or Improper Dividends

In Count 11, Plaintiff seeks to recover from the CAMI Trustees, Carl Bouckaert, and Mieke Hanssens unlawful distributions and/or improper dividends under O.C.G.A. § 14-11-407, which prohibits distributions to a member of an LLC if the distribution would cause the company to be unable to pay its debts as they become due or cause the company's liabilities to exceed its assets. A member or manager who votes for or consents to such a distribution can be held personally liable. O.C.G.A. § 14-11-408(a).

The AC sets forth the recipient, amount, and date of each alleged unlawful distribution in the total amount of $3,040,667.08. [AC ¶ 363]. Most of the distributions occurred in 2013 between July 24, 2013 and November 30, 2013, with one distribution in 2014 on October 31. [Id.]. The AC alleges that at all relevant times, Carl Bouckaert, Mieke Hanssens, and The CAMI Trust were owners and members of Beaulieu, and that they caused Beaulieu to issue the distributions. [AC ¶ 503-504]. In doing so, they did not act in good faith, in a manner that a reasonable person would believe was in the best interests of Beaulieu, or with the care an ordinarily prudent person in a like position would exercise in similar circumstances. [AC ¶ 505-507]. Instead, they put their own financial interests ahead of Beaulieu, and the distributions caused Beaulieu to be unable to pay its debts as they came due or caused its liabilities to exceed its assets. [AC ¶ 508-510].

The Count 11 Defendants argue the claim is time-barred under O.C.G.A. § 14-11-408(c), which requires a claim for unlawful distribution be commenced "within two years after the date on which the effect of the distribution is measured." Defendants argue that under § 14-11-407(c)(3), the effect of the challenged distributions must be measured based on the date they were "authorized" (if payment occurred within 120 days after the date of authorization) or the date the payments were "made" (if occurring more than 120 days after the date of authorization). The Count 11 Defendants further argue that the AC fails to state a claim for wrongful distributions because § 14-11-408(a) limits liability to "the amount of the distribution that exceeds what could have been distributed without violating Code Section 14-11-407." Section 14-11-407 is violated when the distribution causes insolvency, and the AC fails to sufficiently plead that the distributions resulted in Beaulieu's insolvency. In addition, personal liability applies when a member or manager "votes for or expressly consents to a distribution" that violates § 14-11-407. The AC does not contain any allegation as to voting for or expressly consenting to the challenged distributions. Finally, Defendants argue the distributions are not unlawful because they were authorized by Sections 9.2 and 9.3 of the Operating Agreement.

The Court finds that the face of the AC shows that the claim is barred by the statute of limitations. As argued by Plaintiff, an affirmative defense is not generally a basis to grant a motion to dismiss because "[a] plaintiff is 'not required to negate an affirmative defense in [its] complaint.'" *Twin City Fire Ins. Co. v. Hartman, Simons & Wood, LLP*, 609 F. App'x 972, 976 (11th Cir. 2015) (quoting *La Grasta v. First Union Sec., Inc.*, 358 F.3d 840, 845 (11th Cir.2004)). However, "[a] complaint may be dismissed … when the existence of an affirmative defense 'clearly appears on the face of the complaint.'" *Id.* Here, the AC alleges that the challenged

distributions were primarily made during 2013 and, at the latest, on October 31, 2014, such that the two-year period expired prior to the July 2017 bankruptcy filing.

Plaintiff argues the statute of limitations should be tolled under O.C.G.A. § 9-3-96, which provides that "[i]f the defendant or those under whom he claims are guilty of a fraud by which the plaintiff has been debarred or deterred from bringing an action, the period of limitation shall run only from the time of the plaintiff's discovery of the fraud." The statute requires actual fraud rather than constructive fraud, and the fraud must have "deter[ed] or debar[red] the bringing of the action." *Charter Peachford Behavioral Health Sys. v. Kohout*, 233 Ga. App. 452, 457, 504 S.E.2d 514, 522 (1998). "The fraud must conceal the cause of action and cut plaintiff off from suing, preclude him, hinder him, shut him out, or exclude him to debar him from bringing suit for purposes of suspension of the running of the statute of limitation." *Id.* at 457-58, 504 S.E.2d at 522. "To establish fraudulent concealment, a plaintiff must prove that: (1) the defendant committed actual fraud; (2) the fraud concealed the cause of action from the plaintiff; and (3) the plaintiff exercised reasonable diligence to discover his cause of action despite his failure to do so within the statute of limitation." *F&S Glob. Dev., LLC v. Renasant Bank*, No. 1:12-CV-1684, 2013 WL 12247812, at *3 (N.D. Ga. Feb. 19, 2013) (citing *Daniel v. Amicalola Elec. Membership. Corp.*, 289 Ga. 437, 711 S.E.2d 709, 716 (2011)). "A defendant's 'mere silence' is not sufficient to toll the statute of limitations unless there is a duty to disclose because of a relationship of trust and confidence between the parties." *Id.* Although the AC alleges certain badges of fraud for purposes of establishing a claim for actual fraudulent transfer, it does not allege any fraud by Defendants to actively prevent the discovery of alleged unlawful distributions.

Plaintiff cites *Deal v. Tugalo Gas Co., Inc.*, 2018 WL 4255857, *3 (N.D. Ga. Sept. 6, 2018) (vacated in part on other grounds on reconsideration by No. 2:17-CV-209-RWS, 2018

WL 10455283 (N.D. Ga. Nov. 29, 2018)), in support of its argument that dismissal is inappropriate if the tolling statute might apply. However, in *Tugalo Gas*, the court found the statute of limitations defense was "not apparent on the face of the Amended Complaint" in addition to finding intensive fact issues regarding tolling. *Id.* Although the court does not elaborate on those fact-intensive issues, the complaint in *Tugalo Gas* alleged that the president of the debtor caused the debtor "to pay his personal expenses, extend benefits to him, and to incur numerous questionable charges for his family and the other individual Defendants" that were de facto dividends. 2018 WL 4255857, at *2. Here the limitations defense is apparent from the face of the AC, and the AC does not allege any facts regarding efforts to conceal the unlawful dividends or otherwise prevent their discovery or the discovery of a claim for unlawful dividends. Accordingly, there is no basis to toll the statute of limitations. Additionally, the AC does not allege what the dividends were used for and makes only conclusory allegations that they were unlawful. Therefore, Count 11 will be dismissed.

## XI: Counts 13-28: Claim Objections

### A. Count 13: Disallowance of Claims of Ralph Boe

The AC alleges that Ralph Boe filed Proof of Claim No. 1335 asserting an unsecured claim in the amount of $1,119,193 based on amounts due under an executive retirement plan and filed Proof of Claim Nos. 1726 and 1791 asserting duplicate unsecured claims in the same amount. [AC ¶ 376 and Ex. A[41]]. Plaintiff seeks to disallow Mr. Boe's Claim Nos. 1726 and 1791. Although Mr. Boe requested dismissal of all counts against him, he offered no argument regarding the allegations in Count 13. The AC provides sufficient allegations that Claims Nos. 1726 and 1791 are duplicates of Claim No. 1335. Therefore Count 13 will not be dismissed.

---

[41] Page 2 of Proof of Claim No. 1791, which is the page that includes the amount of the claim, is missing from Exhibit A.

**B. Count 15:[42] Disallowance of 546(c) Reclamation Claims of Marglen and Beaulieu Canada**

The AC alleges that Marglen filed Notice of Reclamation Demand No. 900003 in the amount of $738,993.26 for the value of goods allegedly sold and delivered to Beaulieu within 45 days of the petition date. [AC ¶ 380 and Ex. F]. The AC alleges that Beaulieu Canada filed Notice of Reclamation Demand No. 900004 in the amount of $1,578,286.66 for the value of goods allegedly sold and delivered to Beaulieu within 45 days of the petition date. [AC ¶ 390 and Ex. K]. Marglen withdrew its reclamation demand on December 4, 2019, and Beaulieu Canada withdrew its reclamation demand on February 14, 2020. [Doc. 205 at n.2, Doc. 217 at n.3 & Case No. 17-41677 Docs. 1686, 1869]. Therefore, the Motion to Dismiss is moot as to Count 15, and Count 15 will be dismissed.

**C. Count 16: Disallowance of 503(b)(9) Requests of Centaur Tech and Centaur Equestrian**

The AC alleges that Centaur Tech filed 503(b)(9) Request No. 900016 asserting an administrative expense claim in the amount of $242,378.41 [AC ¶ 381] and that Centaur Equestrian filed 503(b)(9) Request No. 900080, asserting an administrative expense claim in the amount of $2,300. [AC ¶ 391]. Plaintiff seeks disallowance of the Centaur Tech and Centaur Equestrian § 503(b)(9) claims to the extent that the goods represented in the claims were not sold, delivered, and received by the Debtors within 20 days of the petition date.[43] Plaintiff contends that the information attached to the claims is not sufficient to determine that the goods were received by the Debtors within 20 days of the petition date. Count 16 was not specifically addressed in the

---

[42] Count 14, which sought disallowance of claims filed by Steven Hillis, was resolved by the stipulation of dismissal. [Doc. 258].
[43] Plaintiff also seeks on different grounds to disallow the Centaur Tech 503(b)(9) claim in Count 20 and to disallow the Centaur Equestrian 503(b)(9) claim in Count 28.

briefs filed or joined by Centaur Tech and Centaur Equestrian. But, to the extent they seek to dismiss this count, the Court will consider whether it states a claim.

The Bankruptcy Code provides for allowance as an administrative claim of "the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business." 11 U.S.C. § 503(b)(9). The allegations in the AC regarding the timing of the receipt of the goods are supported by the 503(b)(9) requests. The petition date is July 16, 2017. Centaur Tech's request does not state when the goods upon which its request was based were received by the Debtors, but its attachments include bills of lading with a space for the delivery date. The delivery date is not filled out on all the bills of lading [see e.g., AC Ex. F at 47]. Centaur Equestrian's request indicates that some of the goods on which its request was based were received by the Debtors between June 19, 2017 and June 25, 2017, which is outside the 20-day period. [AC Ex. L at 3]. Therefore, the AC plausibly states a claim for disallowance of the 503(b)(9) requests to the extent they do not show that the goods at issue were received during the 20 days prior to the Petition Date. The Motion to Dismiss will be denied as to Count 16.

### D. Count 17: Disallowance of 503(b)(9) Request of Pinnacle Polymers

The AC alleges Pinnacle Polymers filed 503(b)(9) Request No. 900106 in the amount of $667,207. [AC ¶ 379 and Ex. D]. The AC also alleges that the prices charged to Beaulieu by Pinnacle Polymers were above-market and exceeded prices that would have been charged by unaffiliated vendors such that Beaulieu paid Pinnacle Polymers more that it would have to a third party in an arm's length transaction. [AC ¶ 155-156]. Plaintiff contends that these facts establish a basis to disallow the 503(b)(9) request. Pinnacle argues that this count is derivative of Counts 2 and 3 because all three counts are premised on the allegation that Pinnacle charged Beaulieu above-

market prices and, therefore, it should be dismissed. However, in Counts 2 and 3, the Court found the allegations of overcharging to be plausible. Under 11 U.S.C. § 503(b)(9), a creditor may be allowed an administrative expense claim for "the value of any goods received by the debtor within 20 days before the date of commencement of a case[.]" The invoice or purchase price is the presumptive value for purposes of § 503(b)(9). *In re SemCrude, L.P.*, 416 B.R. 399, 405 (Bankr. D. Del. 2009) (citing 4 Collier on Bankruptcy ¶ 503.16[a] (15th ed. 2008)). However, the presumption "may be rebutted by evidence indicating that, under the facts and circumstances of a particular transaction, the purchase or invoice price is not an appropriate or relevant indicator of the 'value' obtained by the Debtors." *Id.* Here, with respect to the Bouckaert Affiliates, the overcharging allegation is combined with allegations that the Affiliates are insiders and may have Beaulieu as their only customer, which makes it plausible that the invoice price is not the correct value. Therefore, Plaintiff has stated an objection to the 503(b)(9) claim, and Count 17 will not be dismissed.[44]

### E: Count 18: Disallowance of Reclamation Claim, 503(b)(9) Request, and Proof of Claim No. 1252 of Marglen

The AC alleges that Marlgen filed 503(b)(9) Request No. 900028 in the amount of $290,357.80, Proof of Claim No. 1252 asserting general unsecured claims in the amount of $3,792,597.51 based on the sale of goods, and Notice of Reclamation Demand No. 900003 in the amount of $738,993.26 for the value of goods allegedly sold and delivered to Beaulieu within 45 days of the petition date. [AC ¶ 380 and Ex. E]. The AC alleges that Mieke Hanssens and Carl Bouckaert required Beaulieu to purchase 100% of its polyester staple fiber and other product from

---

[44] The AC alleged that Pinnacle Polymers' 503(b)(9) request included documentation pertaining to the dates that it sold and shipped goods to Beaulieu, but that the documentation was insufficient to determine that the goods were actually received by Beaulieu within 20 days of the petition date. [AC ¶ 370]. However, Count 17 does not seek to disallow Pinnacle Polymers' 503(b)(9) request on that basis.

Marglen, often at above-market prices. [AC ¶ 163]. As a result, Beaulieu paid Marglen more than it would have paid a third party in an arm's length transaction for the purchases. [AC ¶ 169].

Plaintiff contends there is some overlap among the three claims in that they are seeking to recover for some of the same goods, such that Proof of Claim No. 1252 should be reduced to the extent the 503(b)(9) request and the reclamation claim are allowed. Additionally, Plaintiff contends that the alleged over-charging provides a basis to disallow the claims to the extent they exceed the fair market value at which the goods would have changed hands with a third party in arm's length transactions. Marglen argues that Count 18 should be dismissed because it is derivative of the avoidable transfer claims in Counts 2, 3, and 6, which are also subject to dismissal. Furthermore, to the extent the 503(b)(9) objection is related to Marglen's reclamation claim, the Motion to Dismiss is moot because Marglen withdrew its reclamation claim.

Similar to Count 17, it appears Plaintiff is seeking to disallow three of Marglen's claims by challenging the asserted value of the goods Marglen delivered to Beaulieu. Because the Court has found the allegations of overcharging to be plausible, the AC states a claim for disallowance based on value.

With respect to the allegation of duplication among the claims, Marglen has withdrawn its reclamation claim such that it cannot be the subject of duplication. The 503(b)(9) request lists invoices dated between June 26, 2017 and July 13, 2017. [Ex. E at 12]. Documentation attached to Proof of Claim 1252 appears to include at least some of the same invoices. [Ex. E at 19-20]. Therefore, Plaintiff has plausibly shown duplication between Marglen's 503(b)(9) request and Proof of Claim 1252.

Accordingly, Count 18 will be dismissed as moot to the extent it seeks disallowance based on the reclamation claim. Count 18 will not be dismissed to the extent it is based on the

asserted value of goods delivered to Beaulieu or to the extent it alleges duplication between Marglen's 503(b)(9) claim and Proof of Claim 1252.

### F: Count 19: Disallowance of Marglen Proof of Claim No. 1253

The AC alleges Marglen filed Proof of Claim No. 1253 asserting a general unsecured claim in the amount of $2,088,193.29 based on amounts due under a promissory note (the "Note"). [AC ¶ 380 and Ex. E]. Plaintiff seeks to disallow Proof of Claim No. 1253 on the ground that it is not a valid negotiable instrument under Article 3 of the Georgia Commercial Code because it fails to show sufficient consideration. Plaintiff argues that the proof of claim is not prima facie valid because Marglen failed to include documentary support underlying the Note.

Marglen asserts that the Note was extended by Beaulieu in exchange for a credit against Beaulieu's open receivable balance due to Marglen, that such consideration is sufficient for a negotiable instrument under Georgia law, that a copy of the Note was attached to the proof of claim, and that the proof of claim was submitted in writing, was signed under penalty of perjury, and conforms substantially to the Official Form.

A proof of claim executed and filed in accordance with the Bankruptcy Rules is prima facie valid and is deemed allowed in the absence of an objection. 11 U.S.C. § 502(a); Fed. R. Bankr. P. 3001(f). When a claim is based on a writing, "a copy of the writing shall be filed with the proof of claim." Fed. R. Bankr. P. 3001(c)(1). The burden is on the objecting party to overcome the prima facie validity of the claim. If the objecting party succeeds, the burden of proof shifts to the claimant to prove its claim by a preponderance of the evidence. *In re International BioChemical Inds., Inc.*, 521 B.R. 395, 398 (Bankr. N.D. Ga. 2014) (Ellis-Monro, J.) (citing 4 Collier on Bankruptcy ¶ 502.02[3][f] (16th ed.)). Under § 502(d), if the creditor is liable for an avoidable transfer, its claim will be disallowed except to the extent it has satisfied its liability. 11

97

U.S.C. § 502(d). If it has satisfied its liability on an avoidable transaction, the creditor may assert a claim for the amount of the satisfaction. *Id.* § 502(h).

Marglen attached a copy of the Note dated October 19, 2016 in the principal amount of $2,891,318.95 to Proof of Claim No. 1253, as well as an account summary showing payments and accrued interest from October 29, 2016 to July 15, 2017. As such, Proof of Claim 1253 appears to comply with Rule 3001. Plaintiff cites to *A&B Associates, LP*, No. 17-40185, 2019 WL 1470892 (Bankr. S.D. Ga. 2017), for the proposition that additional documents are required, such as invoices or an accounting. In *A&B*, the debtor objected to the proof of claim of a creditor with a first-priority lien on the debtor's apartment building. The creditor's proof of claim had multiple components, including legal fees, expenses, default interest, money paid under a contempt order, and default interest returned to the borrower, among other things. *Id.* at *31-32. In that case, the creditor not only attached the note and deed to secure debt, but attached documentation substantiating the other components of its claim, including assignments, security agreements, multiple UCC-1 financing statements, a calculation of default interest, and pleadings from the proceedings resulting in the contempt order. *Id.* at *33. In this case, Marglen's claim is limited to the balance on the Note, and the Court cannot conclude that it needs to submit any more documentation than the Note and the account summary that were attached to the claim. Therefore, the Court finds the proof of claim meets the requirements for prima facie validity.

Plaintiff also argues as a basis for disallowance that the Note is not a valid negotiable instrument due to lack of consideration. Assuming without deciding that the Note meets the definition of a negotiable instrument because it is a promise to pay without any other undertakings and is payable at a definite time,[45] then under Georgia law, "[t]he drawer or maker

---

[45] *See* O.C.G.A. § 11-3-104(a).

of an instrument has a defense if the instrument is issued without consideration." O.C.G.A. § 11-3-303(b). When an instrument is made for value, it is made for consideration. *Id.* An instrument is transferred for value when it is "issued or transferred as payment of, or as security for, an antecedent claim against any person, whether or not the claim is due[.]" *Id.* § 11-3-303(a)(3).

In *Smith v. Thigpen*, 298 Ga. App. 572, 680 S.E.2d 604 (2009), cited by Marglen, the court said a negotiable instrument "is *presumed to be based on a valid and sufficient consideration.*" 298 Ga. App. at 573, 680 S.E.2d at 605 (citing *Leiter v. Arnold*, 114 Ga. App. 323, 151 S.E.2d 175 (1966)) (emphasis added). Plaintiff has made a bare allegation of insufficient consideration and argues the Court must take his allegation as true. The Court disagrees. It is incumbent upon Plaintiff to allege facts that, when taken as true, would overcome the presumption of sufficient consideration. Plaintiff has not done so here. Therefore, the Motion to Dismiss will be granted as to Count 19.

### G: Count 20: Disallowance of Centaur Tech 503(b)(9) Request and Proof of Claim

The AC alleges Centaur Tech filed 503(b)(9) Request No. 900016 asserting an administrative expense claim in the amount of $282,378.41 and Proof of Claim No. 1496 asserting a general unsecured claim in the amount of $2,205,090.62 for goods sold. [AC ¶ 381 and Ex. F]. The AC alleges that Centaur Tech was a middle man that purchased manufacturing chemicals from Phoenix Chemicals and re-sold them to Beaulieu at a mark up without adding any value. [AC ¶ 177-178]. As a result, Beaulieu paid Centaur Tech more than it would have paid a third-party in an arm's length transaction. [AC ¶ 179]. Plaintiff also asserts that the proof of claim includes the amounts claimed in the 503(b)(9) request. Centaur Tech argues that Count 20 should be dismissed because it is derivative of Counts 2 and 3 in that it is based on alleged fraudulent transfers.

Similar to Counts 17 and 18, it appears Plaintiff is seeking to disallow Centaur Tech's claims by challenging the asserted value of the goods Centaur Tech delivered to Beaulieu. Again, the Court finds such allegations to be plausible. Therefore, the AC states a claim for disallowance based on value.

With regard to duplication of amounts claimed, there does appear to be some overlap between the proof of claim and the 503(b)(9) request. Attached to both claims is an invoice dated July 10, 2017, No. 63070A-IN and the associated bill of lading. [AC Ex F at 60-70, 126-127]. Therefore, the AC states a claim for disallowance based on value and based on any duplicate amounts claimed, and Count 20 will not be dismissed.

**H: Count 21: Disallowance and Expungement of OneSource 503(b)(9) Request and Proof of Claim**

The AC alleges that OneSource filed 503(b)(9) Request No. 900090 in the amount of $92,328.25 and Proof of Claim No. 1394 asserting a general unsecured claim in the amount of $2,552,962.02 that includes amounts asserted in the 503(b)(9) request. [AC ¶ 382 and Ex. G]. The AC alleges that Michael and Nathalie Pollard required Beaulieu to purchase flooring samples from OneSource, which resulted in Beaulieu paying OneSource more than it would have paid a third-party in an arm's length transaction. [AC ¶ 205, 207]. Plaintiff seeks to disallow OneSource's 503(b)(9) request and proof of claim to the extent the claims exceed the fair market price at which the goods would have changed hands between Beaulieu and a third-party vendor acting at arm's length. Plaintiff also seeks to disallow and reduce the proof of claim by the amount that the 503(b)(9) request is allowed.

OneSource contends Count 21 should be dismissed because Counts 2 through 7 are due to be dismissed. [Doc. 160 n.1]. As previously noted, the AC alleges sufficient facts to plausibly assert overcharging by the Bouckaert Affiliates, including OneSource, such that the AC

states a claim in that regard. As to duplication of amounts between OneSource's claims, Exhibit G is unclear. It consists of a copy of the 503(b)(9) request, followed by a copy of the proof of claim, followed by what appears to be another copy of the 503(b)(9) request—all of which are stamped "Received Nov 03 2017" by American Legal Claim Services—followed by a letter dated October 31, 2017 stating that copies of the proof of claim and 503(b)(9) request are enclosed. [AC Ex. G]. It is unclear from Exhibit G and from the Court's review of the claims register kept by American Legal Claim Services, LLC [https://www.americanlegal.com/beaulieu/page/claim-register, *last visited* March 5, 2021], whether a copy of the 503(b)(9) request was an attachment to the proof of claim, in which case it would indicate some duplication of amounts claimed. It is plausible that the 503(b)(9) request was intended as an attachment to the proof of claim. Therefore, the AC sufficiently states a claim for disallowance of the proof of claim based on overcharging and to the extent it includes any amount allowed under the 503(b)(9) request, and Count 21 will not be dismissed.

### I: Count 22: Disallowance of Leinster Proof of Claim

The AC alleges that Leinster filed Proof of Claim No. 1547 asserting a general unsecured claim in the amount of $47,339.89. [AC ¶ 383 and Ex. H]. The AC alleges Leinster is owned by the Bouckaert Children and controlled by Stanislas Bouckaert. [AC ¶ 215]. The AC alleges Leinster procured goods manufactured in Asian countries for shipment to the United States and provided related services. [AC ¶ 217-218]. The AC alleges that there was no written agreement between Beaulieu and Leinster, and that prices charged by Leinster fluctuated to benefit the Bouckaert Children. [AC ¶ 219]. As a result, Beaulieu paid Leinster more that it would have paid a third party in an arm's length transaction. [AC ¶ 220]. Plaintiff seeks to disallow Leinster's proof

of claim to the extent the claim for its services exceeds the fair market price that would have been charged by an unaffiliated third party.

Leinster did not file an individual brief in support of the Motion, and Count 22 was not specifically addressed by the Master Brief.[46] However, because the Motion seeks dismissal of all counts of the AC, the Court will consider whether Count 22 states a claim. As with other claim objections, the allegation of overcharging by Bouckaert Affiliates is plausible. Therefore, Count 22 states a claim and will not be dismissed.

**J: Count 23: Disallowance and Expungement of Avalon 503(b)(9) Request and Proof of Claim**

The AC alleges Avalon filed 503(b)(9) Request No. 900081 asserting an administrative expense claim in the amount of $8,937.60 and Proof of Claim 1379 asserting a general unsecured claim in the amount of $119,061.60 for goods sold that includes amounts asserted in the 503(b)(9) request. [AC ¶ F and Ex. I]. The AC further alleges that Avalon is owned by Nicolas Bouckaert, that it sold recycled yarn tubes to Beaulieu at above-market prices, and that on information and belief Nicolas Bouckaert required Beaulieu to purchase from Avalon regardless of the preferences of plant managers. [AC ¶ 230, 232]. Additionally, on information and belief, the quality of goods sold by Avalon were such that they could only be used about 50% of the time. [AC ¶ 233]. As a result, Beaulieu paid Avalon more than it would have paid a third party in an arm's length transaction. [AC ¶ 234]. Defendant argues that this count is derivative of Counts 2 and 3 and should be dismissed.

The allegations of overcharging on which the claim objections rest are plausible. Therefore Count 23 will not be dismissed on that basis. Additionally, the Accounts Receivable

---

[46] Leinster did file an individual brief in support of a prior motion to dismiss the original complaint. [Docs. 75, 102]. That motion became moot upon the filing of the AC.

Aged Invoice Report attached to the proof of claim lists invoices that also formed the basis of the

503(b)(9) request. Therefore, the AC sufficiently states a claim for disallowance of the proof of

claim to the extent it includes any amount allowed under the 503(b)(9) request. Therefore, Count

23 will not be dismissed.

### K: Count 24: Disallowance of Renuco Recycling Administrative Expense Application and 503(b)(1) Claim

The AC alleges that Renuco Recycling filed Proof of Claim 1494 asserting a

general unsecured claim in the amount of $72,488.82 for real estate taxes, utilities, maintenance,

and other costs associated with Beaulieu's occupancy of real property in Dalton, Georgia under an

Occupancy Lease Agreement. [AC ¶ 385]. The AC further alleges that Renuco Recycling filed an

application for allowance of an administrative expense claim under 11 U.S.C. § 503(b)(1)(A) in

the amount of (1) $408,566.67 for reasonable rental value from the Petition Date until equipment

was sold and removed from the rental property and (2) the amount paid for real estate taxes,

utilities, and maintenance for Beaulieu's use of the model facility to store equipment from the

Petition Date through February 12, 2018. [AC ¶ 386 and Ex. J]. The AC alleges that under the

terms of the Occupancy Agreement, Beaulieu has no obligations other than for real estate taxes,

utilities, maintenance, and other costs associated with Beaulieu's use of the real property. [AC ¶

388]. Plaintiff seeks to disallow Renuco Recyling's administrative expense claim in the amount of

$408,566.67 because Beaulieu had no obligation to pay rent under the Occupancy Agreement.

Renuco Recycling does not specifically argue that Count 24 should be dismissed.

[Doc. 163]. A copy of the Occupancy Agreement is attached to Renuco Recycling's proof of claim

and included as part of Exhibit J, and appears to support Plaintiff's allegations. [AC Ex J at 7-8].

Accordingly, the Court concludes that Plaintiff has stated a claim for disallowance of the rent

component of Renuco Recycling's administrative expense claim, and Count 24 will not be dismissed.

### L: Count 25: Disallowance and Expungement of Beaulieu Canada Reclamation Claim, 503(b)(9) Request, and First Proof of Claim

The AC alleges Beaulieu Canada filed Reclamation Claim No. 900004 in the amount of $1,578,286.66, filed a 503(b)(9) request in the amount of $1,425,793.51, and Proof of Claim No. 1366 asserting a general unsecured claim in the amount of $1,577,582.54. [AC ¶ 390 and Ex. K]. The AC alleges that Mieke Hanssens required Beaulieu to purchase and sell product to and from Beaulieu Canada at prices that benefited Beaulieu Canada, and that the prices charged by Beaulieu Canada were above market and exceeded the prices that would have been charged by unaffiliated third parties for the same product. [AC ¶ 627]. Plaintiff seeks to disallow the reclamation claim, the 503(b)(9) request, and the proof of claim based on the alleged overcharging. Additionally, Plaintiff seeks to disallow the proof of claim to the extent it includes amounts also covered by the reclamation claim and the 503(b)(9) request. Beaulieu Canada contends Plaintiff is seeking to disallow the claims based on the fraudulent transfer allegations pled in Counts 2 and 3, and is therefore a derivative claim that must be dismissed. Beaulieu Canada further argues that because it withdrew its reclamation claim, Count 25 should be dismissed in part as moot.

Count 25 will be dismissed as moot to the extent it seeks disallowance of Beaulieu Canada's reclamation claim, which has been withdrawn. With respect to the 503(b)(9) request and the proof of claim, the allegations of overcharging on which the claim objection rests are plausible, and Count 25 will not be dismissed to the extent it seeks disallowance because of overcharging. Furthermore, the attachments to the 503(b)(9) request and the proof of claim indicate they may be derived from some of the same invoices. [AC Ex. K p. 16-17, 23-35]. Therefore, the AC

sufficiently states a claim for disallowance of the proof of claim to the extent it includes any amount allowed under the 503(b)(9) request and, to that extent, Count 25 will not be dismissed.

**M: Count 26: Disallowance and Expungement of Beaulieu Canada Second Proof of Claim**

The AC alleges Beaulieu Canada filed Proof of Claim No. 1546 as amended by Proof of Claim 1794 asserting an unsecured chargeback claim for amounts incurred by Beaulieu Canada for defective products shipped prepetition in the amount of $248,612.61, an unsecured chargeback claim from the rejection of warranties for defective goods shipped prepetition in the amount of $404,661.38, and an unsecured claim for rejected warranties that Beaulieu Canada may incur for defective goods shipped postpetition in an unliquidated amount. [AC ¶ 390 and Ex. K]. Plaintiff alleges that the proof of claim is not prima facie valid because Beaulieu Canada failed to submit documents to establish Beaulieu's legal liability for the chargeback claims. Beaulieu Canada contends the proof of claim asserts claims based on Beaulieu's rejection of warranty obligations while in Chapter 11 for defective goods known to have shipped prepetition (the liquidated amount) and for defective goods of which Beaulieu Canada had not yet been made aware as of the claims bar date (the contingent, unliquidated amount). Beaulieu Canada points out that it attached a spreadsheet of the known claims with specific details about the claims and that supporting documentation for the contingent claim was not included because it was not available due to the contingent nature of the claim.

It appears the parties may be focusing on two different elements of the proof of claim. While Beaulieu Canada relies on its documentation regarding the amount of the claim, Plaintiff contends the proof of claim lacks documentation to establish Beaulieu's liability for the claim, regardless of amount. Beaulieu Canada did not attach to the proof of claim a copy of the contract that allows Beaulieu Canada to recover from Beaulieu for product defects and warranty

claims. However, Beaulieu Canada filed a copy of the Master Sales Agreement with its response. [Doc. 149 Ex. A]. That contract was expressly referenced in the AC, and paragraph 10 of the contract addresses warranties. [AC ¶ 469-470]. Accordingly, the Court finds that the AC fails to state a claim as to Count 26, and Count 26 will be dismissed.

**N: Count 27: Disallowance of Beaulieu Canada 503(b) Rejection Administrative Expense Claim**

The AC alleges that Beaulieu Canada filed a Request for Allowance and Payment of Administrative Expense Claim asserting an administrative expense chargeback claim in the amount of $214,471.36 arising from rejection of warranties for alleged amounts incurred by Beaulieu Canada related to defective goods shipped on or after the Petition Date, an administrative expense chargeback claim in an unliquidated amount arising from rejection of warranties that Beaulieu Canada may incur for defective goods shipped on or after the Petition Date, and an administrative expense claim in the amount of $106,079.55 for costs Beaulieu Canada paid on behalf of Beaulieu to Leinster. [AC ¶ 390 and Ex. K]. Plaintiff seeks disallowance of the claim because Defendant has failed to show it resulted from an actual and demonstrable benefit to the Debtors' estates. Beaulieu Canada did not specifically seek dismissal of Count 27, other than based on the contention that the AC is a shotgun pleading. [Doc. 149 at 4].

An administrative expense claim may be allowed for "the actual, necessary costs and expenses of preserving the estate[.]" 11 U.S.C. § 503(b)(1)(A). The burden of proof is on claimant to establish its entitlement to an administrative expense claim. *See In re New Power Co*., 313 B.R. 496, 501 (Bankr. N.D. Ga. 2004) (Drake, J.). The administrative expense claim states that Beaulieu Canada incurred costs related to defective goods shipped on or after the Petition Date and may incur costs in the future for such goods. The administrative expense claim further states that before and after the Petition Date Beaulieu Canada paid expenses for an office in Shanghai,

China to Leinster, which were the obligation of Beaulieu, and that Beaulieu benefitted from the payments made on its behalf. [AC Ex. K at 66-67]. Without more detail in the administrative expense claim regarding the benefit to the estate, the Court concludes that the AC states a claim as to Count 27, and Count 27 will not be dismissed.

### O: Count 28: Disallowance and Expungement of Centaur Equestrian 503(b)(9) Request and Proof of Claim

The AC alleges that Centaur Equestrian filed 503(b)(9) Request No. 900080 in the amount of $2,300 and Proof of Claim No. 1380, asserting a general unsecured claim in the amount of $44,226.78 for goods sold, which includes amounts asserted in the 503(b)(9) request. [AC ¶ 391 and Ex. L]. The AC alleges that the transactions between Centaur Equestrian and Beaulieu were insider transactions, in which Beaulieu was charged above-market prices.[47] [AC ¶ 646]. Plaintiff seeks to disallow the claims to the extent they exceed the fair market price at which goods would change hands between Beaulieu and a third-party vendor in an arm's-length transaction and seeks to disallow the general unsecured claim to the extent it includes amounts allowed in the 503(b)(9) request. Defendant argues that this count is derivative of Counts 2 and 3 and should be dismissed.

As with several of the other claims, Plaintiff seeks to disallow Centaur Equestrian's claims by challenging the asserted value of the goods it delivered to Beaulieu. The Court has determined the alleged facts plausibly show that Beaulieu could have paid less if dealing with a different vendor. Therefore, the AC states a claim for disallowance based on value.

With regard to duplication of amounts claimed, there does appear to be some overlap between the proof of claim and the 503(b)(9) request. The 503(b)(9) request is based on

---

[47] The only specific transactions between Centaur Equestrian and Beaulieu alleged in the AC were purported intercompany undocumented loans that were repaid in full. [AC ¶ 297]. Other transactions—leasing a building to Beaulieu, providing printing and assembly services, and charging fees for use of a residence for company meetings—are identified as being with the Centaur Affiliates, which includes Centaur Equestrian. [AC ¶ 42, 296].

invoices numbered 567, 574, and 575. [AC Ex. L at 3]. The same invoices are listed on the attachment to the proof of claim. [AC Ex. L at 17]. Therefore, the AC states a claim for disallowance of any duplicate amounts claimed, and Count 28 will not be dismissed.

**XII: Conclusion**

For the reasons stated herein, the Motion to Dismiss is GRANTED in part and DENIED in part. It is

ORDERED that The CAMI Trust is dismissed as a defendant and all claims against The CAMI Trust are dismissed because The CAMI Trust lacks the capacity to be sued; it is further

ORDERED that Beaulieu International is dismissed as a defendant and all claims against Beaulieu International are dismissed due to lack of personal jurisdiction; it is further

ORDERED that the Motion to Dismiss the claims against the remaining Defendants is resolved as follows:

Count 1 is dismissed as to Del Land, David Marr, Michael Pollard, Karel Vercruyssen, and the CAMI Trustees in their representative capacities.

Count 2 is dismissed as to John Bryant and Beaulieu Fibres, and is dismissed against Beaulieu Canada with respect to the alleged over- and under-charges.

Count 3 is not dismissed in any part.

Count 4 is dismissed as to Renuco Recycling, the CAMI Trustees in their representative capacities, Ralph Boe, and John Bryant.

Count 5 is dismissed as to John Bryant and the CAMI Trustees in their representative capacities.

Count 6 is dismissed as to David Marr for transfers initially made to Sabuka, CEEA, or South Richmond Chemicals and dismissed as to Carl Bouckaert for transfers initially made to Pinnacle Polymers.

Count 7 is dismissed as to all Defendants except Leinster.

Count 8 is not dismissed in any part.

Count 9 is dismissed in full.

Count 10 is dismissed as to Del Land, David Marr, Michael Pollard, Karel Vercruyssen, and the CAMI Trustees in their representative capacities.

Count 11 is dismissed in full.

Count 12 is dismissed as to Del Land, David Marr, Michael Pollard, Karel Vercruyssen, and the CAMI Trustees in their representative capacities.

Count 13 is not dismissed in any part.

Count 15 is dismissed as moot.

Count 16 is not dismissed in any part.

Count 17 is not dismissed in any part.

Count 18 is dismissed as moot only to the extent it seeks disallowance of Marglen's reclamation claim.

Count 19 is dismissed in full.

Count 20 is not dismissed in any part.

Count 21 is not dismissed in any part.

Count 22 is not dismissed in any part.

Count 23 is not dismissed in any part.

Count 24 is not dismissed in any part.

Count 25 is dismissed as moot only to the extent it seeks disallowance of Beaulieu

Canada's reclamation claim.

Count 26 is dismissed in full.

Count 27 is not dismissed in any part.

Count 28 is not dismissed in any part.

**END OF ORDER**

## Distribution List

John F. Isbell
Thompson Hine LLP
Suite 1600 - Two Alliance Center
3560 Lenox Road
Atlanta, GA 30326

Dana Sichel Katz
Fox Rothschild, LLP
1225 17th Street
Suite 2200
Denver, CO 80202

Michael G. Menkowitz
Fox Rothschild, LLP
2000 Market Street
Twentieth Floor
Philadelphia, PA 19103-3222

William H. Stassen
Fox Rothschild LLP
2000 Market St., 20th Floor
Philadelphia, PA 19103

Elizabeth C. Viele
Fox Rothschild, LLP
101 Park Avenue
17th Floor
New York, NY 10178

Austin B. Alexander
Balch & Bingham LLP
Suite 700
30 Ivan Allen Jr. Blvd. N.W.
Atlanta, GA 30308

Robert G Brazier
Baker Donelson Bearman Caldwell
& Berowitz, PC
Suite 1600, Monarch Plaza
3414 Peachtree Road, NE
Atlanta, GA 30326

Warren N. Coppedge, Jr.
Coppedge, Michmerhuizen, Rayburn
Attorneys at Law
508 S. Thornton Avenue
Dalton, GA 30720

Gregory D. Ellis
Lamberth, Cifelli, Ellis & Nason, P.A.
Suite 435
6000 Lake Forrest Drive, N.W.
Atlanta, GA 30328

Michael J. Gorby
Gorby, Peters & Associates, LLC
1175 Peachtree Street, NE,10th Floor
Atlanta, GA 30361

Brooke W. Gram
Balch & Bingham LLP
Suite 700
30 Ivan Allen Jr. Blvd.
Atlanta, GA 30308-3036

Steven G. Hall
Baker Donelson
Suite 1600, Monarch Plaza
3414 Peachtree Road, NE
Atlanta, GA 30326

Edward Hine, Jr.
Edward Hine, Jr. PC
Suite 121
111 Bridgepoint Plaza
P. O. Box 5128
Rome, GA 30162

Walter E. Jones
Balch & Bingham, LLP
Suite 700
30 Ivan Allen Jr. Blvd, NW
Atlanta, GA 30308

Darryl S. Laddin
Arnall Golden Gregory LLP
Suite 2100
171 17th Street, NW
Atlanta, GA 30363

Benjamin Lee
King & Spalding LLP
1180 Peachtree St. NE
Atlanta, GA 30309

Mark S. Marani
Cohen Pollock Merlin Turner, PC
Suite 1600
3350 Riverwood Parkway
Atlanta, GA 30339

Stephen Michmerhuizen
Coppedge, Michmerhuizen, Rayburn
Attorneys at Law
508 South Thornton Avenue
Dalton, GA 30720

Mary Donne Peters
Gorby Peters & Associates, LLC
1175 Peachtree Street
10th Floor, Suite 1000
Atlanta, GA 30361

Sarah L. Primrose
King and Spalding, LLP
1180 Peachtree Street
Atlanta, GA 30309-3521

Howard D. Rothbloom
The Rothbloom Law Firm
Suite 400
309 E. Paces Ferry Road
Atlanta, GA 30305

Jennifer L. Shelfer
Arnall Golden Gregory, LLP
Suite 2100
171 17th Street, NW
Atlanta, GA 30363

Patrick Silloway
Balch & Bingham LLP
Suite 700
30 Ivan Allen Jr. Blvd., N.W.
Atlanta, GA 30308

Michael R. Smith
King & Spalding LLP
1180 Peachtree Street NE
Suite 1600
Atlanta, GA 30309

Michael Charles Sullivan
Parker Hudson Rainer & Dobbs LLP
Suite 3600
303 Peachtree Street, NE
Atlanta, GA 30308

Gregory M. Taube
Nelson Mullins Riley & Scarborough, LLP
Suite 1700
201 17th Street, NW
Atlanta, GA 30363

Bruce Z. Walker
Cohen Pollock Merlin Turner, PC
Suite 1600
3350 Riverwood Parkway
Atlanta, GA 30339-6401

Frank N. White
Arnall Golden Gregory LLP
Suite 2100
171 17th Street, NW
Atlanta, GA 30363

Lisa McVicker Wolgast
Morris, Manning & Martin, LLP
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, GA 30326